Shawn Lindsay, OSB #020695
JURISLAW, LLP
Three Centerpointe Drive, Suite 160
Lake Oswego, OR 97035
Telephone: 503.968.1475
shawn@jurislawyer.com
*Attorney for Plaintiff*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| **OREGON RIGHT TO LIFE**, <br> Plaintiff, <br> v. <br><br> **OREGON DEPARTMENT OF CONSUMER AND BUSINESS SERVICES** and **ANDREW R. STOLFI**, in his official capacities as Department of Consumer and Business Services Director and Oregon Insurance Commissioner, <br> Defendants. | Case No.: **6:23-cv-1282** <br><br> **VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**[1] |

Oregon Right to Life ("**ORTL**") complains against the Oregon Department of Consumer

and Business Services ("**DCBS**") and Andrew R. Stolfi, in his official capacities, as follows:

## Introduction

**1.** This is an as-applied, Free Exercise Clause challenge to the insurance-coverage man-

date at § 2 (the "**Mandate**") of Enrolled House Bill 3391 ("**HB 3391**"/"**Bill**"), i.e., the Reproduc-

tive Health Equity Act ("**RHEA**"),[2] codified in Oregon Revised Statutes ("**ORS**") §§ 743A.066-

---

[1] Verified complaints are evidence. *Lew v Kona Hosp.*, 754 F.2d 1420, 1423 (9th Cir. 1985). All hyperlinks functioned and were correct at the time of filing.

[2] *See*: olis.oregonlegislature.gov/liz/2017R1/Downloads/MeasureDocument/HB3391

**Page 1 – VERIFIED COMPLAINT**

067.

**2.** The 2017 Mandate requires that "health benefit plans" provide coverage for (inter alia) abortion-related and contraceptive-related services, Bill § 2(2) and (5):

(2) A health benefit plan offered in this state must provide coverage for all of the following services, drugs, devices, products and procedures: . . .
(g) Abortion. . . .
. . . .
(j) Any contraceptive drug, device or product approved by the United States Food and Drug Administration, subject to all of the following:
. . . .
(D) A health benefit plan may not infringe upon an enrollee's choice of contraceptive drug, device or product and may not require prior authorization, step therapy or other utilization control techniques for medically appropriate covered contraceptive drugs, devices or other products approved by the United States Food and Drug Administration.
. . . .
(L) As a single claim or combined with other claims for covered services provided on the same day:
(A) Patient education and counseling on contraception . . . .
(B) Services related to . . . the administration and monitoring of contraceptive drugs, devices, and products, including but not limited to:
(i) Management of side effects;
(ii) Counseling for continued adherence to a prescribed regimen;
(iii) Device insertion and removal; and
(iv) Provision of alternative contraceptive drugs, devices or products deemed medically appropriate in the judgment of the enrollee's provider.
. . . .
(5) This section does not exclude coverage for contraceptive drugs, devices or products prescribed by a provider, acting within the provider's scope of practice, for:
(a) Reasons other than contraceptive purposes, such as decreasing the risk of ovarian cancer or eliminating symptoms of menopause; or
(b) Contraception that is necessary to preserve the life or health of an enrollee.

**3.** The Mandate had a grandfathering exemption based on 2017 abortion coverage, Bill § 2(7):

(7) This section does not require a health benefit plan to cover:
. . . .

---

(Bill text); www.oregonlegislature.gov/bills_laws/lawsstatutes/2017orlaw0721.pdf (Oregon Laws).

**Page 2 – VERIFIED COMPLAINT**

(e) Abortion if the insurer offering the health benefit plan excluded coverage for abortion in all of its individual, small employer and large employer group plans during the 2017 plan year.

**4.** This grandfathering exemption was amended by 2023 HB 2002 § 12[3] to read as follows:

(7) This section does not require a health benefit plan to cover:

. . . .

(e) Abortion if the insurer offering the health benefit plan:
**(A) Has a certificate of authority to transact insurance in this state issued by the Department of Consumer and Business Services; and**
**(B)** Excluded coverage for abortion in all of its individual, small employer and large employer group plans during the 2017 plan year.

**5.** This amendment was to prevent governmental plans from using this "legacy clause":

[2023's HB 2002,] Section 12 is closing a loophole in the Reproductive Health Equity Act that was passed in 2017. So that bill requires state regulated health plans to provide abortion coverage with no cost sharing. There is a—what's called sort of like—a legacy clause that excluded certain health insurance—or one—health insurance company from being required to pay for abortions. And the way that exemption was written, it actually ended up being broader than it was intended, and so we're just closing that—closing up that language—to make it clear that it's only applying to insurance carriers, and not, for example, local and county government plans.

*Public Hearing on HB 2002 Before the H. Comm. on Behavioral Health and Health Care of the Oregon State Legislature*, 2023 Regular Session (March 20, 2023) (Testimony of Kimberly McCullough, Legislative Director, Office of the Attorney General, Oregon Department of Justice) olis.oregonlegislature.gov/liz/mediaplayer?clientID=4879615486&eventID=2023031284&startStreamAt=2198 (at 00:40:26).

**6.** The Mandate exempts objecting "religious employers" and their insurers, Bill § 2(9):

An insurer may offer to a religious employer a health benefit plan that does not include coverage for contraceptives or abortion procedures that are contrary to the religious employer's religious tenets only if the insurer notifies in writing all employees who may be enrolled in the health benefit plan of the contraceptives and procedures the employer refuses to cover for religious reasons.

---

[3] olis.oregonlegislature.gov/liz/2023R1/Downloads/MeasureDocument/HB2002.

**7.** Bill § 2(1)(d) adopts the "religious employer" definition at ORS § 743A.066, i.e.:

A "religious employer" is an employer:
(a) Whose purpose is the inculcation of religious values;
(b) That primarily employs persons who share the religious tenets of the employer;
(c) That primarily serves persons who share the religious tenets of the employer; and
(d) That is a nonprofit organization under section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code.

**8.** Though ORTL objects on religious grounds to providing insurance coverage in its health-benefit plan for (i) abortion (except to save the mother's life[4]) and (ii) "contraceptives" that act as abortifacients,[5] it doesn't fit the "religious employer" definition because (though it is nonprofit and its employees share its religious views) its purpose is prolife advocacy, not inculcating religious values, and it doesn't primarily serve persons sharing its religious tenets.

**9.** In the Ninth Circuit, California churches recently won similar free-exercise challenges to California's 2014 abortion-insurance-coverage mandate. *Foothill Church v. Watanabe*, 623 F. Supp. 3d 1079 (E.D. Cal. 2022) (summary judgment); *Foothill Church v. Watanabe*, No. 2:15-cv-02165, 2023 WL 1767748, at *5 (E.D. Cal. Feb. 3, 2023) (Order granting permanent injunction on free-exercise claim and ordering DMHC Director to process exemption for "abortion care coverage comporting with their religious beliefs").[6]

**10.** ORTL seeks to be treated as the Mandate treats "religious employers."

---

[4] This exception to ORTL's abortion opposition applies to discussions herein of ORTL's abortion position (and of those controlling ORTL), unless context indicates otherwise.

[5] ORTL's opposition to abortion herein includes opposition to any abortifacients, sometimes mislabeled as "contraceptives."

[6] This followed remand for consideration in light of *Fulton v. City of Philadelphia*, 141 S.Ct. 1868 (2021). *Foothill Church v. Watanabe*, 3 F.4th 1201 (9th Cir. 2021). *See also Skyline Wesleyan Church v. CDMHC*, 968 F.3d 738 (9th Cir. 2020) (free-exercise challenge held justiciable); Order Granting Joint Motion and Entering Judgment, *Skyline*, Doc. 141, No. 3:16-cv-00501 (S.D. Cal. May 11, 2023) (agreed permanent injunction for Skyline and ordered relief).

