Shawn Lindsay, OSB #020695
JURISLAW, LLP
Three Centerpointe Drive, Suite 160
Lake Oswego, OR 97035
Telephone: 503.968.1475
shawn@jurislawyer.com
*Attorney for Plaintiff*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| **OREGON RIGHT TO LIFE**, <br> Plaintiff, <br> v. <br><br> **OREGON DEPARTMENT OF CONSUMER AND BUSINESS SERVICES** and **ANDREW R. STOLFI**, in his official capacities as Department of Consumer and Business Services Director and Oregon Insurance Commissioner, <br> Defendants. | Case No.: **6:23-cv-1282** <br><br> **PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND SUPPORTING MEMORANDUM OF LAW** <br><br><br> Request for Oral Argument |

**PL.'S PRELIM. INJ. MOT. & MEM.**

# Table of Contents

MOTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

MEMORANDUM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Governing Legal Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Factual Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    *ORTL's Organizational Nature* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    *ORTL's Mission and Policy Positions* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    *ORTL's Provision of Health Insurance* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
    *The Legislature's Awareness of ORTL's and Others' Legal Objections* . . . . . . . . . . . 11
    *ORTL's Specific Objections to the Mandate Summarized* . . . . . . . . . . . . . . . . . . . . 12
    *Irreparable Harm and No Adequate Remedy at Law*. . . . . . . . . . . . . . . . . . . . . . . . . 13

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

  I.    On the merits, the Mandate violates ORTL's free-exercise right as applied. . . . . . 13

      A.    The controlling Free Exercise Clause analysis was established in *Smith*. . . . . 14

          1.    The Clause protects against government burdens on religious exercise based on sincerely held religious beliefs. . . . . . . . . . . . . . . . . . . . . . . 15
          2.    Neutral, generally applicable laws get rational-basis scrutiny. . . . . . . . . 15
          3.    Non-neutral, non-general laws get strict scrutiny. . . . . . . . . . . . . . . . . . 15

      B.    The Mandate is not neutral or generally applicable, so strict scrutiny applies. 21

      C.    The Mandate fails strict scrutiny as applied to ORTL. . . . . . . . . . . . . . . . . . . . 28

          1.    ORTL's non-complicity beliefs are sincerely held. . . . . . . . . . . . . . . . . 28
          2.    The Mandate substantially burdens ORTL's free exercise. . . . . . . . . . . 29
          3.    Not exempting ORTL is not narrowly tailored to a compelling interest. . 29

  II.    The remaining preliminary injunction factors warrant relief. . . . . . . . . . . . . . . . . 33

      A.    ORTL will suffer irreparable harm absent relief. . . . . . . . . . . . . . . . . . . . . . . . 33

      B.    A preliminary injunction is in the public interest. . . . . . . . . . . . . . . . . . . . . . . 34

      C.    The balance of equities tips sharply in ORTL's favor. . . . . . . . . . . . . . . . . . . . 34

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

# Table of Authorities

*Cases*

*Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011) . . . . . . . . . . . . . . . . . 34

*Am. Trucking Ass'n, Inc. v. City of Los Angeles*, 559 F.3d 1046 (9th Cir. 2009). . . . . . . . . . . . . 5

*Ashcroft v. ACLU*, 542 U.S. 656 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Boerne v. Flores*, 521 U.S. 507 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Burwell v. Hobby Lobby Stores*, 573 U.S. 682 (2014) . . . . . . . . . . . . . . . . . . . . . . 7-8, 28-30, 32

*Cantwell v. Connecticut*, 310 U.S. 296 (1940) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Church of the Lukumi Babalu Aye v. Hialeah*, 508 U.S. 520 (1993) . . . . . . . 15-17, 19, 26, 28-30

*Colo. Christian Univ. v. Weaver*, 534 F.3d 1245 (10th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . 23

*Elrod v. Burns*, 427 U.S. 347 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 33

*Employment Division v. Smith*, 494 U.S. 872 (1990) . . . . . . . . . . . . . . . . . 14-15, 17-21, 25-26, 28

*FEC v. Wisconsin Right to Life, Inc.*, 551 U.S. 449 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*First Nat'l Bank v. Bellotti*, 435 U.S. 765 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Foothill Church v. Watanabe*, 3 F.4th 1201 (9th Cir. 2021) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Foothill Church v. Watanabe*, 623 F. Supp. 3d 1079 (E.D. Cal. 2022) . . .  4, 10, 17, 20-22, 28-31

*Foothill Church v. Watanabe*, No. 2:15-cv-02165, 2023 WL 1767748 (E.D. Cal. Feb. 3, 2023) . 4

*Fulton v. City of Philadelphia*, 141 S.Ct. 1868 (2021) . . . . . . . . . . . .  4, 10, 14-21, 24, 26, 29-32

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418 (2006) . . . . . . . . . 5

*Hobbie v. Unemployment Appeals Comm'n of Florida*, 480 U.S. 136 (1987) . . . . . . . . . . . . . . 18

*Irvin v. HSBC Bank USA, N.A.*, 2017 WL 5075246 (D. Or. 2017) . . . . . . . . . . . . . . . . . . . . . . . 5

*Klein v. City of San Clemente*, 584 F.3d 1196 (9th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Mazurek v. Armstrong*, 520 U.S. 968 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Melendres v. Arpaio*, 695 F.3d 990 (9th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Monterey Mech. Co. v. Wilson*, 125 F.3d 702 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . 34

*Preminger v. Principi*, 422 F.3d 815 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Rep. Party Minn. v. White*, 536 U.S. 765 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Rodriguez v. Robbins*, 715 F.3d 1127 (9th Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Rom. Cath. Diocese Brooklyn v. Cuomo*, 141 S.Ct. 63 (2020). . . . . . . . . . . . . . . . . . . . . . . . 17

*S. Bay United Pentecostal Church v. Newsom*, 141 S.Ct. 716 (2021) . . . . . . . . . . . . . . . . . . . 16

*S. Bay United Pentecostal Church v. Newsom*, 992 F.3d 945 (9th Cir. 2021) . . . . . . . . . . . . . 18

*Sammartano v. First Judicial Dist. Ct., Cnty. of Carson City*, 303 F.3d 959 (9th Cir. 2002) . 5, 33

*San Antonio Ind. School Dist. v. Rodriguez*, 411 U.S. 1 (1973) . . . . . . . . . . . . . . . . . . . . . . . . 5

*Sherbert v. Verner*, 374 U.S. 398 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 20

*Skyline Wesleyan Church v. DMHC*, 968 F.3d 738 (9th Cir. 2020) . . . . . . . . . . . . . . . . . . . . . . 4

*Spencer v. World Vision*, 633 F.3d 723 (9th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Stormans v. Wiesman*, 579 U.S. 942 (2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15-16, 22

*Stormans v. Wiesman*, 794 F.3d 1064 (9th Cir. 2015) . . . . . . . . . . . . . . . . . . . 15, 19-20, 24, 26

*Tandon v. Newsom*, 141 S.Ct. 1294, 1296 (2021) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 26

*Too Marker Products, Inc. v. Shinhan Art Materials, Inc.*, 2009 WL 4718733 (D. Or. 2009) . . . 5

*Underwood v. Rochester*, 2018 WL 3613990 (D. Or. 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*United States v. Playboy Entm't Group, Inc.*, 529 U.S. 803 (2000) . . . . . . . . . . . . . . . . . . . . . . 5

*Winter v. Natural Resources Defense Council*, 555 U.S. 7 (2008). . . . . . . . . . . . . . . . . . . . . 5, 33

*Wisconsin v. Yoder*, 406 U.S. 205 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

**Constitutions, Statutes, and Rules**

26 U.S.C. § 501(c)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

26 U.S.C. § 501(c)(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

42 U.S.C. § 1988 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Consolidated Appropriations Act, 2018, Pub. L. 115-41, Div. H, § 507(d), 132 Stat. 348
    (Mar. 23, 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

FRCP 65(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Free Exercise Clause, U.S. Const. Amend. I. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

LR 7-1(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ORS §§ 743A.066-067 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Religious Freedom Restoration Act of 1993 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 29

U.S. Const. Amend. XIV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

U.S. Const. Art. VI, § 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Wash. Admin. Code 246-863-095 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

### Other Authorities

Letter from Michael L. Cotton, Chief Executive Officer, Providence Health Plans, to Hon.
    Mitch Greenlick, Chair, H. Comm. on Health Care (Mar. 15, 2017), olis.oregonlegisla-
    ture.gov/liz/2017R1/Downloads/CommitteeMeetingDocument/107514 . . . . . . . . . . . . . . 11

Milken Inst. Sch. Pub. Health, *Equity vs. Equality: What's the Difference?*,
    onlinepublichealth.gwu.edu/resources/equity-vs-equality/, . . . . . . . . . . . . . . . . . . . . . . . . 24

Ore. Health Auth., *House Bill 3391: Reproductive Health Equity Act: Report to the Legisla-
    ture* (2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24-25

PHP, *2022 Oregon Member Handbook: Choice* (2022) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

# MOTION[1]

Under LR 7-1(a)(1), Oregon Right to Life ("**ORTL**") certifies that, "[i]n compliance with this Rule, the parties made a good faith effort through [a video conference on September 11, 2023] to resolve the dispute and have been unable to do so." Defendants' position is that they oppose the present motion.

Under § 2 (the "**Mandate**") of 2017 Enrolled House Bill ("**HB 3391**"/"**Bill**"), Oregon mandated that health benefit plans provide coverage for (as relevant) abortion and contraception to which ORTL objects under the Free Exercise Clause of the First Amendment, U.S. Const. Amend. I. ORTL moves for a preliminary injunction enjoining Defendants from enforcing the Mandate against ORTL or any insurer in any way differently than for "religious employers," Bill § 2(9) ( "An insurer may offer to a religious employer a health benefit plan that does not include coverage for contraceptives or abortion procedures that are contrary to the religious employer's tenets . . . ."); ordering Defendants to treat ORTL as "religious employers" are treated; and requiring Defendants to direct any present or future ORTL health-benefit plan provider to accommodate ORTL's religious beliefs. FRCP 65. This Motion should be granted. *See* Memorandum.