**Page 4 – VERIFIED COMPLAINT**

## Jurisdiction and Venue

**11.** This case is brought under the First and Fourteenth Amendments and 42 U.S.C. § 1983, so this Court has federal-question jurisdiction, 28 U.S.C. §§ 1331 and 1343, and may provide declaratory and injunctive relief, 28 U.S.C. §§ 2201 and 2202; Fed. R. Civ. P. 57 and 65.

**12.** Venue is proper in this Court under 28 U.S.C. § 1391(b) because Plaintiff and Defendants reside in this district and a substantial part of the events at issue occurred in this district.

**13.** The Eugene Division is proper under LR 3-2 because Plaintiffs and Defendants are located in Marion County and events at issue substantially occurred in this division.

## Parties

**14.** Plaintiff ORTL is an Oregon non-stock corporation with its principal place of business in Keizer, Oregon. ORTL is organized and operates as a nonprofit membership organization that is exempt from federal income taxes under § 501(c)(4) of the U.S. Internal Revenue Code. ORTL was formed in 1970 to proclaim and advocate for the inherent dignity of human life and to promote respect and protection for human life regardless of race, sex, age, or stage of development. ORTL has over 25,000 members and supporters in Oregon, including in Marion County.

**15.** Defendant DCBS—created by ORS § 705.105(1)—administers and enforces the Insurance Code. *See, e.g.*, ORS § 731.988; Bill § 3. Bill § 1 adds the Mandate to the Insurance Code. Civil penalties are provided for violating "any provision of the Insurance Code . . . ." ORS § 731.988.

**16.** Defendant Andrew R. Stolfi, DCBS Director and Oregon Insurance Commissioner, *see* www.oregon.gov/dcbs/news-info/Pages/about-us.aspx, is sued in those official capacities. DCBS is "under the supervision and control of a director," ORS § 705.105(2), and "[w]ith re-

**Page 5 – VERIFIED COMPLAINT**

spect to the duties, functions and powers imposed upon the director under the insurance laws, the director may be designated by the title of Insurance Commissioner or may appoint a person . . . under the supervision and control of the director . . . ," ORS § 704.105(5).

## Standing & Ripeness

**17.** ORTL has standing because it has suffered an injury in fact, fairly traceable to the Mandate, and requested relief will redress its injury. *See Skyline*, 968 F.3d at 746 (standing elements). *Skyline* held that Skyline had standing to challenge California's abortion-insurance mandate though it regulated "plans" and none sought exemption in accord with Skyline's beliefs. *Id.* at 746-751. Under *Skyline*, ORTL has injury since the Mandate requires coverage for things violating ORTL's religious beliefs, ORTL's injury is a direct result of the Mandate, and requested relief will provide redress. *Id.*

**18.** ORTL's challenge is ripe under *Skyline*. *Id.* at 747 ("We see no distinction between injury in fact and constitutional ripeness . . . and . . . proceed . . . under the same 'rubric' to determine whether both requirements are satisfied." (citation omitted)); *id.* at 748 (case ripe); *id.* at 751-53 (finding prudential ripeness). *Cf. Patsy v. Bd. Regents*, 457 U.S. 496, 516 (1982) (exhaustion of administrative remedies not required under 42 U.S.C. § 1983).

## Facts

### *ORTL's Organizational Nature*

**19.** ORTL is a prolife-issue-advocacy, nonprofit, Oregon corporation. *See supra* Parties.

**20.** A Board of Directors controls ORTL. Its Executive Director manages daily operations.

**21.** ORTL is a membership organization. Members join due to agreement with ORTL's

**Page 6 – VERIFIED COMPLAINT**

prolife principles and provide at least modest financial support. *See, e.g.*, www.ortl.org/get-involved/become-a-member. Members select two at-large Board members with voting rights.

**22.** ORTL's website is at www.ortl.org, where information about it is publicly available.

**23.** Related to ORTL are a PAC and a § 501(c)(3) Education Foundation, www.ortl.org/what-is-oregon-right-to-life/#1445930230395-d0e4383f-9e8a, which founded StandUpGirl.com, a popular prolife, online resource for girls in unplanned pregnancies.

**24.** ORTL is an affiliate of National Right to Life Committee ("**NRLC**"), America's oldest and largest national prolife organization. NRLC information is at www.nrlc.org.

**25.** Current full-time ORTL personnel are Executive Director, Office Manager, Administrative Assistant, Community Outreach Director, Community Outreach Specialist, Political Director, Communications Manager, Events and Social Media Coordinator, Development Specialist, and Data Management Specialist.

***ORTL's Mission and Policy Positions***

**26.** ORTL's directors, officers, board members, and employees must subscribe to ORTL's mission, beliefs, and policy positions, and members join because of agreement with those.

**27.** ORTL's mission is to advocate for the most vulnerable human beings whose right to life is denied or abridged under current law. It works to reestablish protection for all innocent human life from conception to natural death. *See* www.ortl.org/what-is-oregon-right-to-life/.

**28.** ORTL operates under its stated policy positions. *See* www.ortl.org/positions/.

**29.** ORTL believes individual human life begins at conception, i.e., at fertilization (not implantation or any other time after fertilization). *See* www.ortl.org/positions/ (Position Statement on Contraceptives: "Once the sperm and egg have united, . . . a new human life begins.")

**Page 7 – VERIFIED COMPLAINT**

**30.** "[ORTL] believes in the sanctity of all human life from the moment of conception to natural death," www.ortl.org/positions/ (Position Statement on Abortion), and that:

> Abortion ends the life of a genetically distinct, growing human being. [ORTL] oppose[s] abortion at any point of gestation. In rare cases, a mother may have a life threatening condition in which medical procedures intended to treat the condition of the mother may result in the unintended death of her preborn baby. At the same time, ORTL recognizes that modern medical practice . . . increase[s] the ability to save both the life of the mother and the baby.

*Id.* Accordingly. ORTL opposes abortion except where the mother's life is in imminent danger.

**31.** "[ORTL] takes no position on . . . birth control method[s] . . . prohibit[ing] the sperm and egg from uniting. Once the[y] . . . have united, . . . a new human life begins and ORTL opposes any drug, device, or procedure which destroys the new human life. ORTL supports full disclosure of information . . . to women considering contraceptives," www.ortl.org/positions/ (Position Statement on Contraceptives), including whether a particular "contraceptive" can act as an abortifacient (i.e., destroying individual human life in utero after fertilization). *Id.*

**32.** ORTL believes, as did plaintiffs in *Burwell v. Hobby Lobby Stores*, 573 U.S. 682 (2014), that four types of "contraception" that could act after fertilization are abortifacients, *id.* at 701-02. "These include two forms of emergency contraception commonly called 'morning after' pills and two types of intrauterine devices." *Id.* The *Hobby Lobby* Brief for Respondents[7] provides specific detail, quoting a lower court: "'Four of the twenty approved methods—two types of intrauterine devices (IUDs) and the emergency contraceptives commonly known as Plan B and Ella—can function by preventing the implantation of a fertilized egg.'" *Id.* at 4-5 (citation omitted). "[T]he government concedes that the drugs and devices at issue can prevent uterine implantation of an embryo." *Id.* at 5 n.2. Specifically, the government conceded that "Plan B (levonor-

---

[7] *Available at* https://becketpdf.s3.amazonaws.com/13-354-bs.pdf.