As this injunction poses no monetary risk to Defendants and this is a First Amendment case, ORTL requests that bond be waived. FRCP 65(c); *see, e.g.*, *Baca v. Moreno Valley Unified School Dist.*, 936 F. Supp. 719, 738 (C.D. Cal. 1996) (waiving First Amendment case bond).

# MEMORANDUM

## Introduction

This is an as-applied, free-exercise challenge to the Mandate, Bill § 2, in the Reproductive

---

[1] ORTL separately moves to "advance the trial on the merits and consolidate it with the hearing" on the preliminary injunction. FRCP 65(a)(2). All hyperlinks were functional at filing.

**Page 1 – PL.'S PRELIM. INJ. MOT. & MEM.**

Health Equity Act ("**RHEA**"), codified in Oregon Revised Statutes ("**ORS**") §§ 743A.066-067.

*See* olis.oregonlegislature.gov/liz/2017R1/Downloads/MeasureDocument/HB3391 (Bill text);

www.oregonlegislature.gov/bills_laws/lawsstatutes/2017orlaw0721.pdf (Oregon Laws). The

2017 Mandate requires "health benefit plans" to cover abortion and contraception as follows.

- Bill § 2(2) states the Mandate:

  (2) A health benefit plan offered in this state must provide coverage for all of the following services, drugs, devices, products and procedures: . . .
  (g) Abortion. . . .
  . . . .
  (j) Any contraceptive drug, device or product approved by the United States Food and Drug Administration, subject to all of the following:
  . . . .
  (D) A health benefit plan may not infringe upon an enrollee's choice of contraceptive drug, device or product and may not require prior authorization, step therapy or other utilization control techniques for medically appropriate covered contraceptive drugs, devices or other products approved by the United States Food and Drug Administration.
  . . . .
  (L) As a single claim or combined with other claims for covered services provided on the same day:
  (A) Patient education and counseling on contraception . . . .
  (B) Services related to . . . the administration and monitoring of contraceptive drugs, devices, and products, including but not limited to:
  (i) Management of side effects;
  (ii) Counseling for continued adherence to a prescribed regimen;
  (iii) Device insertion and removal; and
  (iv) Provision of alternative contraceptive drugs, devices or products deemed medically appropriate in the judgment of the enrollee's provider.
  . . . .

- Bill § 2(5) details things not excluded by the Mandate:

  (5) This section does not exclude coverage for contraceptive drugs, devices or products prescribed by a provider, acting within the provider's scope of practice, for:
  (a) Reasons other than contraceptive purposes, such as decreasing the risk of ovarian cancer or eliminating symptoms of menopause; or
  (b) Contraception that is necessary to preserve the life or health of an enrollee.

- The Mandate had a grandfathering exemption based on 2017 abortion coverage, Bill § 2(7):

  (7) This section does not require a health benefit plan to cover:

**Page 2 – PL.'S PRELIM. INJ. MOT. & MEM.**

. . . .

(e) Abortion if the insurer offering the health benefit plan excluded coverage for abortion in all of its individual, small employer and large employer group plans during the 2017 plan year.

- This grandfathering exemption was amended by 2023 HB 2002 § 12[2] to read as follows:

(7) This section does not require a health benefit plan to cover:
. . . .
(e) Abortion if the insurer offering the health benefit plan:
**(A) Has a certificate of authority to transact insurance in this state issued by the Department of Consumer and Business Services; and**
**(B) E**xcluded coverage for abortion in all of its individual, small employer and large employer group plans during the 2017 plan year.

This amendment was to prevent governmental plans from using this "legacy clause":

[2023's HB 2002,] Section 12 is closing a loophole in the Reproductive Health Equity Act that was passed in 2017. So that bill requires state regulated health plans to provide abortion coverage with no cost sharing. There is a—what's called sort of like—a legacy clause that excluded certain health insurance—or one—health insurance company from being required to pay for abortions. And the way that exemption was written, it actually ended up being broader than it was intended, and so we're just closing that—closing up that language—to make it clear that it's only applying to insurance carriers, and not, for example, local and county government plans.

*Public Hearing on HB 2002 Before the H. Comm. on Behavioral Health and Health Care of the*

*Oregon State Legislature*, 2023 Regular Session (March 20, 2023) (Testimony of Kimberly

McCullough, Legislative Director, Office of the Attorney General, Oregon Department of Justice),

olis.oregonlegislature.gov/liz/mediaplayer?clientID=4879615486&eventID=2023031284&startSt

reamAt=2198 (at 00:40:26).

- The Mandate exempts objecting "religious employers" and their insurers, Bill § 2(9):

An insurer may offer to a religious employer a health benefit plan that does not include coverage for contraceptives or abortion procedures that are contrary to the religious employer's religious tenets only if the insurer notifies in writing all employees who may be enrolled in the health benefit plan of the contraceptives and procedures the employer refuses to cover for religious reasons.

---

[2] olis.oregonlegislature.gov/liz/2023R1/Downloads/MeasureDocument/HB2002.

- Bill § 2(1)(d) adopts the narrow "religious employer" definition at ORS § 743A.066, i.e.:

  A "religious employer" is an employer:
  (a) Whose purpose is the inculcation of religious values;
  (b) That primarily employs persons who share the religious tenets of the employer;
  (c) That primarily serves persons who share the religious tenets of the employer; and
  (d) That is a nonprofit organization under section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code.

Though ORTL objects on religious grounds to providing insurance coverage in its health-benefit plan for (i) abortion (except to save the mother's life[3]) and (ii) "contraceptives" that act as abortifacients,[4] it doesn't fit the "religious employer" definition because (though it is nonprofit and its employees share its religious views) its purpose is prolife advocacy, not inculcating religious values, and it doesn't primarily serve persons sharing its religious tenets.

California churches recently won similar challenges to California's 2014 abortion-insurance mandate. *Foothill Church v. Watanabe*, 623 F. Supp. 3d 1079 (E.D. Cal. 2022) (summary judgment); *Foothill Church v. Watanabe*, No. 2:15-cv-02165, 2023 WL 1767748, at *5 (E.D. Cal. Feb. 3, 2023) (permanent injunction on free-exercise claim and order for DMHC Director to process exemption for "abortion care coverage comporting with their religious beliefs").[5]

## Governing Legal Standards

ORTL seeks a preliminary injunction, as did the plaintiff in *Fulton*, 141 S.Ct. at 1876. Preliminary injunctions require (1) a likelihood of success on the merits; (2) a likelihood of irrepara-

---

[3] This exception to ORTL's abortion opposition applies to discussions herein of ORTL's abortion position (and of those controlling ORTL), unless context indicates otherwise.

[4] ORTL's opposition to abortion herein includes opposition to any abortifacients, sometimes mislabeled as "contraceptives"

[5] This followed remand for consideration in light of *Fulton v. City of Philadelphia*, 141 S.Ct. 1868 (2021). *Foothill Church v. Watanabe*, 3 F.4th 1201 (9th Cir. 2021). *See also Skyline Wesleyan Church v. DMHC*, 968 F.3d 738 (9th Cir. 2020) (free-exercise challenge held justiciable); Order Granting Joint Motion and Entering Judgment, *Skyline*, Doc. 141, No. 3:16-cv-00501 (S.D. Cal. May 11, 2023) (agreed permanent injunction for Skyline and ordered relief).

ble harm absent preliminary relief; (3) that the balance of equities tips in movant's favor; and (4) that an injunction is in the public interest. *Winter v. Natural Resources Defense Council*, 555 U.S. 7, 20 (2008); *Am. Trucking Ass'n, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009); *Too Marker Products, Inc. v. Shinhan Art Materials, Inc.*, 2009 WL 4718733, at *2 (D. Or. 2009). "The elements . . . are balanced, so that a stronger showing of one element may offset a weaker showing of another. For example, a stronger showing of irreparable harm to plaintiff might offset a lesser showing of likelihood of success on the merits." *Irvin v. HSBC Bank USA, N.A.*, 2017 WL 5075246, at *1 (D. Or. 2017). *See also Underwood v. Rochester*, 2018 WL 3613990, at *2 (D. Or. 2018) (citing 9th Circuit cases).

"[B]urdens at the preliminary injunction stage track the burdens at trial." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006); *accord Winter*, 555 U.S. at 22 (citing *Mazurek v. Armstrong*, 520 U.S. 968 (1997), which held that the "clear show-ing" applies to "the burden of persuasion," 520 U.S. at 972 (citation omitted)). That strict-scru-tiny burden requires *Defendants* to prove the Mandate's burden on First Amendment activity is narrowly tailored to a compelling interest and less-restrictive means are inadequate to serve the interest. *See Gonzales*, 546 U.S. at 428-29 (citing *Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004)); *see also FEC v. Wisconsin Right to Life, Inc.*, 551 U.S. 449, 478 (2007) (strict-scrutiny burden on government); *United States v. Playboy Entm't Group, Inc.*, 529 U.S. 803, 816 (2000) (same); *San Antonio Ind. School Dist. v. Rodriguez*, 411 U.S. 1, 16 (1973) (citation omitted) (strict scrutiny eliminates presumption of validity; government bears "heavy burden of justification").

In First Amendment cases, likely merits success is the dominant factor, so once that is estab-lished other elements follow. *See, e.g.*, *Sammartano v. First Judicial Dist. Ct., Cnty. of Carson City*, 303 F.3d 959, 972-74 (9th Cir. 2002), *abrogated in part by Winter*, 555 U.S. at 24.

**Page 5 – PL.'S PRELIM. INJ. MOT. & MEM.**

# Factual Background

Facts about ORTL and legislative testimony are verified in the Verified Complaint.