**Page 8 – VERIFIED COMPLAINT**

gestrel), Ella (ulipristal acetate) and copper IUDs like ParaGard may act by 'preventing implanta-tion (of a fertilized egg in the uterus)' [and that] IUDs with progestin 'alter[] the endometrium.'" *Id.* (citations omitted). ORTL does not want to be compelled by the Mandate to include these four abortifacients in its sponsored health-benefit plan. Concerning these, ORTL believes like the *Hobby Lobby* objectors that "'it is immoral and sinful for [them] to intentionally participate in, pay for, facilitate, or otherwise support these drugs.'" 573 U.S. at 702 (citation omitted). Under *Hobby Lobby*, those objectors were not required to cover them in employee health insurance. *See id*. at 690-692.

**33.** "ORTL opposes any techniques of human conception occurring outside of the mater-nal body which lead to the destruction of human life, whether for family growth or experimenta-tion." www.ortl.org/positions/ (Position Statement on Assisted Reproductive Technology).

**34.** ORTL's belief in "the sanctity of human life from the moment of conception until natural death," www.ortl.org/positions/ (Position Statement on Euthanasia), arises from Judeo-Christian religious beliefs—traditionally incorporated into Western Civilization's respect for human life—to which ORTL and those who control it subscribe. Those include the Bible's com-mand against the intentional destruction of innocent human life, making the taking of innocent human life a grave sin. These beliefs include the inviolable, inherent, ultimate worth of each hu-man life, which requires respect for and protection of innocent human life by opposing abortion and abortifacient "contraceptives." And these beliefs include the consequent belief that it is a grave religious and moral wrong to deliberately cooperate, facilitate, or otherwise participate in some meaningful way in the provision of abortion or abortifacient "contraceptives," which belief precludes ORTL from providing insurance coverage for those without violating conscience.

**35.** ORTL's beliefs about the sanctity of human life motivate its actions and are held by

**Page 9 – VERIFIED COMPLAINT**

its board members, officers, employees, and members, all of whom would be displeased if ORTL violated those beliefs and would likely disassociate from ORTL were it to do so.

36. As a prolife advocate, ORTL seeks to have all that it says and does be consistent with its beliefs and prolife message. This applies to employee health insurance coverage. ORTL believes funding insurance coverage for abortion communicates a message contrary to its prolife message.

*ORTL's Provision of Health Insurance*

37. ORTL's religious beliefs include a duty of care for and just compensation to its employees, based on which it provides them a health-benefit plan. But ORTL believes it should not provide coverage contrary to its beliefs, shared by its directors, officers, employees, and members.

38. ORTL also believes it should provide employee health insurance to obtain and retain excellent employees to further its mission, so forcing ORTL to forgo such insurance would put it at a competitive disadvantage and hamper its mission. And the employees ORTL wants want health-insurance coverage, but without the coverage to which ORTL and they object.

39. Eight ORTL personnel are currently covered under ORTL's health-benefit plan.

40. Before the Mandate, ORTL provided a plan through Providence Health Plans ("**PHP**"), which it had provided since 2015, that excluded abortion coverage.

41. The Mandate has an *abortion* grandfathering exemption: "(7) This section does not require a health benefit plan to cover: . . . (e) Abortion if the insurer offering the health benefit plan excluded coverage for abortion in all of its individual, small employer and large employer group plans during the 2017 plan year." Bill § 2(7). PHP is the only known entity that fits that exemption. That exemption doesn't address *contraceptive* coverage.

**Page 10 – VERIFIED COMPLAINT**

**42.** ORTL's present PHP plan excludes abortion coverage "unless there is a severe theat to the mother, or if the life of the fetus cannot be sustained," PHP, *2022 Oregon Member Handbook: Choice* 61 (2022), but doesn't exclude abortifacient "contraceptives," *id.* at 24.

**43.** ORTL wants to provide an employee health-benefit plan without Mandate-imposed objectionable coverage. ORTL wants a plan covering abortion only in case of imminent danger to the mother's life and not covering abortifacient "contraceptives." The Mandate bars this.

**44.** PHP is not suitable because it covers abortifacient "contraceptives" and abortion beyond imminent danger to the mother's life. PHP also is not suitable because Oregon Health & Science University ("**OHSU**") is not in-network. OHSU is a premier health care facility that ORTL wants its employees to be able to access in-plan and that ORTL's employees want to access in-plan. PHP also is not suitable because in the past rate hikes have outpaced other plans and could do so again leaving ORTL without an economically desirable option.

**45.** Other options, e.g., faith-based medical-cost-sharing groups and direct primary-care alternatives, are unsuitable as ORTL and its employees want a traditional health-benefit plan.

**46.** ORTL has not sought a "religious employer" exemption under Bill § 2(9) because doing so would be futile since the narrow "religious employer" definition excludes ORTL.

**47.** ORTL has not sought an exemption under a good-cause exemption mechanism as in *Fulton*, 141 S.Ct. at 1877-78, and *Foothill*, 623 F. Supp. 3d at 1093, since Oregon lacks such a general exemption authority, making any such ORTL exemption request futile.

**48.** ORTL *did* seek an exemption under Bill § 2(10), authorizing exemptions if the Mandate might "adversely affect the allocation of federal funds." ORTL did so under the Weldon Amendment (a federal-funds conscience provision), based on now-defunct Trump administration interpretations of its provisions. The exemption wasn't granted, but DCBS thus became fully

**Page 11 – VERIFIED COMPLAINT**

aware of ORTL's conscience objections to the Mandate and offered ORTL no options.

49. ORTL wants relief like that for "religious employers": authorization for *insurers to offer* and *employers to obtain* health-benefit plans compatible with religious beliefs. Bill § 2(9).

*The Legislature's Awareness of ORTL's and Others' Legal Objections*

50. HB 3391 legislative history is available at olis.oregonlegislature.gov/liz/2017R1/Measures/Overview/HB3391. As evidenced there, ORTL lobbied against the Bill, testifying against it before two committees and asking for an exemption in the final legislation since ORTL and others were not protected by any existing exemption, so the legislature *knew* of ORTL's objections, burden, and lack of exemption. *See, e.g.*, olis.oregonlegislature.gov/liz/2017R1/Downloads/CommitteeMeetingDocument/108284 (Colm Willis for ORTL on Witness Registration for 3/15/2017 hearing); olis.oregonlegislature.gov/liz/2017R1/Downloads/CommitteeMeetingDocument/136756 (same for 6/28/2017 hearing). Oregon Family Council submitted written testimony with a legal-counsel letter attached explaining the Bill's free-exercise flaws that made the Bill vulnerable to a First Amendment challenge. *See* olis.oregonlegislature.gov/liz/2017R1/Downloads/CommitteeMeetingDocument/107838. PHP submitted a letter stating that "Providence is a faith-based, not-for-profit health system that proudly serves as Oregon's largest health care provider, largest health plan, and the largest private employer," Letter from Michael L. Cotton, Chief Executive Officer, Providence Health Plans, to Hon. Mitch Greenlick, Chair, House Committee on Health Care at 1 (Mar. 15, 2017), olis.oregonlegislature.gov/liz/2017R1/Downloads/CommitteeMeetingDocument/107514 ("**PHP Letter**"), explaining why the conscience-clause provision at Bill § 2(10) did not protect it, *id.* at 2-3, and asked the committee to address PHP's conscience-protection need and "provide a conscience clause for religious-sponsored insurers," *id.* at 3. Though aware of the lack of general conscience protection, the legislature, instead of

**Page 12 – VERIFIED COMPLAINT**

offering broadly applicable conscience protection, employed the grandfathering provision at Bill § 2(7)(e) that protected PHP based solely on excluding abortion coverage in 2017.