### ORTL's Organizational Nature

ORTL is an Oregon non-stock corporation whose principle place of business is Keizer, Oregon. It is a 26 U.S.C. § 501(c)(4) nonprofit organization formed in 1970 to advocate for the inherent dignity of human life and to promote respect and protection for human life regardless of race, sex, age, or stage of development. It has over 25,000 members and supporters in Oregon, including Marion County. A Board of Directors controls ORTL. Its Executive Director manages daily operations. ORTL is a membership organization. Members join due to agreement with ORTL's prolife principles and provide at least modest financial support. *See, e.g.*, ortl.org/get-involved/become-a-member. Members select two at-large Board members with voting rights. ORTL's website is at www.ortl.org, where information about it is publicly available. Related to ORTL are a PAC and a § 501(c)(3) Education Foundation, ortl.org/what-is-oregon-right-to-life/#1445930230395-d0e4383f-9e8a, which founded StandUpGirl.com, a popular prolife, online resource for girls in unplanned pregnancies. ORTL is an affiliate of the National Right to Life Committee ("**NRLC**"), America's oldest and largest national prolife organization. *See* nrlc.org. Current full-time ORTL personnel are Executive Director, Office Manager, Administrative Assistant, Community Outreach Director, Political Director, Communications Specialist, Events and Social Media Coordinator, Development Specialist, and Data Management Specialist.

### ORTL's Mission and Policy Positions

ORTL's directors, officers, board members, and employees must subscribe to ORTL's mission, beliefs, and policy positions, and members join because of agreement with those. ORTL's mission is to advocate for the most vulnerable human beings whose right to life is denied or

**Page 6 – PL.'S PRELIM. INJ. MOT. & MEM.**

abridged under current law. It works to reestablish protection for all innocent human life from conception to natural death. *See* ortl.org/what-is-oregon-right-to-life/. ORTL operates under its stated policy positions. *See* ortl.org/positions/.

ORTL believes individual human life begins at conception, i.e., fertilization. *See* ortl.org/positions/ (Statement on Contraceptives: "Once the sperm and egg have united, . . . a new human life begins"). "[ORTL] believes in the sanctity of all human life from the moment of conception to natural death," ortl.org/positions/ (Statement on Abortion), and that:

> Abortion ends the life of a genetically distinct, growing human being. [ORTL] oppose[s] abortion at any point of gestation. In rare cases, a mother may have a life threatening condition in which medical procedures intended to treat the condition of the mother may result in the unintended death of her preborn baby. At the same time, ORTL recognizes that modern medical practice . . . increase[s] the ability to save both the life of the mother and the baby.

*Id.* Accordingly, ORTL opposes abortion except where the mother's life is in imminent danger. "[ORTL] takes no position on . . . birth control method[s] . . . prohibit[ing] the sperm and egg from uniting. Once the[y] . . . have united, . . . a new human life begins and ORTL opposes any drug, device, or procedure which destroys the new human life. ORTL supports full disclosure of information . . . to women considering contraceptives," ortl.org/positions/ (Statement on Contraceptives), including whether a particular "contraceptive" can act as an abortifacient (i.e., destroying individual human life in utero after fertilization). *Id.*

ORTL believes, as did plaintiffs in *Burwell v. Hobby Lobby Stores*, 573 U.S. 682 (2014), that four types of "contraception" that could act after fertilization are abortifacients, *id.* at 701-02. "These include two forms of emergency contraception commonly called 'morning after' pills and two types of intrauterine devices." *Id.* at 701-03. The *Hobby Lobby* Brief for Respondents[6] provides specific detail, quoting a lower court: "'Four of the twenty approved methods—two types

---

[6] *Available at* https://becketpdf.s3.amazonaws.com/13-354-bs.pdf.

of intrauterine devices (IUDs) and the emergency contraceptives commonly known as Plan B and Ella—can function by preventing the implantation of a fertilized egg.'" *Id.* at 4-5 (citation omitted). "[T]he government concedes that the drugs and devices at issue can prevent uterine implantation of an embryo." *Id.* at 5 n.2. Specifically, the government conceded that "Plan B (levonorgestrel), Ella (ulipristal acetate) and copper IUDs like ParaGard may act by 'preventing implantation (of a fertilized egg in the uterus)' [and that] IUDs with progestin 'alter[] the endometrium.'" *Id.* (citations omitted). ORTL doesn't want to include those abortifacients in its health-benefit plan. Concerning these, ORTL believes like the *Hobby Lobby* objectors that "'it is immoral and sinful for [them] to intentionally participate in, pay for, facilitate, or otherwise support these drugs.'" 573 U.S. at 702 (citation omitted). Under *Hobby Lobby*, those objectors were not required to cover them in employee health insurance. *See id*. at 690-92.

"ORTL opposes any techniques of human conception occurring outside of the maternal body which lead to the destruction of human life, whether for family growth or experimentation." ortl.org/positions/ (Statement on Assisted Reproductive Technology).

ORTL's belief in "the sanctity of human life from the moment of conception until natural death," ortl.org/positions/ (Statement on Euthanasia), arises from Judeo-Christian religious beliefs—traditionally incorporated into Western Civilization's respect for human life—to which ORTL and those who control it subscribe. Those include the Bible's command against the intentional destruction of innocent human life, making the taking of innocent human life a grave sin. These beliefs include the inviolable, inherent, ultimate worth of each human life, which requires respect for and protection of innocent human life by opposing abortion and abortifacient "contraceptives." And those beliefs include the consequent belief that it is a grave religious and moral wrong to deliberately cooperate, facilitate, or otherwise participate in some meaningful way in

the provision of abortion or abortifacient "contraceptives," which belief precludes ORTL from providing insurance coverage for those without violating conscience.

ORTL's beliefs about the sanctity of human life motivate its actions and are held by its board members, officers, employees, and members, all of whom would be displeased if ORTL violated those beliefs and would likely disassociate from ORTL were it to do so. As a prolife advocate, ORTL seeks to have all that it says and does be consistent with its beliefs and prolife message. This applies to employee health insurance coverage. ORTL believes funding insurance coverage for abortion communicates a message contrary to its prolife message.

### *ORTL's Provision of Health Insurance*

ORTL's religious beliefs include a duty of care for and just compensation to its employees, based on which it provides them a health-benefit plan. But ORTL believes it should not provide coverage contrary to its beliefs, shared by its directors, officers, employees, and members. ORTL also believes it should provide employee health insurance to obtain and retain excellent employees to further its mission, so forcing ORTL to forgo such insurance would put it at a competitive disadvantage and hamper its mission. And the employees ORTL wants want health-insurance coverage, but without the coverage to which ORTL and they object. Eight ORTL personnel are currently covered under ORTL's health-benefit plan. Before the Mandate, ORTL provided a plan through Providence Health Plans ("**PHP**"), which it had provided since 2015, that excluded abortion coverage.

The Mandate has an *abortion* grandfathering exemption involving such abortion-excluding plans, i.e., "if the insurer offering the health benefit plan excluded coverage for abortion in all of its individual, small employer and large employer group plans during the 2017 plan year." Bill § 2(7). *See supra* Introduction (amendment to disallow governmental plans from using this ex-

emption). PHP is the only known entity that fits that exemption. ORTL's present PHP plan excludes abortion coverage "unless there is a severe theat to the mother, or if the life of the fetus cannot be sustained," PHP, *2022 Oregon Member Handbook: Choice* 61 (2022), but doesn't exclude abortifacient "contraceptives," *id.* at 24. ORTL wants to provide an employee health-benefit plan without Mandate-imposed, objectionable coverage. ORTL wants a plan covering abortion only in case of imminent danger to the mother's life and not covering abortifacient "contraceptives." The Mandate bars this.

PHP is not suitable for ORTL because it covers abortifacient "contraceptives" and abortion beyond imminent danger to the mother's life. PHP also is not suitable because Oregon Health & Science University ("**OHSU**") is not in-network. OHSU is a premier health care facility that ORTL wants its employees to be able to access in-plan and that ORTL's employees want to access in-plan. PHP also is not suitable because in the past rate hikes have outpaced other plans and could do so again leaving ORTL without an economically desirable option. Other options, e.g., faith-based medical-cost-sharing groups and direct primary-care alternatives, are unsuitable as ORTL and its employees want a traditional health-benefit plan.

ORTL has not sought a "religious employer" exemption under Bill § 2(9) because doing so would be futile since the "religious employer" definition excludes ORTL. ORTL has not sought an exemption under a good-cause exemption mechanism as in *Fulton*, 141 S.Ct. at 1877-78, and *Foothill*, 623 F. Supp. 3d at 1093, since Oregon lacks such a general mechanism, making such a request futile. ORTL *did* seek an exemption under Bill § 2(10), authorizing exemptions if the Mandate might "adversely affect the allocation of federal funds." ORTL did so under the Weldon Amendment (a federal-funds conscience provision), based on now-defunct Trump administration interpretations of its provisions. The exemption wasn't granted, but DCBS thus became fully

aware of ORTL's conscience objections to the Mandate and offered ORTL no options.

As set out more fully below, *infra* Conclusion, ORTL wants relief allowing it to be treated as "religious employers" are, i.e., with authorization for *insurers to offer* and *employers to obtain* health-benefit plans compatible with religious beliefs. Bill § 2(9).

### The Legislature's Awareness of ORTL's and Others' Legal Objections

HB 3391 legislative history is available at olis.oregonlegislature.gov/liz/2017R1/Measures/Overview/HB3391, and video recordings of hearings are available. ORTL and similar religious objectors to the Bill lobbied against it, testifying against it before two committees and asking for an exemption in the final legislation since ORTL and others were not protected by any existing exemption, so the legislature *knew* of ORTL's objections, burden, and lack of exemption. *See also* olis.oregonlegislature.gov/liz/2017R1/Downloads/CommitteeMeetingDocument/108284 (Colm Willis for ORTL on Witness Registration for 3/15/2017 hearing); olis.oregonlegislature.gov/liz/2017R1/Downloads/CommitteeMeetingDocument/136756 (same for 6/28/2017 hearing). Oregon Family Council submitted written testimony with a legal-counsel letter attached explaining the Bill's free exercise flaws that made it vulnerable to a First Amendment challenge and establishing that the "religious employer" exemption was inadequate to protect other entities. *See* olis.oregonlegislature.gov/liz/2017R1/Downloads/CommitteeMeetingDocument/107838. PHP submitted a letter stating that "Providence is a faith-based, not-for-profit health system that proudly serves as Oregon's largest health care provider, largest health plan, and the largest private employer," Letter from Michael L. Cotton, Chief Executive Officer, Providence Health Plans, to Hon. Mitch Greenlick, Chair, H. Comm. on Health Care at 1 (Mar. 15, 2017), olis.oregonlegislature.gov/liz/2017R1/Downloads/CommitteeMeetingDocument/107514 ("**PHP Letter**"), explaining why the conscience-clause provision at Bill § 2(10) did

**Page 11 – PL.'S PRELIM. INJ. MOT. & MEM.**

not protect it as an insurer, *id.* at 2-3, and asked the committee to "provide a conscience clause for religious-sponsored insurers," *id.* at 3. Though aware of the lack of adequate, general, conscience protection, the legislature, instead of offering broadly applicable conscience protection, employed the grandfathering provision at Bill § 2(7)(e) that protected PHP based solely on excluding abortion coverage in 2017. In 2023, the legislature blocked governmental entities from using the grandfathering provision. *See supra* Introduction.