**51.** Video of Bill testimony details Bill opponents' arguments and need for protection. The PHP CEO testified based on the PHP Letter, explaining that PHP needed a clear conscience exemption. *Public Hearing on HB 3391 Before the H. Comm. on Health Care of the Or. State Leg.*, 2017 Regular Session (March 15, 2017) (Testimony of Michael Cotton, Chief Executive Officer, Providence Health Plans), invintus-client-media.s3.wasabisys.com/4879615486/oregon_f9ea023c-9fcb-4e89-8ede-062410b792aa.mp4 (at 01:56:03) ("**March 15, 2017 Hearing**"). Jessica Adamson, Director, Government Relations, Providence Health and Services, reiterated the need for PHP to be protected as an *insurer* providing health benefit plans, though she clarified that as a major *employer*, Providence had a self-funded plan and so was not subject to the Mandate. March 15, 2017 Hearing at 00:19:52; 00:32:17. Colm Willis, testifying for ORTL, explained that the Bill didn't protect ORTL though it violated ORTL's deeply held beliefs. March 15, 2017 Hearing at 00:23:05. Teresa Harke, representing Oregon Family Council, testified that the "religious employer" exemption didn't protect the free-exercise rights of many Oregonians and was subject to litigation for violating religious liberty rights. March 15, 2017 Hearing at 00:25:21.

***ORTL's Specific Objections to the Mandate Summarized***

**52.** ORTL objects on religious grounds to providing coverage for abortion and related services in its health-benefit plan. By "abortion" ORTL means:

The use or prescription of any instrument or device or of an abortifacient to intentionally:

(A)    kill, or attempt to kill, the unborn child of a woman known to be pregnant; or

**Page 13 – VERIFIED COMPLAINT**

(B)    terminate, or attempt to terminate, the pregnancy of a woman known to be pregnant, with

an intention other than:

(i)    to produce a live birth and preserve the life and health of the child if born alive; or

(ii)    to remove a dead unborn child or an ectopic pregnancy;

(C)    except where the physician performing the abortion has determined, based on reasonable

medical judgment, that the abortion is necessary to prevent the death of the pregnant

woman, but not if that determination is based on a claim or a diagnosis that the pregnant

woman will engage in conduct that would result in her death.

**53.** On the same grounds, as part of its objection to abortion, ORTL objects to covering

"contraceptives" that can act as abortifacients, i.e., (a) Plan B (levonorgestrel), (b) Ella (ulipristal

acetate), (c) copper IUDs (like ParaGard), and (d) IUDs with progestin—or any comparable "con-

traceptives" of the same type and chemical makeup that can also act as abortifacients.

*Irreparable Harm and No Adequate Remedy at Law*

**54.** ORTL is presently suffering irreparable harm to its constitutional rights due to the

Mandate, *Elrod v. Burns*, 427 U.S. 347, 373 (1976), and has no adequate remedy at law.

**Count I**
**The Mandate violates ORTL's free-exercise rights as applied.**

**55.** Plaintiff realleges and incorporates by reference all allegations in all preceding para-

graphs.

**56.** The Mandate violates ORTL's Free Exercise Clause rights. U.S. Const. Amend. I.

*ORTL's Sincerely Held Religious Beliefs*

**57.** ORTL's sincerely held religious belief is that covering abortion and abortifacient

"contraceptives" in its health-benefit plan involves forbidden abortion complicity. *Supra* Facts.

**Page 14 – VERIFIED COMPLAINT**

**58.** ORTL's *abortion* belief is like the churches' who got declaratory and injunctive relief under the Free Exercise Clause in *Foothill*, 623 F. Supp. 3d 1079, and *Skyline*, 968 F.3d 738.

**59.** ORTL's *abortifacient* belief is like that of the plaintiffs in *Hobby Lobby*, who were protected from coverage under the federal Religious Freedom Restoration Act ("**RFRA**"). 573 U.S. at 720, 724.

**60.** *Fulton* reasserted that it is not for government to gainsay such religious beliefs:

> [T]he City's actions have burdened CSS's religious exercise by putting it to the choice of curtailing its mission or approving relationships inconsistent with its beliefs. . . . In [defendant's] view, certification reflects only that foster parents satisfy the statutory criteria, not that the agency endorses their relationships. But CSS believes that certification is tantamount to endorsement. And "religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection."

141 S.Ct. at 1876 (citation omitted). So ORTL's religious beliefs must be accepted as stated.

### *The Mandate's Substantial Free-Exercise Burden*

**61.** Compelling prolife ORTL to violate its religious belief or not provide a health-benefit plan is a substantial burden on its free-exercise right, just as the similar mandates at issue in the *Foothill*, *Skyline*, and *Hobby Lobby* cases were substantial burdens. *See, e.g.*, *Hobby Lobby*, 573 U.S. at 691 ("[W]e must decide whether the challenged HHS regulations [imposing abortifacient insurance coverage] substantially burden the exercise of religion, and we hold that they do.").

### *Free-Exercise Analysis Post-***Smith**

**62.** *Employment Division v. Smith*, 494 U.S. 872 (1990),[8] held that a "valid and neutral law of general applicability . . . that . . . proscribes (or prescribes) conduct that [one's] religion

---

[8] If needed, ORTL seeks *Smith*'s overruling in the U.S. Supreme Court. *See Agostini v. Felton*, 521 U.S. 203, 237 (1997). Pre-*Smith*, strict scrutiny applied to neutral and generally applicable laws. *See Smith*, 494 U.S. at 894 (O'Connor, J., joined by Brennan, Marshall, and Blackmun, JJ., concurring in judgment based on strict-scrutiny analysis) (collecting cases).

**Page 15 – VERIFIED COMPLAINT**

prescribes (or proscribes)" is subject to rational-basis review, 494 U.S. at 879 (citation omitted).

Laws that are non-neutral, not generally applicable ("**non-general**"), or both, *do* get strict scrutiny. *Id.* at 886 n.3. *Accord Stormans v. Wiesman*, 794 F.3d 1064, 1076 (9th Cir. 2015).

**63.** *Fulton* applied *Smith* to strike a requirement that a religious, state-licensed, foster-care agency certify same-sex couples as foster parents against belief. 141 S.Ct. at 1882. Despite non-neutrality evidence, it was "more straightforward" to use a non-generality analysis. *Id.* at 1877.

### *Determining Whether a Provision is Not "Generally Applicable"*

**64.** A law is a "general law," *Smith*, 494 U.S. at 879, or of "general applicability," *id.*, if it applies "across-the-board," *id.* at 884, to all to whom asserted interests apply, as in *Smith*, where the controlled-substances ban applied to all without exception. A law is not "generally applicable" if it is *underinclusive* in relation to those to whom "the government's asserted interest" applies. *Fulton*, 141 S.Ct. at 1877; *accord Church of the Lukumi Babalu Aye v. Hialeah*, 508 U.S. 520, 543 (1993) ("ordinances are underinclusive for those ends."); *id.* ("underinclusiveness is substantial"); *id.* at 544 ("underinclusive with regard to . . . interest"); *id.* at 545 ("underinclusive . . . with regard to [interest]"); *id.* ("underinclusive on its face"); *id.* at 546 ("ordinances are overbroad or underinclusive in substantial respects.").