Video of Bill testimony details Bill opponents' arguments and need for protection. The PHP CEO testified based on the PHP Letter, explaining that PHP needed a clear conscience exemption. *Public Hearing on HB 3391 Before the H. Comm. on Health Care of the Oregon State Leg.*, 2017 Regular Session (March 15, 2017) (Testimony of Michael Cotton, Chief Executive Officer, Providence Health Plans), invintus-client-media.s3.wasabisys.com/4879615486/oregon_f9ea023c-9fcb-4e89-8ede-062410b792aa.mp4 (at 01:56:03) ("**March 15, 2017 Hearing**"). Jessica Adamson, Director, Government Relations, Providence Health and Services reiterated the need for PHP to be protected as an *insurer* providing health benefit plans, though she clarified that as a major *employer*, Providence had a self-funded plan and so was not subject to the Mandate. March 15, 2017 Hearing at 00:19:52; 00:32:17. Colm Willis, testifying for ORTL, explained that the Bill didn't protect ORTL though it violated ORTL's deeply held beliefs. March 15, 2017 Hearing at 00:23:05. Teresa Harke, representing Oregon Family Council, testified that the "religious employer" exemption didn't protect the free-exercise rights of many Oregonians and was subject to litigation for violating religious liberty. March 15, 2017 Hearing at 00:25:21.

***ORTL's Specific Objections to the Mandate Summarized***

ORTL objects on religious grounds to providing coverage for abortion and related services in its health-benefit plan. By "abortion" ORTL means:

**Page 12 – PL.'S PRELIM. INJ. MOT. & MEM.**

The use or prescription of any instrument or device or of an abortifacient to intentionally:

(A) kill, or attempt to kill, the unborn child of a woman known to be pregnant; or

(B) terminate, or attempt to terminate, the pregnancy of a woman known to be pregnant, with an

   intention other than:

   (i)  to produce a live birth and preserve the life and health of the child if born alive; or

   (ii)  to remove a dead unborn child or an ectopic pregnancy;

(C) except where the physician performing the abortion has determined, based on reasonable

   medical judgment, that the abortion is necessary to prevent the death of the pregnant woman,

   but not if that determination is based on a claim or a diagnosis that the pregnant woman will

   engage in conduct that would result in her death.

On the same grounds, as part of its objection to abortion, ORTL objects to covering "contra-ceptives" that can act as abortifacients, i.e., (a) Plan B (levonorgestrel), (b) Ella (ulipristal ace-tate), (c) copper IUDs (like ParaGard), and (d) IUDs with progestin—or any comparable "contra-ceptives" of the same type and chemical makeup that can also act as abortifacients.

***Irreparable Harm and No Adequate Remedy at Law***

ORTL is presently suffering irreparable harm to its constitutional rights due to the Mandate, *see Elrod v. Burns*, 427 U.S. 347, 373 (1976), and has no adequate remedy at law.

# Argument

## I.

### On the merits, the Mandate violates ORTL's free-exercise right as applied.

ORTL is likely[7] to succeed on the merits of its as-applied claim under the Free Exercise

---

[7] For purposes of ORTL's separate motion to consolidate the hearing on the merits with the hearing on the preliminary injunction motion, ORTL actually succeeds on the merits.

Clause. U.S. Const. Amend. I.[8] As established next: (**A**) the controlling Free Exercise Clause analysis was established in *Employment Division v. Smith*, 494 U.S. 872 (1990); (**B**) the Mandate is not neutral or generally applicable; and (**C**) the Mandate fails strict scrutiny as applied.

## A. The controlling Free Exercise Clause analysis was established in *Smith*.

*Smith* (5-4) altered free-exercise analysis by removing neutral, generally applicable laws from strict scrutiny. *Compare id.* at 879 *with id.* at 894 (O'Connor, J., joined by Brennan, Marshall, and Blackmun, JJ., concurring in judgment with strict-scrutiny analysis) (collecting cases).[9] *Fulton* plaintiffs sought overruling *Smith*, but the Court held it could protect plaintiffs under *Smith*, 141 S.Ct. at 1881.[10] ORTL is entitled to relief under *Smith*, but if needed it seeks *Smith*'s overruling for reasons stated in Justice Alito's *Fulton* concurrence, *id.* at 1882-1926 (Alito, J., joined by Thomas and Gorsuch, JJ., concurring in judgment). Only the High Court can overrule *Smith*. *Agostini v. Felton*, 521 U.S. 203, 237 (1997). The controlling analysis follows.

---

[8] "Congress shall make no law . . . prohibiting the free exercise [of religion]." *Id.* The Fourteenth Amendment, U.S. Const. Amend. XIV, applies the Clause to states. *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940).

[9] Congress quickly reinstated strict scrutiny for federally imposed free-exercise burdens:

*Smith*'s impact was quickly felt, and Congress was inundated with reports of the decision's consequences.[footnote omitted] In response, it attempted to restore the *Sherbert*[ *v. Verner*, 374 U.S. 398 (1963),] test. In the House, then-Representative Charles Schumer introduced a bill that made a version of that test applicable to all actions taken by the Federal Government or the States. H. R. 1308, 103d Cong., 1st Sess. (1993). This bill, which eventually became the Religious Freedom Restoration Act (RFRA), passed in the House without dissent, was approved in the Senate by a vote of 97 to 3, and was enthusiastically signed into law by President Clinton. 139 Cong. Rec. 27239–27341 (1993) (House voice vote); *id.*, at 26416 (Senate vote); Remarks on Signing the Religious Freedom Restoration Act of 1993, 29 Weekly Comp. of Pres. Doc. 2377 (1993).

*Fulton*, 141 S.Ct. at 1893-94 (Alito, J., joined by Thomas and Gorsuch, JJ., concurring in the judgment). Though RFRA originally reached state-imposed burdens, *Boerne v. Flores*, 521 U.S. 507 (1997), held that Congress lacked that power. Many states have RFRAs. Oregon doesn't.

[10] Five Justices supported reconsidering *Smith* as needed. *Id.* at 1882 (Barrett, J., joined by Kavanaugh, J., concurring); *id.* at 1883 (Alito, J., joined by Thomas and Gorsuch, JJ., concurring in judgment); *id.* at 1926 (Gorsuch, J., joined by Thomas and Alito, JJ., concurring in judgment).

1. **The Clause protects against government burdens on religious exercise based on sincerely held religious beliefs.**

The Clause protects against government burdens on religious exercise based on sincerely held religious beliefs. *Fulton*, 141 S.Ct. at 1876 ("burdened CSS's religious exercise by putting it to a choice of curtailing its mission or approving relationships inconsistent with its beliefs").

2. **Neutral, generally applicable laws get rational-basis scrutiny.**

*Smith* held that a "valid and neutral law of general applicability . . . that . . . proscribes (or prescribes) conduct that [one's] religion prescribes (or proscribes)" is subject to rational-basis review. 494 U.S. at 879 (citation omitted).

3. **Non-neutral, non-general laws get strict scrutiny.**

Laws that are *non*-neutral, *not* generally applicable ("**non-general**"), or both, get strict scrutiny. *Id.* at 886 n.3. *Accord Stormans v. Wiesman*, 794 F.3d 1064, 1076 (9th Cir. 2015), *cert. denied*, 579 U.S. 942 (2016).[11] So "law[s] . . . must be justified by a compelling governmental interest and . . . narrowly tailored to advance that interest." *Church of the Lukumi Babalu Aye v. Hialeah*, 508 U.S. 520, 531-32 (1993). "The tests for '[n]eutrality and general applicability are interrelated, and . . . failure to satisfy one requirement is a likely indication that the other has not been satisfied.'" *Stormans*, 794 F.3d at 1076 (quoting *Lukumi*, 508 U.S. at 531). "Nevertheless, we must consider each criterion separately so as to evaluate the text of the challenged law as well as the 'effect . . . in its real operation.'" *Id.* (quoting *Lukumi*, 508 U.S. at 535). *Fulton* applied *Smith* to strike a requirement that a religious, state-licensed, foster-care agency certify same-sex couples as foster parents against belief. 141 S.Ct. at 1882. Despite non-neutrality evidence, it was "more straightforward" to use a non-generality analysis. *Id.* at 1877.

---

[11] Though the Ninth Circuit's *Stormans* opinion is correct regarding strict scrutiny, where its analysis varies from the U.S. Supreme Court's the latter controls. *See infra* I.A.3.

A law is a "general law," *Smith*, 494 U.S. at 879, or of "general applicability," *id.*, if it applies "across-the-board," *id.* at 884, to all to whom asserted interests apply, as in *Smith*, where the controlled-substances ban applied to all without exception. A law is not "generally applicable," *id.* at 880, if it is *underinclusive* (or overbroad) in relation to those to whom "the government's asserted interest" applies. *Fulton*, 141 S.Ct. at 1877; *accord Lukumi*, 508 U.S. at 543 ("ordinances are underinclusive for those ends."); *id.* ("underinclusiveness is substantial"); *id.* at 544 ("underinclusive with regard to . . . interest"); *id.* at 545 ("underinclusive . . . with regard to [interest]"); *id.* ("underinclusive on its face"); *id.* at 546 ("ordinances are overbroad or underinclusive in substantial respects."). *See also Stormans*, 579 U.S. 942, 136 S.Ct. at 2433-34, 2437 (Alito, J., joined by Roberts, C.J., and Thomas, J., dissenting from denial of certiorari) (questioning Ninth Circuit's finding that Christian pharmacists weren't targeted and demonstrating law was non-general as "underinclusive").