**65.** Underinclusiveness *also* can establish that: (**i**) an asserted interest can't be taken seriously, *see Rep. Party Minn. v. White*, 536 U.S. 765, 766 (2002) ("as a means of pursuing this interest, . . . clause is so woefully underinclusive that the Court does not believe it was adopted for that purpose." (citation omitted)); *First Nat'l Bank v. Bellotti*, 435 U.S. 765, 793 (1978) (underinclusiveness "undermines the likelihood of a genuine state interest"); (**ii**) an asserted interest isn't "compelling," *Lukumi*, 508 U.S. at 546-47; or (**iii**) a provision is not narrowly tai-

**Page 16 – VERIFIED COMPLAINT**

lored, *id.* at 546; *S. Bay United Pentecostal Church v. Newsom*, 141 S.Ct. 716, 718 (2021) (statement of Gorsuch, J., joined in relevant part by four other Justices) (citing *Bellotti*, 435 U.S. at 793) (underinclusivity is a "telltale sign[] th[e] Court has long used to identify laws that fail strict scrutiny.").

66. *Fulton* provided two non-exclusive analyses that can establish free-exercise non-generality (*see next*). 141 S.Ct. at 1877. These are necessarily *non-exclusive* because the *test* is "general applicability" alone, *Smith*, 494 U.S. at 879, and a *key* to that is inclusiveness relative to asserted interests.

67. *Fulton* cited *Smith* for one non-generality analysis, herein the "**particular-reason analysis**": "A law is not generally applicable if it 'invite[s]' the government to consider the particular reasons for a person's conduct by providing '"a mechanism for individualized exemptions."' 141 S.Ct. at 1877 (quoting *Smith*, 494 U.S. at 884). So laws with individual-exemption mechanisms are non-general, as in *Fulton*, 141 S.Ct. at 1878, and *Foothill*, 623 F. Supp. 3d at 1092-93 ("A law is not generally applicable if it invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions." (cleaned up)). But *Fulton* emphasized what lies *behind* such a mechanism, i.e., "government . . . consider[ing] . . . particular reasons" when exempting. This reading was confirmed when *Fulton* rejected the argument that the mechanism was "irrelevant because the Commissioner ha[d] never granted one," 141 S.Ct. at 1872, but the Court said the issue was whether the government was invited "'to decide which reasons for not complying with the policy are worthy of solicitude.'" *Id.* (quoting *Smith*, 494 U.S. at 884). So if particular reasons are, or can be, considered for granting exemptions, a law is non-general.

68. Also, *Fulton* decided that if *part* of a law has such a particular-reason mechanism,

**Page 17 – VERIFIED COMPLAINT**

though another doesn't, they must be read together and the *whole* is non-general. 142 S.Ct. at 1879. *Cf. id.* at 1928-29 (Gorsuch, J., joined by Thomas and Alito, JJ., concurring in judgment) (Majority position is that "the City's power to grant exemptions from its nondiscrimination policy *anywhere* 'undercuts its asserted interests' and thus 'trigger[s] strict scrutiny for applying the policy *everywhere*.'" (emphasis in original; citation omitted).

**69.** *Fulton* said, "A law also lacks general applicability if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Fulton*, 141 S.Ct. at 1877 (citation omitted) ("**comparable-exemption analysis**"). This example was from *Lukumi*, 508 U.S. 520, where a law was non-general for barring animal sacrifice based on a public-health interest concerning animal carcass disposal that logically applied to exempted hunters and restaurants. *Fulton*, 141 S.Ct. at 1877 (citation omitted). *See also Rom. Cath. Diocese Brooklyn v. Cuomo*, 141 S.Ct. 63, 66 (2020) (pandemic-based law non-general for restricting worship sites to ten persons while not restricting "many whose services are not limited to those . . . regarded as essential"); *Tandon v. Newsom*, 141 S.Ct. 1294, 1296, 1298 (2021) (pandemic restrictions "contain[ing] myriad exceptions . . . for . . . activities" "comparable" to restricted religious exercise "not . . . generally applicable"); *In re S. Bay United Pentecostal Church*, 992 F.3d 945, 948 (9th Cir. 2021). The comparable-exemption analysis can't logically be restricted to *secular* exemptions (at issue in these cases) because comparable *religious* exemptions make laws not "generally applicable," *Smith*, 494 U.S. at 879, in relation to asserted interests. *See Tandon*, 141 S.Ct. at 1298 ("contains myriad exceptions and accommodations for *comparable activities*" (emphasis added)).

**70.** These two *Fulton* analyses are necessarily *non-exclusive* because the sole overarching *test* is whether a law is "general," *Smith*, 494 U.S. at 874, 879, "generally applicable," *id.* at 879-

**Page 18 – VERIFIED COMPLAINT**

80, "across-the-board," *id.* at 884, or "uniform," *Hobbie v. Unemployment Appeals Comm'n of Florida*, 480 U.S. 136, 141 (1987) ("neutral and uniform"); *Wisconsin v. Yoder*, 406 U.S. 205, 220 (1972) ("applies uniformly to all citizens of the State"). *Fulton*'s particular-reason and comparable-exemption analyses are merely two ways to satisfy the overarching generality test. So the actual test is general applicability itself, determined by inclusion relative to interests.

***The Mandate Is Not Neutral***

71. The Mandate must be neutral *and* generally applicable to avoid strict scrutiny. Regarding neutrality, the Mandate isn't neutral. Its purpose was to force abortion and contraception insurance coverage on entities that didn't provide coverage, so it necessarily targeted those who objected to such coverage for religious and moral reasons, as evidenced by the fact that the legislature was aware that entities like ORTL objected and weren't protected by the "religious employer" exemption. *Supra* Facts. *Cf. Stormans*, 136 S.Ct. at 2435-37 & n.3 (Alito, J., joined by Roberts, C.J., and Thomas, J., dissenting from cert. denial) (questioning Ninth Circuit's finding that Christian pharmacists weren't targeted after district court found that they were as a factual matter). Thus, requiring groups like ORTL to provide mandated coverage was an actual object of the Mandate.

72. The Mandate was patterned after an August 2014 California abortion-insurance mandate that was established by enforcement-instruction letters from California's DMHC. *Compare Foothill*, 623 F. Supp. 3d at 1082-83 (describing mandated abortion coverage); *id.* at 1085-87 (same); *id.* at 1989 (same), *with* Mandate; *compare also* 623 F. Supp. 3d at 1085 n.5 (California's "religious employer" definition), *with* Mandate Bill § 2(1)(d) (adopting definition near-verbatim to California's). California's abortion-coverage mandate arose in response to lobbying of California's DMHC by "advocacy organizations opposed to the elimination of coverage for abor-

tion," 623 F. Supp. 3d at 1089, after "two Catholic universities announc[ed] they would be 'eliminating abortion coverage from their employee health plans,'" *id.* (citation omitted).

73. Oregon's similar Bill, which had its first reading in the house on March 9, 2017, olis.oregonlegislature.gov/liz/2017R1/Measures/Overview/HB3391, similarly imposed abortion coverage on all health benefit plans except for similarly defined "religious employers" (initially) and had like advocates, olis.oregonlegislature.gov/liz/2017R1/Measures/Analysis/HB3391 (listing "Courtney Graham and Andrea Salinas fact sheet" submitted on March 15, 2017, for "NARAL Pro-Choice Oregon, American Civil Liberties Union of Oregon, Family Forward Oregon, et al."); olis.oregonlegislature.gov/liz/2017R1/Downloads/CommitteeMeetingDocument/107499 (text of advocacy fact sheet).