Underinclusiveness *also* can establish that: (**i**) an asserted interest can't be taken seriously, *see Rep. Party Minn. v. White*, 536 U.S. 765, 766 (2002) ("as a means of pursuing this interest, . . . clause is so woefully underinclusive that the Court does not believe it was adopted for that purpose." (citation omitted)); *First Nat'l Bank v. Bellotti*, 435 U.S. 765, 793 (1978) (underinclusiveness "undermines the likelihood of a genuine state interest"); (**ii**) an asserted interest isn't "compelling," *Lukumi*, 508 U.S. at 546-47; or (**iii**) a provision is not narrowly tailored, *id.* at 546; *S. Bay United Pentecostal Church v. Newsom*, 141 S.Ct. 716, 718 (2021) (statement of Gorsuch, J., joined in relevant part by four other Justices) (citing *Bellotti*, 435 U.S. at 793) (underinclusivity is a "telltale sign[] th[e] Court has long used to identify laws that fail strict scrutiny.").

*Fulton* provided two non-exclusive analyses that can establish free-exercise non-generality. 141 S.Ct. at 1877. *Fulton* cited *Smith* for one, herein the "**particular-reason analysis**": "A law is

not generally applicable if it 'invite[s]' the government to consider the particular reasons for a person's conduct' by providing '"a mechanism for individualized exemptions."' *Id.* (quoting *Smith*, 494 U.S. at 884). So laws with individual-exemption mechanisms, are non-general, as in *Fulton*, 141 S.Ct. at 1878, and *Foothill*, 623 F. Supp. 3d at 1092-93 ("A law is not generally applicable if it invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions." (cleaned up)). But *Fulton* emphasized what lies *behind* such a mechanism, i.e., "government . . . consider[ing] . . . particular reasons" when exempting. This reading was confirmed when *Fulton* rejected the argument that the mechanism was "irrelevant because the Commissioner ha[d] never granted one," 141 S.Ct. at 1872, saying the issue was whether government was invited '"to decide which reasons for not complying with the policy are worthy of solicitude."' *Id.* (quoting *Smith*, 494 U.S. at 884). So if particular reasons are, or can be, considered for granting exemptions, a law is non-general. Also, *Fulton* decided that if *part* of a law has such a particular-reason mechanism, though another doesn't, they must be read together and the *whole* is non-general. 142 S.Ct. at 1879. *Cf. id.* at 1928-29 (Gorsuch, J., joined by Thomas and Alito, JJ., concurring in judgment) (Majority position is that "the City's power to grant exemptions from its nondiscrimination policy *anywhere* 'undercuts its asserted interests' and thus 'trigger[s] strict scrutiny for applying the policy *everywhere*.'" (emphasis in original; citation omitted)).

*Fulton* said, "A law also lacks general applicability if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Fulton*, 141 S.Ct. at 1877 (citation omitted) ("**comparable-exemption analysis**"). This example was from *Lukumi*, 508 U.S. 520, where a law was non-general for barring animal sacrifice based on a public-health interest concerning animal carcass disposal that logically applied to exempted

hunters and restaurants. *Fulton*, 141 S.Ct. at 1877 (citation omitted). *See also Rom. Cath. Diocese Brooklyn v. Cuomo*, 141 S.Ct. 63, 66 (2020) (pandemic-based law non-general for restricting worship sites to ten persons but not restricting "many whose services are not limited to those . . . regarded as essential"); *Tandon v. Newsom*, 141 S.Ct. 1294, 1296, 1298 (2021) (per curiam) (granting injunction pending appeal) (COVID-19 restrictions "contain[ing] myriad exceptions . . . for . . . activities" "comparable" to restricted religious exercise "not . . . generally applicable"); *In re S. Bay United Pentecostal Church*, 992 F.3d 945, 948 (9th Cir. 2021). The comparable-exemption analysis can't logically be restricted to *secular* exemptions (at issue in these cases) because comparable *religious* exemptions also make laws not "generally applicable," *Smith*, 494 U.S. at 879, in relation to asserted interests. *See Tandon*, 141 S.Ct. at 1298 ("contains myriad exceptions and accommodations for *comparable activities*" (emphasis added)).

These two *Fulton* analyses are necessarily *non-exclusive* because the sole overarching *test* is whether a law is "general," *Smith*, 494 U.S. at 874, 879, "generally applicable," *id.* at 879-80, "across-the-board," *id.* at 884, or "uniform," *Hobbie v. Unemployment Appeals Comm'n of Florida*, 480 U.S. 136, 141 (1987) ("neutral and uniform"); *Wisconsin v. Yoder*, 406 U.S. 205, 220 (1972) ("applies uniformly to all citizens of the State"). *Fulton*'s particular-reason and comparable-exemption analyses are merely two ways to satisfy the overarching generality test. So the actual test is general applicability itself, determined by inclusion relative to interests.

The foregoing free-exercise analysis from the U.S. Supreme Court necessarily controls over any contrary lower-court analysis. For example, in *Tandon*, 141 S.Ct. 1294 (per curiam), the Court noted that "[t]his is the fifth time the Court has summarily rejected the Ninth Circuit's analysis of California's COVID restrictions on religious exercise," *id.* at 1297-98 (collecting cases). The Court reiterated that California's regulation "contains myriad exceptions and accom-

modations for comparable activities," *id.* at 1298, and strict scrutiny "'is not watered down'; it 'really means what it says,'" *id.* (quoting *Lukumi*, 508 U.S. at 546).

Thus, the High Court's analysis controls over any contrary Ninth Circuit analysis in *Stormans*, 794 F.3d 1064, which involved rules compelling pharmacists to act against conscience. *Stormans* (i) noted the Supreme Court's "'individualized exemption' doctrine," *id.* at 1081; (ii) said *Smith* "limited that doctrine," *id.*; (iii) noted the "substantially similar" and "good faith compliance" language in the rules plaintiffs identified as "discretionary text," *id.*; (iv) concluded "the rules do not afford unfettered discretion that could lead to religious discrimination because the provisions are tied to particularized, objective criteria," *id.* at 1081-82; (v) said "[t]he mere existence of an exemption that affords some minimal governmental discretion does not destroy a law's general applicability," *id.* at 1082; and (vi) agreed with courts that "have rejected a *per se* approach and instead apply a fact-specific inquiry to determine whether the regulation at issue was motivated by discriminatory animus, or whether the facts support an argument that the challenged rule is applied in a discriminatory fashion that disadvantages religious groups . . . ,'" *id.* (citation omitted). That narrowing of *Smith*'s "generally applicable" test erred under *Smith* and fails under *Fulton*.

While simply comparing *Stormans*'s narrowed test with *Fulton*'s reveals the errors, five highlights establish it. First, *Fulton* nowhere endorsed the Ninth Circuit's notion that the generally applicable inquiry requires a "fact-specific inquiry to determine whether the regulation at issue was motivated by discriminatory animus." *Id.* (citation omitted). Under *Fulton*, "animus" might apply to the *neutrality* analysis, but not to the *generality* analysis, which simply identifies non-generality alone.

Second, *Fulton* reaffirmed that "[a] law is not generally applicable if it 'invite[s]' the gov-

ernment to consider the particular reasons for a person's conduct by providing "'a mechanism for individualized exemptions.'" 141 S.Ct. at 1877 (quoting *Smith*, 494 U.S. at 884). So individual-exemption mechanisms make laws non-general without more, as in *Fulton*, 141 S.Ct. at 1878, and *Foothill*, 623 F. Supp. 3d at 1092-93.

Third, the Ninth Circuit's claim that the "mere existence" of such a mechanism "does not destroy a law's general applicability," 794 F.3d at 1082, is erroneous since *Fulton* rejected the argument that the mechanism was "irrelevant because the Commissioner ha[d] never granted one," 141 S.Ct. at 1872, and decided that if *part* of a law has such a mechanism, though another does not, they must be read together and the *whole* is non-general, *id.* at 1879.

Fourth, the *Stormans* claim that *Smith* "limited" the "individualized exemption doctrine," 794 F.3d at 1081, is erroneous because *Smith* instead declined to apply the "*Sherbert* test to ana-lyze free exercise challenges to . . . laws" "with an across-the-board criminal prohibition on a particular form of conduct," 494 U.S. at 884, that did *not* have a "a system of individual exemp-tions," *id.* (citations omitted). That *Stormans* claim also errs under *Fulton*'s reaffirmation of the *Smith* analysis that such a mechanism makes a law non-general, 141 S.Ct. at 1877.

Fifth, the Ninth Circuit's belief that "unfettered discretion" is required for an individualized-exemption mechanism to make a law non-general, 794 F.3d at 1081-82, fails under both *Smith* and *Fulton*. As *Stormans* noted, *Smith* showed that precedent had established the "'individual-ized exemptions' doctrine." *Id.* at 1081. But *Smith*'s discussion neither mentioned "unfettered discretion" nor established such a requirement for a "mechanism for individualized exemptions" or "a system of individual exemptions." 494 U.S. at 884. *Smith* cited the unemployment compen-sation law at issue in *Sherbert* "as allowing benefits for employment caused by at least some 'per-sonal reasons,'" *id.* (citation omitted), which limited discretion to such reasons. *Foothill* correctly

understood *Fulton* that the non-generality test asks only if there *is* an individualized-exemption mechanism without any consideration of the scope of the discretion: "A law is not generally applicable if it invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions." 623 F. Supp. 3d at 1092-93 (cleaned up).

*After* stating this, *Foothill* added *other* approaches involving discretion:

> Nor is it generally applicable if it includes "a formal system of entirely discretionary exceptions ...." [141 S.Ct.] at 1878. Such a mechanism or formal system might include a "good cause" standard permitting the government to grant exemptions, *Smith*, 494 U.S. at 884, or a provision in the law allowing exceptions at the "sole discretion" of a government agent, *Fulton*, 141 S.Ct. at 1878.