74. Moreover, PHP and ORTL *both* testified at legislative hearings that they needed a conscience exemption, *supra* Facts, but only PHP was exempted (by the grandfathering exemption), which indicates hostility against ORTL and favoritism toward PHP.

75. Furthermore, the "religious employers" definition is overly narrow, *see supra* Introduction, so that entities seeking a free-exercise exemption essentially have to be churches to qualify. That narrow definition and the PHP exemption indicate the legislature's decision to pick and choose among religious organizations, favoring some and evidencing hostility to others. *Cf. Spencer v. World Vision, Inc.*, 633 F.3d 723, 728–29 (9th Cir. 2011) (O'Scannlain, Cir. J., concurring) (if statute "requires an organization to be a 'church' to qualify for [an] exemption," it "discriminate[s] against religious institutions," "rais[ing] the specter of constitutionally impermissible discrimination between institutions on the basis of the 'pervasiveness or intensity' of their religious beliefs" (citations omitted)); *Colo. Christian Univ. v. Weaver*, 534 F.3d 1245, 1259 (10th Cir. 2008) (it is no more constitutionally acceptable for state to discriminate between

**Page 20 – VERIFIED COMPLAINT**

"*types* of [religious] institution" than to discriminate between denominations (emphasis added)).

**76.** That anti-religious hostility is even evident in the "religious employers" definition, which only says insurers "may" offer conscience-conforming plans, Bill § 2(9), without requiring insurers to offer such plans, leaving religious employers at insurers' mercy. And that hostility is evident in the formal federal-funds-exemption mechanism, which allows a conscience exemption "only to the minimum extent necessary to ensure the continued receipt of federal funds." Bill § 2(10).

**77.** So the Mandate is the result of, and itself evidences, non-neutrality to religious free exercise. That requires strict scrutiny.

### *The Mandate Is Not Generally Applicable*

**78.** Regarding generality, "resolv[ing] this case under the rubric of general applicability" is "straightforward." *Fulton*, 141 S. Ct. at 1877. The Mandate is underinclusive for not applying to *all* to whom the asserted interest logically applies, including by grandfathering PHP and having a formal individual-exemption mechanism, on which basis *Fulton* found non-generality.

**79.** The interest is asserted in the name "Reproductive Health Equity Act," i.e., an equal-outcome interest, *see, e.g.*, Milken Inst. Sch. Pub. Health, *Equity vs. Equality: What's the Difference?*, onlinepublichealth.gwu.edu/resources/equity-vs-equality/, in providing financial coverage for "reproductive health" services for all. RHEA's requirements confirm that cover-all interest by mandating health-benefit plans to cover "reproductive health," Bill § 2, and funding the same coverage for some, Bill §§ 4-5, 11. That cover-all interest is confirmed by officials: "House Bill (HB) 3391 ensures that Oregonians have access to comprehensive reproductive health care regardless of their income, citizenship or immigration status, gender identity, or insurance coverage," since "everyone deserves access to" such care. Ore. Health Auth., *House Bill 3391: Repro-*

**Page 21 – VERIFIED COMPLAINT**

*ductive Health Equity Act: Report to the Legislature* 1 (2018).[9] Gov. Brown confirmed the purpose to "'expand[] access to basic reproductive health services for all Oregonians . . . .'" *Id.*

80. The "generally applicable" analysis, *Smith*, 494 U.S. at 879, next asks whether the Mandate is underinclusive in relation to that cover-all interest. It is, in at least four ways.

81. First, the Mandate is underinclusive due to the grandfathering exemption, Bill § 2(7)(e), which excludes covering "[a]bortion if the insurer offering the health benefit plan excluded coverage for abortion in all of its individual, small employer and large employer group plans during the 2017 plan year." Under *Smith*'s overarching "generally applicable" test, 494 U.S. at 880, this exemption makes the Mandate non-general because the cover-all interest logically applies to all health-benefit plans. Under *Fulton*'s comparable-exemption analysis, 141 S.Ct. at 1877, the Mandate is non-general because this exemption excludes abortion coverage on the secular ground of 2017 plan coverage while not exempting ORTL on religious grounds. And if, despite that secular language, the legislature created this exemption for the particular reasons stated in the PHP Letter—such as Providence being faith-based and "Oregon's largest health care provider, largest health plan, and the largest private employer," PHP Letter at 1—that makes the exemption non-general under particular-reason analysis. That PHP is the "largest" in multiple ways makes the Mandate *substantially* underinclusive.

82. Second, the Mandate is underinclusive for exempting "religious employers" from abortion and contraceptive coverage. Bill § 2(9). Though that is an appropriate accommodation under establishment-clause analysis, the present context is the free-exercise "generally applicable" test, and *Smith*'s free-exercise analysis asks *solely* whether a law is "generally applicable" to

---

[9] Available at
www.oregon.gov/oha/PH/HEALTHYPEOPLEFAMILIES/REPRODUCTIVESEXUALHEALTH/Documents/RHEA/HB3391-Leg-Report.pdf.

all to whom an interest logically extends, 494 U.S. at 879, not *how* non-generality occurs. *See Tandon*, 141 S.Ct. at 1298 (per curiam) (strict scrutiny applies because provision "contains myriad exceptions and accommodations for comparable activities"). Though the exemptions *Fulton* cited from *Lukumi* were *secular*, 141 S.Ct. at 1877, the cover-all interest logically extends to all plans covering all entities, so this exemption makes the Mandate non-general. Moreover, in administering this exemption, Defendants must consider particular reasons, i.e., whether "religious employers" (a) have the right purpose, (b) primarily employ like-values persons, (c) primarily serve like-values persons, and (d) are nonprofit. Bill § 2(1)(d) (incorporating ORS § 743A.066). That makes the Mandate non-general under *Fulton*'s particular-reason analysis, 141 S.Ct. at 1877.

**83.** Third, the Mandate is underinclusive because it has a *formal* mechanism for individualized exemptions to avoid loss of federal funding, but only as far as necessary:

> If [DCBS] concludes that enforcement of this section may adversely affect the allocation of federal funds to this state, the department may grant an exemption to the requirements but only to the minimum extent necessary to ensure the continued receipt of federal funds.

Bill § 2(10). That mechanism alone makes the Mandate not "generally applicable" under *Smith*. 494 U.S. at 880, 884-85. And under *Fulton*, it doesn't matter whether exemptions are *granted*. 141 S.Ct. at 1872. Under *Fulton*'s particular-reason analysis, *id.* at 1877, this formal mechanism allows Defendants to consider particular reasons why exemptions are sought—as in ORTL's exemption request, *supra* Facts—and balance reasons to grant as little conscience protection as necessary to save federal funding, so it is readily non-general under that analysis. Since *Fulton* held that if *part* of a law has such a particular-reason mechanism it makes the *whole* non-general, *id.* at 1879; *id.* at 1928-29 (Gorsuch, J., joined by Thomas and Alito, JJ, concurring in judgment),

**Page 23 – VERIFIED COMPLAINT**

this formal mechanism for individualized exemptions makes the Mandate as a whole non-general. The Mandate is also non-general under *Fulton*'s comparable-exemption analysis because it authorizes an exemption for a *secular* reason, i.e., assuring federal funds, while not exempting ORTL for a *religious* reason, i.e., in seeking an exemption under this mechanism, *supra* Facts, ORTL argued that it objected because it believes that abortion is a grave moral wrong and religiously forbidden under the traditional Judeo-Christian beliefs that motivate the actions of ORTL, its board members, and employees.[10]

**84.** Fourth, the Mandate is underinclusive because it excludes certain types of health plans. For example Bill § 2(1)(c) defines "health benefit plan" to exclude certain plans:

> (c) "Health benefit plan" has the meaning given that term in ORS 743B.005, excluding Medicare Advantage Plans and including health benefit plans offering pharmacy benefits administered by a third party administrator or pharmacy benefit manager.