*Id.* at 1093. This correctly recognizes that the mentions of "sole discretion" and "entirely discretionary" in *Fulton* were *describing* a provision that had such language: "'unless an exception is granted by the Commissioner or the Commissioner's designee, in his/her sole discretion,'" 141 S.Ct. at 1878 (citation omitted). *Fulton* made clear that this "sole discretion" language was *descriptive*, not *prescriptive* of language formal mechanisms require. *Compare id.* at 1877 (test stated as "a mechanism for individualized exemptions" with no mention of "sole discretion") *with id.* at 1878 ("in this case at the 'sole discretion' of the Commissioner") *and id.* at 1879 ("here, at the Commissioner's 'sole discretion'"). So where an individualized-exemption mechanism exists, it makes a law non-general without any consideration of how much discretion it affords. And assuming *arguendo* that the *Stormans* "minimal governmental discretion" language survives *Fulton*, which it doesn't, the existence of a *formal* exemption mechanism differs in kind from the "substantially similar" and "good faith compliance" language at issue in *Stormans*. As established next, Oregon has such a formal mechanism that makes it non-general.

## B.  The Mandate is not neutral or generally applicable, so strict scrutiny applies.

The Mandate must be neutral *and* generally applicable to avoid strict scrutiny. The Mandate

isn't *neutral*. Its purpose was to force abortion and contraception insurance coverage on entities that didn't provide coverage, so it necessarily targeted those who objected to such coverage for religious and moral reasons, as evidenced by the fact that the legislature was aware that entities like ORTL objected and weren't protected by the "religious employer" exemption. *Supra* Facts. *Cf. Stormans*, 579 U.S. 942, 136 S.Ct. at 2433-34, 2437 & n.3 (Alito, J., joined by Roberts, C.J., and Thomas, J., dissenting from cert. denial) (questioning Ninth Circuit's finding that Christian pharmacists weren't targeted after district court found that they were as a factual matter). Thus, requiring groups like ORTL to provide mandated coverage was an actual object of the Mandate. The Mandate was patterned after an August 2014 California abortion-insurance mandate that was established by enforcement-instruction letters from California's DMHC. *Compare Foothill*, 623 F. Supp. 3d at 1082-83 (describing mandated abortion coverage); *id.* at 1085-87 (same); *id.* at 1989 (same), *with* Mandate; *compare also* 623 F. Supp. 3d at 1085 n.5 (California's "religious employer" definition), *with* Mandate Bill § 2(1)(d) (adopting definition near-verbatim to California's). California's abortion-coverage mandate arose in response to lobbying of California's DMHC by "advocacy organizations opposed to the elimination of coverage for abortion," 623 F. Supp. 3d at 1089, after "two Catholic universities announc[ed] they would be 'eliminating abortion coverage from their employee health plans,'" *id.* (citation omitted). Oregon's similar Bill, which had its first reading in the house on March 9, 2017, olis.oregonlegislature.gov/liz/2017R1/Measures/Overview/HB3391, similarly imposed abortion coverage on all health benefit plans except for similarly defined "religious employers" (initially) and had like advocates, olis.oregonlegislature.gov/liz/2017R1/Measures/Analysis/HB3391 (listing "Courtney Graham and Andrea Salinas fact sheet" submitted on March 15, 2017, for "NARAL Pro-Choice Oregon, American Civil Liberties Union of Oregon, Family Forward Oregon, et al.");

olis.oregonlegislature.gov/liz/2017R1/Downloads/CommitteeMeetingDocument/107499 (text of

advocacy fact sheet). Moreover, PHP and ORTL *both* testified at legislative hearings that they

needed a conscience exemption, *supra* Facts, but only PHP was exempted (by the grandfathering

exemption), which indicates hostility against ORTL and favoritism toward PHP.

Furthermore, the "religious employers" definition is too narrow, *see supra* Introduction, so

that entities seeking a free-exercise exemption essentially have to be churches to qualify. That

narrow definition and PHP's exemption indicate the legislature's decision to pick and choose

among religious organizations, favoring some and evidencing hostility to others. *Cf. Spencer v.

World Vision*, 633 F.3d 723, 728-29 (9th Cir. 2011) (O'Scannlain, Cir. J., concurring) (if statute

"requires an organization to be a 'church' to qualify for [an] exemption," it "discriminate[s]

against religious institutions," "rais[ing] the specter of constitutionally impermissible discrimina-

tion between institutions on the basis of the 'pervasiveness or intensity' of their religious beliefs"

(citations omitted)); *Colo. Christian Univ. v. Weaver*, 534 F.3d 1245, 1259 (10th Cir. 2008) (it is

no more constitutionally acceptable for state to discriminate between "*types* of [religious] institu-

tion" than to discriminate between denominations (emphasis added)). The religious hostility in-

herent in the exemption's "religious employers" requirement plainly renders the Mandate uncon-

stitutional under *Stormans*, which recognized that laws that "refer[] to a religious practice with-

out a secular meaning discernable from the language or context" "lack[] facial neutrality." 794

F.3d 1076. The rules challenged in *Stormans* contained no religious exemption. *Id.* at 1072 (no

exemption for "Delivery Rule"; *parties* agreed that "Pharmacist Responsibility Rule" did not ap-

ply to pharmacists with religious *or* secular objections, although rule had no formal exemption,

*see* Wash. Admin. Code 246-863-095 (2007)). The Mandate, however, with its "religious em-

ployer" exemption, fails this test since it refers to religion *as such*, and thus cannot possibly be

interpreted to have a secular meaning, which distinguishes it from the rules at issue in *Stormans* and renders it non-neutral under *Stormans*.

That anti-religious hostility is even evident in the "religious employers" definition, which only says insurers "may" offer conscience-conforming plans, Bill § 2(9), without requiring insurers to offer such plans, leaving religious employers at insurers' mercy. And that hostility is evident in the formal federal-funds-exemption mechanism, which allows a conscience exemption "only to the minimum extent necessary to ensure the continued receipt of federal funds." Bill § 2(10). So the Mandate is the result of, and itself evidences, non-neutrality to religious free exercise, requiring strict scrutiny.

Regarding *generality*, "resolv[ing] this case under the rubric of general applicability" is "straightforward." *Fulton*, 141 S. Ct. at 1877. The Mandate is underinclusive for not applying to *all* to whom the asserted interest logically applies, including by grandfathering PHP and having a formal individual-exemption mechanism, on which basis *Fulton* found non-generality.

The interest is asserted in the name "Reproductive Health Equity Act," i.e., an *equal-outcome* interest, *see, e.g.*, Milken Inst. Sch. Pub. Health, *Equity vs. Equality: What's the Difference?*, onlinepublichealth.gwu.edu/resources/equity-vs-equality/, in providing financial coverage for "reproductive health" services for all. RHEA's requirements confirm that cover-all interest by mandating health-benefit plans to cover "reproductive health," Bill § 2, and funding the same coverage for some, Bill §§ 4-5, 11. That cover-all interest is confirmed by officials: "House Bill (HB) 3391 ensures that Oregonians have access to comprehensive reproductive health care regardless of their income, citizenship or immigration status, gender identity, or insurance coverage," since "everyone deserves access to" such care. Ore. Health Auth., *House Bill 3391: Repro-*

*ductive Health Equity Act: Report to the Legislature* 1 (2018).[12] Governor Brown confirmed the

purpose to "'expand[] access to basic reproductive health services for all Oregonians . . . .'" *Id.*

The "generally applicable" analysis, *Smith*, 494 U.S. at 880, next asks whether the Mandate

is underinclusive in relation to that cover-all interest. It is, in at least four ways.

First, the Mandate is underinclusive due to the grandfathering exemption, Bill § 2(7)(e),

which excludes covering "[a]bortion if the insurer offering the health benefit plan excluded cov-

erage for abortion in all of its individual, small employer and large employer group plans during

the 2017 plan year." Under *Smith*'s overarching "generally applicable" test, 494 U.S. at 880, this

exemption makes the Mandate non-general because the cover-all interest logically applies to all

health-benefit plans. Under *Fulton*'s comparable-exemption analysis, 141 S.Ct. at 1877, the

Mandate is non-general because this exemption excludes abortion coverage on the secular

ground of 2017 plan coverage while not exempting ORTL on religious grounds. And if, despite

that secular language, the legislature created this exemption for the particular reasons stated in

the PHP Letter—such as Providence being faith-based and "Oregon's largest health care pro-

vider, largest health plan, and the largest private employer," PHP Letter at 1—that makes the ex-

emption non-general under particular-reason analysis. That PHP is the "largest" in multiple ways

makes the Mandate *substantially* underinclusive.

Second, the Mandate is underinclusive for exempting "religious employers" from abortion

and contraceptive coverage. Bill § 2(9). Though that is an appropriate accommodation under

establishment-clause analysis, the present context is the free-exercise "generally applicable" test,

and *Smith*'s free-exercise analysis asks *solely* whether a law is "generally applicable" to all to

---

[12] Available at www.oregon.gov/oha/PH/HEALTHYPEOPLEFAMILIES/REPRO-DUCTIVESEXUALHEALTH/Documents/RHEA/HB3391-Leg-Report.pdf.

whom an interest logically extends, 494 U.S. at 879, not *how* non-generality occurs. *See Tandon*, 141 S.Ct. at 1298 (per curiam) (strict scrutiny applies because provision "contains myriad exceptions and accommodations for comparable activities"). Though the exemptions *Fulton* cited from *Lukumi* were *secular*, 141 S.Ct. at 1877, the cover-all interest logically extends to all plans covering all entities (and beyond), so this exemption makes the Mandate non-general. And in administering this exemption, Defendants must consider particular reasons, i.e., whether "religious employers" (a) have the right purpose, (b) primarily employ like-values persons, (c) primarily serve like-values persons, and (d) are nonprofit. Bill § 2(1)(d) (incorporating ORS § 743A.066). That makes the Mandate non-general under *Fulton*'s particular-reason analysis, 141 S.Ct. at 1877.

Third, the Mandate is underinclusive because it has a *formal* mechanism for individualized exemptions—to avoid loss of federal funding, but only as far as necessary:

> If [DCBS] concludes that enforcement of this section may adversely affect the allocation of federal funds to this state, the department may grant an exemption to the requirements but only to the minimum extent necessary to ensure the continued receipt of federal funds.