Far from expanding "reproductive health" services funding under all plans, the Mandate advances the cover-all interest only for those with health-benefit plans (or who qualify for public funding, Bill § 5). This leaves countless employed, self-employed, and unemployed persons un-

---

[10] ORTL argued that DCBS should grant the requested exemption because the Mandate, as applied to those unwilling to "provide coverage of . . . abortions," jeopardizes Oregon's receipt of federal funds under the Weldon Amendment ("**Weldon**"), which provides as follows:

> (1) None of the funds made available in this Act may be made available to a Federal agency or program, or to a *State* or local government, if such agency, program, or government subjects any institutional or individual health care entity to *discrimination* on the basis that the health care entity does not provide, pay for, *provide coverage of*, or refer for *abortions*.
> (2) In this subsection, the term "*health care entity*" includes an individual physician or other health care professional, a hospital, a provider-sponsored organization, a health maintenance organization, a *health insurance plan*, or *any other kind of health care* facility, organization, or *plan*.

*See, e.g.*, Consolidated Appropriations Act, 2018, Pub. L. 115-41, Div. H, § 507(d), 132 Stat. 348 (Mar. 23, 2018) (emphasis added). Under Trump administration interpretations of Weldon's provisions, ORTL could make this argument, though those changed in the next administration.

Page 24 – VERIFIED COMPLAINT

aided by the Mandate. These coverage gaps undermine the cover-all interest and make the Mandate not "generally applicable," 494 U.S. at 880, in relation to that interest under *Smith*. And the legislature had to consider particular reasons for why the Mandate excludes all of these situations when there is no exemption for ORTL's health-benefit plan, which makes the Mandate non-general under *Fulton*'s particular-reasons analysis. 141 S.Ct. at 1877.

85. Under *Fulton*'s comparable-exemption analysis, *id.* at 1877-78, the above exemptions and gaps make the Mandate non-general if they "undermine the government's asserted interests" "in a similar way" to what exempting ORTL would do, *id.* at 1877, or "in a similar or greater degree," *Lukumi*, 508 U.S. at 543. Exempting ORTL would undermine the cover-all interest in a similar degree to exempting "religious employers" because like-values employees in both cases don't want the objectionable coverage. The other exceptions and gaps undermine the cover-all interest to a "greater degree," *id.*, based on comparing ORTL employees not wanting objectionable coverage to others wanting that coverage.

86. In sum, the Mandate is non-neutral, and it is non-general in multiple ways in relation to the cover-all interest under *Smith*'s overarching "generally applicable" test and *Fulton*'s non-exclusive non-generality tests. So the free-exercise analysis proceeds under strict scrutiny.

### The Mandate Fails Applicable Strict Scrutiny as Applied

87. Strict scrutiny is "the most rigorous of scrutiny," *Lukumi*, 508 U.S. at 546, inquiring whether *denying ORTL an exemption* "advances 'interests of the highest order' and is narrowly tailored to achieve those interests," *Fulton*, 141 S.Ct. at 1881 (quoting *Lukumi*, 508 U.S. at 546). If "the government can achieve its interests in a manner that does not burden religion, it must do so." *Fulton*, 141 S.Ct. at 1881; *accord Hobby Lobby*, 573 U.S. at 728.

88. The focus is on whether denying ORTL an exemption is narrowly tailored to a com-

**Page 25 – VERIFIED COMPLAINT**

pelling interest. *Gonzales v. O Centro Espirita Beneficente Uniao Do Vegetal*, 546 U.S. 418, 430-432 (2006); *Fulton*, 141 S.Ct. at 1881 ("The question . . . is not whether the [defendant] has a compelling interest in enforcing its [challenged] policies generally, but whether it has such an interest in denying an exception to [plaintiff]."). "Rather than rely on 'broadly formulated interests,' courts must 'scrutinize[ ] the asserted harm of granting specific exemptions to particular religious claimants.'" *Id.* (citation omitted)). So the cover-all interest asserted for the Mandate doesn't apply here.

**89.** Regarding interests for denying ORTL an exemption from the substantial burden on its free-exercise rights, Defendants will presumably assert ones like those in *Foothill*, none of which sufficed, 623 F. Supp. 3d at 1094:

> The Director explains her decision not to make an exception at the Churches' request by citing her policy not to entertain requests for exceptions unless they come from a plan. She cites three compelling government interests. Def.'s MSJ at 18. First, the policy prevents "a flood of exemption requests from over 26 million enrollees" who may object to their plan's covered care services. *Id.* Second, it prevents "significant third-party harm to enrollees," which may occur if employers opt out of legally mandated healthcare coverage. *Id.* at 18-19. Third, it appropriately restricts DMHC's jurisdiction as authorized by the California State Legislature. *Id.* at 19. None of these interests are sufficiently compelling, nor is the department's rigid approach narrowly tailored. *Lukumi*, 508 U.S. at 531-32.

**90.** The *Foothill* court found the "first two interests . . . speculative and thus, 'insufficient to satisfy strict scrutiny.'" *Id.* (citing *Fulton*, 141 S.Ct. at 1882). Here flood-prevention and third-party-harm interests also would be speculative and insufficient.

**91.** The flood-prevention interest wasn't compelling because (i) it was "'conjecture' and unsubstantiated in the record," (ii) the focus must be on exempting a particular claimant, (iii) cases cited "arose outside of California and concerned entirely different policies," *id.* (citations omitted), and (iv), the Director had resources and options:

**Page 26 – VERIFIED COMPLAINT**

Even assuming similar religious challenges materialized in California in large numbers, the Director has not offered evidence showing that entertaining these religious objections would be so difficult and time-consuming that "DMHC's operations would grind to a halt ...." *Id.* at 20. The DMHC could reject outlandish requests on their merits and limit requests to those from employers like the Churches, rather than individuals. Finally, if the DMHC receives and approves an exemption request from a religious claimant, the DMHC can ensure the claimant's plan is "at the table," *id.* at 21, by including the plan on communications and requesting the plan submit a revised evidence of coverage document that includes the approved exemption.

*Id. See also Hobby Lobby*, 573 U.S. at 732-33 ("flood" argument not compelling). Here, a flood-prevention interest would also be conjecture and not focused on ORTL's request. Defendants can similarly address the concerns in the unlikely event there were anything approaching a flood. And an asserted interest in preventing similarly situated entities from pursuing their rights is not cognizable because the Free Exercise Clause is part of "the supreme law of the land," which pre-empts all efforts to deny such rights. U.S. Const. Art. VI, § 2.

92. The third-party-harm interest wasn't compelling: "'all the Churches' employees share their religious beliefs about abortion, so the State's interest in withholding an exemption *from the Churches* cannot be compelling.'" *Foothill*, 623 F. Supp. 3d at 1095 (citation omitted; emphasis in original). "Accordingly, the Director may limit religious exemptions to 'particular' employers who provide coverage to employees who share their religious beliefs." *Id.* (citing *Fulton*, 141 S.Ct. at 1881). Here, ORTL's employees also share its beliefs regarding abortion and abortifacient "contraceptives," so no third-party-harm interest is compelling.