Bill § 2(10). That mechanism alone makes the Mandate not "generally applicable" under *Smith*. 494 U.S. at 880, 884-85. And under *Fulton*, it doesn't matter whether exemptions are *granted*. 141 S.Ct. at 1872. Under *Fulton*'s particular-reason analysis, *id.* at 1877, this formal mechanism allows Defendants to consider particular reasons why exemptions are sought—as in ORTL's exemption request, *supra* Facts—and balance reasons to grant as little conscience protection as necessary to save federal funding, so it is readily non-general under that analysis.[13] Since *Fulton* held that if *part* of a law has such a particular-reason mechanism it makes the *whole* non-general, *id.* at 1879; *id.* at 1928-29 (Gorsuch, J., joined by Thomas and Alito, JJ., concurring in judgment),

---

[13] To the extent any *Stormans* analysis might be contrary, it doesn't control. *Supra* I.A.3.

this formal mechanism for individualized exemptions makes the Mandate as a whole non-general. The Mandate is also non-general under *Fulton*'s comparable-exemption analysis because it authorizes an exemption for a *secular* reason, i.e., assuring federal funds, while not exempting ORTL for a *religious* reason, i.e., in seeking an exemption under this mechanism, *supra* Facts, ORTL argued that it objected because it believes that abortion is a grave moral wrong and religiously forbidden under the traditional Judeo-Christian beliefs that motivate the actions of ORTL, its board members, and employees.[14]

Fourth, the Mandate is underinclusive because it excludes certain types of health plans. For example Bill § 2(1)(c) defines "health benefit plan" to exclude certain plans:

> (c) "Health benefit plan" has the meaning given that term in ORS 743B.005, excluding Medicare Advantage Plans and including health benefit plans offering pharmacy benefits administered by a third party administrator or pharmacy benefit manager.

Far from expanding "reproductive health" services funding under all plans, the Mandate advances the cover-all interest only for those with health-benefit plans (or who qualify for public funding, Bill § 5). This leaves countless employed, self-employed, and unemployed persons unaided by the Mandate. These coverage gaps undermine the cover-all interest and make the Man-

---

[14] ORTL argued that DCBS should grant the requested exemption because the Mandate as applied to those unwilling to "provide coverage of . . . abortions" jeopardizes Oregon's receipt of federal funds under the Weldon Amendment ("**Weldon**"), which provides as follows:

> (1) None of the funds made available in this Act may be made available to a Federal agency or program, or to a *State* or local government, if such agency, program, or government subjects any institutional or individual health care entity to *discrimination* on the basis that the health care entity does not provide, pay for, *provide coverage of*, or refer for *abortions*.

> (2) In this subsection, the term "*health care entity*" includes an individual physician or other health care professional, a hospital, a provider-sponsored organization, a health maintenance organization, a *health insurance plan*, or *any other kind of health care* facility, organization, or *plan*.

*See, e.g.*, Consolidated Appropriations Act, 2018, Pub. L. 115-41, Div. H, § 507(d), 132 Stat. 348 (Mar. 23, 2018) (emphasis added). Under Trump administration interpretations of Weldon's provisions, ORTL could make this argument, though those changed in the next administration.

date not "generally applicable," 494 U.S. at 880, in relation to that interest under *Smith*. And the legislature had to consider particular reasons for why the Mandate excludes all of these situations when there is no exemption for ORTL's health-benefit plan, which makes the Mandate non-general under *Fulton*'s particular-reasons analysis. 141 S.Ct. at 1877.

The above exemptions and gaps make the Mandate non-general since they undermine the government's asserted interest "in a similar or greater degree" to granting ORTL an exemption. *Lukumi*, 508 U.S. at 543. For example, exempting "religious employers" would undermine the cover-all interest in a similar degree to exempting ORTL because like-values employees in both cases don't want the objectionable coverage. The other exceptions and gaps undermine the cover-all interest to a "greater degree," *id.*, based on comparing ORTL employees *not* wanting objectionable coverage to others *wanting* that coverage.

In sum, the Mandate is non-neutral and it is non-general in multiple ways in relation to the cover-all interest under *Smith*'s overarching "generally applicable" test and *Fulton*'s non-exclusive, non-generality tests. So the free-exercise analysis proceeds under strict scrutiny.

## C. The Mandate fails strict scrutiny as applied to ORTL.

The Mandate fails strict scrutiny as applied to ORTL and its religious beliefs. *Defendants* have the burden to justify the Mandate under strict scrutiny. *Supra* Governing Legal Standards.

### 1. ORTL's non-complicity beliefs are sincerely held.

ORTL's sincerely held religious belief is that covering abortion and abortifacients in its health-benefit plan involves forbidden abortion complicity. *Supra* Facts. ORTL's *abortion* belief is like the churches' in *Foothill*, 623 F. Supp. 3d 1079, and *Skyline*, 968 F.3d 738. Its *abortifacient* belief is like that of *Hobby Lobby* plaintiffs, 573 U.S. at 702, who were protected from

coverage under the federal RFRA, *supra* Facts. Such beliefs cannot be gainsaid:

> [T]he City's actions have burdened CSS's religious exercise by putting it to the choice of curtailing its mission or approving relationships inconsistent with its beliefs. . . . In [defendant's] view, certification reflects only that foster parents satisfy the statutory criteria, not that the agency endorses their relationships. But CSS believes that certification is tantamount to endorsement. And "religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection."

*Fulton*, 141 S.Ct. at 1876 (citation omitted). So ORTL's beliefs must be accepted as stated.

### 2.    The Mandate substantially burdens ORTL's free exercise.

Compelling prolife ORTL to violate its religious belief or not provide a health-benefit plan substantially burdens its free-exercise right, just as the similar mandates at issue in the *Foothill*, *Skyline*, and *Hobby Lobby* cases were substantial burdens. *See, e.g.*, *Hobby Lobby*, 573 U.S. at 691 ("[W]e must decide whether the challenged HHS regulations [imposing abortifacient insurance coverage] substantially burden the exercise of religion, and we hold that they do.").

### 3.    Not exempting ORTL is not narrowly tailored to a compelling interest.

As applied to ORTL, the Mandate fails "the most rigorous of scrutiny," *Lukumi*, 508 U.S. at 546, which inquires whether *denying ORTL an exemption*[15] "advances 'interests of the highest order' and is narrowly tailored to achieve those interests," *Fulton*, 141 S.Ct. at 1881 (citation omitted). If "the government can achieve its interests in a manner that does not burden religion, it must do so." *Id.*; *accord Hobby Lobby*, 573 U.S. at 728. "Rather than rely on 'broadly formulated interests,' courts must 'scrutinize[ ] the asserted harm of granting specific exemptions to particular religious claimants.'" *Fulton*, 141 S.Ct. 1881 (citation omitted)).

---

[15] "The granting of an exemption from a generally applicable law is tantamount to a holding that a law is unconstitutional as applied to a particular set of facts [citation omitted], and cases holding generally applicable laws unconstitutional as applied are unremarkable." *Fulton*, 141 S.Ct. at 1916-17 (Alito, J., joined by Thomas and Gorsuch, JJ., concurring in judgment).

**Page 29 – PL.'S PRELIM. INJ. MOT. & MEM.**

Regarding interests for denying ORTL relief, Defendants will presumably assert ones like those in *Foothill*, none of which sufficed, 623 F. Supp. 3d at 1094:

> The Director explains her decision not to make an exception at the Churches' request by citing her policy not to entertain requests for exceptions unless they come from a plan. She cites three compelling government interests. Def.'s MSJ at 18. First, the policy prevents "a flood of exemption requests from over 26 million enrollees" who may object to their plan's covered care services. *Id.* Second, it prevents "significant third-party harm to enrollees," which may occur if employers opt out of legally mandated healthcare coverage. *Id.* at 18-19. Third, it appropriately restricts DMHC's jurisdiction as authorized by the California State Legislature. *Id.* at 19. None of these interests are sufficiently compelling, nor is the department's rigid approach narrowly tailored. *Lukumi*, 508 U.S. at 531-32 . . . .

The *Foothill* court found the "first two interests . . . speculative and thus 'insufficient to satisfy strict scrutiny.'" *Id.* (citing *Fulton*, 141 S.Ct. at 1882). Here flood-prevention and third-party-harm interests also would be speculative and insufficient.

The flood-prevention interest wasn't compelling because (i) it was "'conjecture' and unsubstantiated in the record," (ii) the focus must be on exempting a particular claimant, (iii) cases cited "arose outside of California and concerned entirely different policies," *id.* (citations omitted), and (iv), the Director had resources and options:

> Even assuming similar religious challenges materialized in California in large numbers, the Director has not offered evidence showing that entertaining . . . objections would be so difficult and time-consuming that "DMHC's operations would grind to a halt ...." *Id.* at 20. The DMHC could reject outlandish requests on their merits and limit requests to those from employers like the Churches, rather than individuals. Finally, if the DMHC receives and approves an exemption request from a religious claimant, the DMHC can ensure the claimant's plan is "at the table," *id.* at 21, by including the plan on communications and requesting the plan submit a revised evidence of coverage document that includes the approved exemption.

*Id.* at 1094-95. *See also Hobby Lobby*, 573 U.S. at 732-33 ("flood" argument not compelling). Here, a flood-prevention interest would also be conjecture and unfocused on ORTL's request. Defendants can similarly address the concerns in the unlikely event there were anything like a flood. And an asserted interest in preventing similar entities from pursuing rights is non-cogniza-

ble because the federal constitution preempts governmental efforts to deny such rights. U.S.

Const. Art. VI, § 2.

The third-party-harm interest wasn't compelling: "'all the Churches' employees share their

religious beliefs about abortion, so the State's interest in withholding an exemption *from the*

*Churches* cannot be compelling.'" *Foothill*, 623 F. Supp. 3d at 1095 (citation omitted; emphasis

in original). "Accordingly, the Director may limit religious exemptions to 'particular' employers

who provide coverage to employees who share their religious beliefs." *Id.* (citing *Fulton*, 141

S.Ct. at 1881). Here, ORTL's employees also share its beliefs regarding abortion and abortifa-

cient "contraceptives," so no third-party-harm interest is compelling.