93. The state-law-compliance interest wasn't compelling. The Director said state law only permitted her to regulate health plans, which *Foothill* assumed *arguendo* and rejected:

Nonetheless, nothing in the statutory text explicitly precludes her from fielding requests for exemptions from religious claimants. Likewise, nothing appears to preclude the Director from directing the religious claimant's plan to submit a revised evidence of coverage document comporting with the religious claimant's belief to

**Page 27 – VERIFIED COMPLAINT**

the DMHC for approval. The Director's authority to give orders to a plan does not foreclose the authority to consider requests for those orders from others. In the end, the Director is still regulating the plan.

*Id.* Here, were Defendants to make a similar argument—though Oregon lacks the "good cause" formal mechanism California's insurance scheme had, *id.* at 1093—the foregoing or like answers would refute it. Vitally, the Free Exercise Clause and Supremacy Clause don't allow those with implementing and enforcement authority over state law to evade the preempting effect of the First Amendment on the grounds that state law limits them because, if a federal free-exercise violation is occurring, Defendants must provide the means to cure it based on their authority.

94. *Foothill* held that "the Director has not shown '[she] lacks other means of achieving [her] desired goal without imposing a substantial burden on the exercise of religion by [plaintiffs].'" 623 F. Supp. 3d at 1095 (bracketed text from court) (quoting *Hobby Lobby*, 573 U.S. at 728). Accordingly, "[t]he Director's denial of the Churches' request for exceptions to accommodate their religious beliefs, based solely on the fact that those requests did not originate with a plan, was not narrowly tailored to serve a compelling interest." *Id.*

95. *Hobby Lobby* rejected the argument that imposing abortifacient "contraceptive" funding on religious objectors under the Affordable Care Act was "essential to the comprehensive health-insurance scheme that ACA establishes." 573 U.S. at 733-34. The Court said if religious organizations certify that abortifacients violate their religious beliefs, the ACA required that

> the organization's insurance issuer or third-party administrator must "[e]xpressly exclude contraceptive coverage from the group health insurance coverage provided in connection with the group health plan" and "[p]rovide separate payments for any contraceptive services required to be covered" without imposing "any cost-sharing requirements . . . on the eligible organization, the group health plan, or plan participants or beneficiaries."

*Id.* at 730-31 (citations omitted). That was more narrowly tailored because it "d[id] not impinge on

**Page 28 – VERIFIED COMPLAINT**

the plaintiffs' religious belief that providing insurance coverage for the contraceptives at issue here violates their religion, and it serves HHS's stated interests equally well." *Id.* at 731. Oregon could have put a similar bypass in the Mandate. Its failure to do so fails narrow tailoring. And Bill § 5 reveals a less-restrictive option, i.e., state funding could provide any coverage Oregon wants for employees of religious objectors without violating ORTL's free-exercise rights.

96. *Fulton* also rejected asserted interests as not sufficiently compelling to force a Christian foster-care agency to violate its religious beliefs regarding same-sex couples as foster parents. 141 S.Ct. at 1881-82. "The City asserts that its non-discrimination policies serve three compelling interests: maximizing the number of foster parents, protecting the City from liability, and ensuring equal treatment of prospective foster parents and foster children." *Id.* at 1881. The Court noted that these were at "a high level of generality, but the First Amendment demands a more precise analysis," a focus on interests supporting *not exempting* the objecting Christian agency. *Id.* The Court said the maximization interest might actually be served by the exemption and potential litigation was speculative. *Id.* at 1881-82. It said that, while the equal-treatment interest was stronger, it was undercut by allowing exemptions, *id.* at 1882 (citations omitted):

> That leaves the interest of the City in the equal treatment of prospective foster parents and foster children. We do not doubt that this interest is a weighty one, for "[o]ur society has come to the recognition that gay persons and gay couples cannot be treated as social outcasts or as inferior in dignity and worth." . . . .On the facts of this case, however, this interest cannot justify denying CSS an exception for its religious exercise. The creation of a system of exceptions under the contract undermines the City's contention that its non-discrimination policies can brook no departures. . . . The City offers no compelling reason why it has a particular interest in denying an exception to CSS while making them available to others.

The same applies to ORTL if Oregon asserts such an interest, e.g., its grandfathering exemption, federal-funds exemption mechanism, and other gaps undercut any such brook-no-departures interest, but RHEA instead asserts an interest in *equitable funding* for abortion and contraception.

**Page 29 – VERIFIED COMPLAINT**

**97.** In sum, no compelling interest justifies not exempting ORTL from the Mandate. Even assuming *arguendo* one were compelling, there are more narrowly tailored options to further any interest. So the Mandate violates ORTL's free-exercise right.

*Relief*

**98.** The Mandate is unconstitutional as applied to ORTL. So appropriate relief is required. ORTL is entitled to relief like that afforded "religious employers," Bill § 2(9), and like that in *Foothill*, which granted summary judgment, 623 F. Supp. 3d 1079, and entered a permanent injunction and ordered relief, *Foothill*, No. 2023 WL 1767748, at *5 (ordering Director to process exemption requests for "abortion care coverage comporting with their religious beliefs"). After that, the *Skyline* parties got a similar agreed judgment. Order Granting Joint Mot. and Entering J., Doc. 141, *Skyline*, No. 3:16-cv-00501 (S.D. Cal. May 11, 2023). The same is required here.

## Prayer for Relief

ORTL prays for the following relief from the Mandate:

1. Declaratory judgment that the Mandate's requirement that health-benefit plans cover abortion and abortifacient "contraceptives" is unconstitutional as applied to ORTL;

2. Preliminary and permanent injunctions ordering Defendants to treat ORTL as "religious employers" are treated, Bill § 2(9), enjoining Defendants from enforcing the Mandate against ORTL or any insurer in any way differently than for "religious employers," and direct any present or future ORTL health-benefit plan provider to accommodate ORTL's religious beliefs;

3. Attorneys' fees, costs, and expenses to which ORTL may be entitled to law, including under 42 U.S.C. § 1988; and

4. Any other relief the Court deems just and proper.

**Page 30 – VERIFIED COMPLAINT**

## Verification

I, Lois Anderson, verify that:

• I am the Executive Director of ORTL;

• I am familiar with the facts about ORTL, its directors, employees, and members, as well as its legislative testimony in opposition to the Bill;

• Facts about ORTL and its legislative testimony are verified based on personal knowledge;

• Other alleged facts are based on information and belief;

• If called on to give testify concerning the foregoing, I would do so competently; and

• I declare under penalty of perjury that the foregoing statements concerning ORTL are true and correct. 28 U.S.C. § 1746.

Executed on  8/24/2023  _____

Lois Anderson, ORTL Executive Director

**Page 31 – VERIFIED COMPLAINT**

Dated: September 5, 2023

Respectfully submitted,

/s/ Shawn Lindsay

James Bopp, Jr., IN Bar #2838-84*
  jboppjr@aol.com
Richard E. Coleson, IN Bar #11527-70*
  rcoleson@bopplaw.com
Joseph D. Maughon, VA Bar #87799*
  jmaughon@bopplaw.com
THE BOPP LAW FIRM, PC
The National Building
1 South Sixth Street
Terre Haute, IN 47807-3510
812.232.2434 telephone
812.235.3685 facsimile

*pro hac vice application forthcoming
*Counsel for Plaintiff*

Shawn Lindsay, OSB #020695
JURISLAW, LLP
Three Centerpointe Drive, Suite 160
Lake Oswego, OR 97035
503.968.1475 telephone
shawn@jurislawyer.com
*Attorney for Plaintiff*

**Page 32 – VERIFIED COMPLAINT**