The state-law-compliance interest wasn't compelling. The Director said state law only per-

mitted her to regulate health plans, which *Foothill* assumed *arguendo* and rejected:

> Nonetheless, nothing in the statutory text explicitly precludes her from fielding requests for
> exemptions from religious claimants. Likewise, nothing appears to preclude the Director from
> directing the religious claimant's plan to submit a revised evidence of coverage document
> comporting with the religious claimant's belief to the DMHC for approval. The Director's au-
> thority to give orders to a plan does not foreclose the authority to consider requests for those
> orders from others. In the end, the Director is still regulating the plan.

*Id.* Here, were Defendants to make a similar argument—though Oregon lacks the general "good

cause" formal mechanism California's insurance scheme had, *id.* at 1093—the foregoing or like

answers would refute it. Vitally, the Free Exercise Clause and Supremacy Clause don't allow

those with implementing and enforcement authority over state law to evade the preempting effect

of the First Amendment on the grounds that state law limits them because, if a federal free-exer-

cise violation is occurring, Defendants must provide the means to cure it based on their authority.

*Foothill* held that "the Director has not shown '[she] lacks other means of achieving [her]

desired goal without imposing a substantial burden on the exercise of religion by [plaintiffs].'"

*Id.* at 1095 (bracketed text from court) (quoting *Hobby Lobby*, 573 U.S. at 728). Accordingly, "[t]he Director's denial of the Churches' request for exceptions to accommodate their religious beliefs, based solely on the fact that those requests did not originate with a plan, was not narrowly tailored to serve a compelling interest." *Id.*

*Hobby Lobby* rejected the argument that imposing abortifacient "contraceptive" funding on religious objectors under the Affordable Care Act was "essential to the comprehensive health-insurance scheme that ACA establishes." 573 U.S. at 733-34. The Court said if religious organizations certify that abortifacients violate their religious beliefs, the ACA required that

> the organization's insurance issuer or third-party administrator must "[e]xpressly exclude contraceptive coverage from the group health insurance coverage provided in connection with the group health plan" and "[p]rovide separate payments for any contraceptive services required to be covered" without imposing "any cost-sharing requirements . . . on the eligible organization, the group health plan, or plan participants or beneficiaries."

*Id.* at 730-31 (citations omitted). That was more narrowly tailored because it "d[id] not impinge on the plaintiffs' religious belief that providing insurance coverage for the contraceptives at issue here violates their religion, and it serves HHS's stated interests equally well." *Id.* at 731. Oregon could have put a similar bypass in the Mandate. Its failure to do so fails narrow tailoring. And Bill § 5 reveals a less-restrictive option, i.e., state funding could provide any coverage Oregon wants for employees of religious objectors without violating ORTL's free-exercise rights.

*Fulton* also rejected asserted interests as not sufficiently compelling to force a Christian foster-care agency to violate its religious beliefs regarding same-sex couples as foster parents. 141 S.Ct. at 1881-82. "The City asserts that its non-discrimination policies serve three compelling interests: maximizing the number of foster parents, protecting the City from liability, and ensuring equal treatment of prospective foster parents and foster children." *Id.* at 1881. The Court

noted that these were at "a high level of generality, but the First Amendment demands a more precise analysis," a focus on interests supporting *not exempting* the objecting Christian agency. *Id.* The Court said the maximization interest might actually be served by the exemption and potential litigation was speculative. *Id.* at 1881-82. It said that, while the equal-treatment interest was stronger, it was undercut by allowing exemptions, *id.* at 1882 (citations omitted):

> That leaves the interest of the City in the equal treatment of prospective foster parents and foster children. We do not doubt that this interest is a weighty one, for "[o]ur society has come to the recognition that gay persons and gay couples cannot be treated as social outcasts or as inferior in dignity and worth." . . . .On the facts of this case, however, this interest cannot justify denying CSS an exception for its religious exercise. The creation of a system of exceptions under the contract undermines the City's contention that its non-discrimination policies can brook no departures. . . . The City offers no compelling reason why it has a particular interest in denying an exception to CSS while making them available to others.

The same applies to ORTL if Oregon asserts such an interest, e.g., its grandfathering exemption, federal-funds exemption mechanism, and other gaps undercut any such brook-no-departures interest, but RHEA instead asserts an interest in *equitable funding* for abortion and contraception.

In sum, no compelling interest justifies not exempting ORTL from the Mandate. Even assuming *arguendo* one were compelling, there are more narrowly tailored options to further any interest. So the Mandate violates ORTL's free-exercise right.

## II.
### The remaining preliminary injunction factors warrant relief.

In First Amendment challenges, the likelihood of success on the merits is the dominant factor, so once likely merits success is established the other elements follow. *Sammartano*, 303 F.3d at 972-74, *abrogated in part by Winter*, 555 U.S. at 24.

**A. ORTL will suffer irreparable harm absent relief.**

Given the violation of its free-exercise right, ORTL is suffering irreparable harm. *Elrod*, 427

U.S. at 373 ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."). "[T]he deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (citation omitted). *Accord Monterey Mech. Co. v. Wilson*, 125 F.3d 702, 715 (9th Cir. 1997) (constitutional-rights violation is per se irreparable harm).

**B. A preliminary injunction is in the public interest.**

Abiding by the First Amendment is always in the public interest. *See, e.g.*, *Klein v. City of San Clemente*, 584 F.3d 1196, 1208 (9th Cir. 2009) (where constitutional rights affected, "public interest . . . tip[s] sharply in favor of enjoining" laws); *Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005) ("[A]ll citizens have a stake in upholding the Constitution" and have "concerns [that] are implicated when a constitutional right has been violated."); *Melendres*, 695 F.3d at 1002 ("'[I]t is always in the public interest to prevent the violation of a party's constitutional rights.'" (citation omitted)). No third-party harm is involved as only ORTL employees are involved, and they don't want the contested coverage the Mandate compels. So the public interest tips sharply in ORTL's favor.

**C. The balance of equities tips sharply in ORTL's favor.**

"[T]he balance of hardships between the parties," *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1137 (9th Cir. 2011), tips sharply in ORTL's favor. ORTL's interests are in not violating religious belief and implementing First Amendment protection. Defendants will suffer no harm from a preliminary injunction as they "cannot suffer harm from an injunction that merely ends an unlawful practice[.]" *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013).

## Conclusion

The Mandate is unconstitutional as applied to ORTL. So appropriate relief is required. ORTL is entitled to relief like that afforded "religious employers," Bill § 2(9), and like that in *Foothill*, which granted summary judgment, 623 F. Supp. 3d 1079, and entered a permanent injunction and ordered relief, *Foothill*, No. 2023 WL 1767748, at *5 (ordering Director to process exemption requests for "abortion care coverage comporting with their religious beliefs"). After that, the *Skyline* parties got a similar agreed judgment. Order Granting Joint Mot. and Entering J., Doc. 141, *Skyline*, No. 3:16-cv-00501 (S.D. Cal. May 11, 2023). The same is required here.

As stated in the Verified Complaint's Prayer for Relief, ORTL prays for the following:

1. Declaratory judgment that the Mandate's requirement that health-benefit plans cover abortion and abortifacient "contraceptives" is unconstitutional as applied to ORTL;

2. Preliminary and permanent injunctions ordering Defendants to treat ORTL as "religious employers" are treated, Bill § 2(9); enjoining Defendants from enforcing the Mandate against ORTL or any ORTL health-benefit plan provider differently than for "religious employers"; and requiring Defendants to direct any present or future ORTL health-benefit plan provider to accommodate ORTL's religious beliefs;

3. Attorneys' fees, costs, and expenses to which ORTL may be entitled by law, including under 42 U.S.C. § 1988; and

4. Any other relief the Court deems just and proper.

Dated: September 12, 2023

James Bopp, Jr., IN Bar #2838-84*
 jboppjr@aol.com
Richard E. Coleson, IN Bar #11527-70*
 rcoleson@bopplaw.com
Joseph D. Maughon, VA Bar #87799*
 jmaughon@bopplaw.com
THE BOPP LAW FIRM, PC
The National Building
1 South Sixth Street
Terre Haute, IN 47807-3510
812.232.2434 telephone
812.235.3685 facsimile

*pro hac vice application forthcoming
*Counsel for Plaintiff*

Respectfully submitted,

/s/ Shawn Lindsay

Shawn Lindsay, OSB #020695
JURISLAW, LLP
Three Centerpointe Drive, Suite 160
Lake Oswego, OR 97035
Telephone: 503.968.1475
shawn@jurislawyer.com
*Attorney for Plaintiff*

# Attorney Certificate of Service

I hereby certify that on September 12, 2023, I have made service of the foregoing **Motion for Preliminary Injunction and Supporting Memorandum of Law** on the parties listed below in the manner indicated:

| | |
|---|---|
| BRIAN SIMMONDS MARSHALL #196129<br>Senior Assistant Attorney General<br>Department of Justice<br>100 SW Market Street<br>Portland, OR 97201<br>Tel (971) 673-1880<br>Fax (971) 673-5000<br>Brian.S.Marshall@doj.state.or.us<br>*Attorney for Defendants Oregon Department of Consumer and Business Services and Andrew W. Stolfi* | ☐ U.S. Mail<br>☐ Facsimile<br>☐ Hand Delivery<br>☐ Overnight Courier<br>☐ Email:<br>☒ Electronically via USDC CM/ECF system |
| ALEX C. JONES #213898<br>Department of Justice<br>100 SW Market Street<br>Portland, OR 97201<br>Tel (971) 673-1880<br>Fax (971) 673-5000<br>Alex.C.Jones@doj.state.or.us<br>*Attorney for Defendants Oregon Department of Consumer and Business Services and Andrew W. Stolfi* | ☐ U.S. Mail<br>☐ Facsimile<br>☐ Hand Delivery<br>☐ Overnight Courier<br>☐ Email:<br>☒ Electronically via USDC CM/ECF system |

DATED: September 12, 2023

JURISLAW LLP

/s/ Shawn Lindsay
Shawn Lindsay, OSB #020695
JURISLAW, LLP
Three Centerpointe Drive, Suite 160
Lake Oswego, OR 97035
Telephone: 503.968.1475
shawn@jurislawyer.com
*Attorney for Plaintiff*