UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| **OREGON RIGHT TO LIFE**,<br><br>Plaintiff,<br><br>v.<br><br>**OREGON DEPARTMENT OF CONSUMER AND BUSINESS SERVICES** and **ANDREW R. STOLFI**, in his official capacities as Department of Consumer and Business Services Director and Oregon Insurance Commissioner,<br><br>Defendants. | Case No.: **6:23-cv-1282**<br><br><br>**DECLARATION OF JOSEPH D. MAUGHON IN SUPPORT OF PRELIMINARY INJUNCTION MOTION** |

## Declaration of Joseph D. Maughon
## in Support of Preliminary Injunction Motion

I, Joseph D. Maughon, verify the following facts in support of the Preliminary Injunction

Motion:

**1.** Attached as exhibits are PDF versions of web-pages that I retrieved on September 12,

2023, from the indicated URLs below that were cited in the Preliminary Injunction Memo:

**Exhibit**:

A. H.B. 3391 (Enrolled), 79th Or. Legis. Assemb., 2017 Reg. Legis. Sess.,
https://olis.oregonlegislature.gov/liz/2017R1/Downloads/MeasureDocument/HB3391.

B. Or. Laws 2017, ch. 721 (H.B. 3391),
www.oregonlegislature.gov/bills_laws/lawsstatutes/2017orlaw0721.pdf.

C. H.B. 2002 (Enrolled), 82nd Or. Legis. Assemb., 2023 Reg. Legis. Sess.,
https://olis.oregonlegislature.gov/liz/2023R1/Downloads/MeasureDocument/HB2002.

D. *Public Hearing on HB 2002 Before the H. Comm. on Behavioral Health and Health Care of the Oregon State Legislature*, 2023 Regular Session (March 20, 2023) (Testi-

mony of Kimberly McCullough, Legislative Director, Office of the Attorney General, Oregon Department of Justice) https://olis.oregonlegislature.gov/liz/mediaplayer?clientID=4879615486&eventID=2023031284&startStreamAt=2198.

E.  Department of Consumer and Business Services, *About Us*, www.oregon.gov/dcbs/news-info/Pages/about-us.aspx.

F.  Br. for Resp'ts 4-5, Feb. 10, 2014, *Burwell v. Hobby Lobby Stores*, 573 U.S. 682 (2014),  https://becketpdf.s3.amazonaws.com/13-354-bs.pdf.

G.  Overview, H.B. 3391, 2017 Reg. Legis. Sess., https://olis.oregonlegislature.gov/liz/2017R1/Measures/Overview/HB3391.

H.  *Witness Registration: Public Hearing on H.B. 3391 Before the House Health Care Committee*, 2017 Regular Leg. Sess. (March 15, 2017), https://olis.oregonlegislature.gov/liz/2017R1/Downloads/CommitteeMeetingDocument/108284.

I.  *Witness Registration: Public Hearing on H.B. 3391 Before the Joint Ways and Means Subcommittee On Human Services*, 2017 Regular Leg. Sess. (June 28, 2017), https://olis.oregonlegislature.gov/liz/2017R1/Downloads/CommitteeMeetingDocument/136756.

J.  *Testimony on HB3391: Written Testimony of Teresa Harke for Public Hearing on H.B. 3391 Before the House Committee on Health Care*, 2017 Regular Leg. Sess. (March 15, 2017), https://olis.oregonlegislature.gov/liz/2017R1/Downloads/CommitteeMeetingDocument/107838.

K.  Letter from Michael L. Cotton, Chief Executive Officer, Providence Health Plans, to Hon. Mitch Greenlick, Chair, House Committee on Health Care (Mar. 15, 2017), https://olis.oregonlegislature.gov/liz/2017R1/Downloads/CommitteeMeetingDocument/107514.

L.  *Public Hearing on HB 3391 Before the H. Comm. on Health Care of the Or. State Leg.*, 2017 Regular Session (March 15, 2017) (Testimony of Michael Cotton, Chief Executive Officer, Providence Health Plans), https://invintus-client-media.s3.wasabisys.com/4879615486/oregon_f9ea023c-9fcb-4e89-8ede-062410b792aa.mp4.

M.  Analysis, H.B. 3391, 2017 Reg. Legis. Sess., https://olis.oregonlegislature.gov/liz/2017R1/Measures/Analysis/HB3391.

N.  Courtney Graham and Andrea Salinas Fact Sheet, H.B. 3391, 2017 Reg. Legis. Sess., https://olis.oregonlegislature.gov/liz/2017R1/Downloads/CommitteeMeetingDocument/107499.

O.  Milken Inst. Sch. Pub. Health, *Equity vs. Equality: What's the Difference?* (November 5, 2020), https://onlinepublichealth.gwu.edu/resources/equity-vs-equality/.

P.  Ore. Health Auth., *House Bill 3391: Reproductive Health Equity Act: Report to the Legislature* 1 (2018), www.oregon.gov/oha/PH/HEALTHYPEOPLEFAMILIES/ REPRODUCTIVESEXUALHEALTH/Documents/RHEA/HB3391-Leg-Report.pdf.

**2.** The web-page exhibits are true and accurate copies of the original online versions of the cited items.

## Verification

I, Joseph D. Maughon, declare as follows:

1.  I am a citizen of the United States of America and a resident of the State of Virginia. I am over the age of 18. I am an associate attorney at The Bopp Law Firm, P.C.

2.  I have personal knowledge of the facts and activities set out in the foregoing, and if called to testify I would competently testify as to the matters stated herein.

3.  I affirm under penalty of perjury that the factual statements in the foregoing are true and correct.


Dated: September 12, 2023                    /s/Joseph D. Maughon
                                             Joseph D. Maughon

**Exhibit A**
**H.B. 3391 Enrolled**

79th OREGON LEGISLATIVE ASSEMBLY--2017 Regular Session

## Enrolled

# House Bill 3391

Sponsored by Representatives BARKER, WILLIAMSON, FAHEY, Senators DEVLIN, MONNES ANDERSON; Representatives ALONSO LEON, BOONE, GOMBERG, HELM, HERNANDEZ, HOLVEY, KENY-GUYER, LININGER, MALSTROM, MARSH, MCLAIN, MEEK, NOSSE, PILUSO, POWER, RAYFIELD, REARDON, SANCHEZ, SMITH WARNER, SOLLMAN, WITT, Senators BEYER, DEMBROW, FREDERICK, GELSER, MANNING JR, PROZANSKI, RILEY, STEINER HAYWARD, TAYLOR

CHAPTER ..................................................

AN ACT

Relating to reproductive health care; and declaring an emergency.

**Be It Enacted by the People of the State of Oregon:**

**SECTION 1.** Section 2 of this 2017 Act is added to and made a part of the Insurance Code.
**SECTION 2. (1) As used in this section:**
(a) "Contraceptives" means health care services, drugs, devices, products or medical procedures to prevent a pregnancy.
(b) "Enrollee" means an insured individual and the individual's spouse, domestic partner and dependents who are beneficiaries under the insured individual's health benefit plan.
(c) "Health benefit plan" has the meaning given that term in ORS 743B.005, excluding Medicare Advantage Plans and including health benefit plans offering pharmacy benefits administered by a third party administrator or pharmacy benefit manager.
(d) "Religious employer" has the meaning given that term in ORS 743A.066.
(2) A health benefit plan offered in this state must provide coverage for all of the following services, drugs, devices, products and procedures:
(a) Well-woman care prescribed by the Department of Consumer and Business Services by rule consistent with guidelines published by the United States Health Resources and Services Administration.
(b) Counseling for sexually transmitted infections, including but not limited to human immunodeficiency virus and acquired immune deficiency syndrome.
(c) Screening for:
(A) Chlamydia;
(B) Gonorrhea;
(C) Hepatitis B;
(D) Hepatitis C;
(E) Human immunodeficiency virus and acquired immune deficiency syndrome;
(F) Human papillomavirus;
(G) Syphilis;
(H) Anemia;
(I) Urinary tract infection;
(J) Pregnancy;

(K) Rh incompatibility;

(L) Gestational diabetes;

(M) Osteoporosis;

(N) Breast cancer; and

(O) Cervical cancer.

(d) Screening to determine whether counseling related to the BRCA1 or BRCA2 genetic mutations is indicated and counseling related to the BRCA1 or BRCA2 genetic mutations if indicated.

(e) Screening and appropriate counseling or interventions for:

(A) Tobacco use; and

(B) Domestic and interpersonal violence.

(f) Folic acid supplements.

(g) Abortion.

(h) Breastfeeding comprehensive support, counseling and supplies.

(i) Breast cancer chemoprevention counseling.

(j) Any contraceptive drug, device or product approved by the United States Food and Drug Administration, subject to all of the following:

(A) If there is a therapeutic equivalent of a contraceptive drug, device or product approved by the United States Food and Drug Administration, a health benefit plan may provide coverage for either the requested contraceptive drug, device or product or for one or more therapeutic equivalents of the requested drug, device or product.

(B) If a contraceptive drug, device or product covered by the health benefit plan is deemed medically inadvisable by the enrollee's provider, the health benefit plan must cover an alternative contraceptive drug, device or product prescribed by the provider.

(C) A health benefit plan must pay pharmacy claims for reimbursement of all contraceptive drugs available for over-the-counter sale that are approved by the United States Food and Drug Administration.

(D) A health benefit plan may not infringe upon an enrollee's choice of contraceptive drug, device or product and may not require prior authorization, step therapy or other utilization control techniques for medically appropriate covered contraceptive drugs, devices or other products approved by the United States Food and Drug Administration.

(k) Voluntary sterilization.

(L) As a single claim or combined with other claims for covered services provided on the same day:

(A) Patient education and counseling on contraception and sterilization.

(B) Services related to sterilization or the administration and monitoring of contraceptive drugs, devices and products, including but not limited to:

(i) Management of side effects;

(ii) Counseling for continued adherence to a prescribed regimen;

(iii) Device insertion and removal; and

(iv) Provision of alternative contraceptive drugs, devices or products deemed medically appropriate in the judgment of the enrollee's provider.

(m) Any additional preventive services for women that must be covered without cost sharing under 42 U.S.C. 300gg-13, as identified by the United States Preventive Services Task Force or the Health Resources and Services Administration of the United States Department of Health and Human Services as of January 1, 2017.

(3) A health benefit plan may not impose on an enrollee a deductible, coinsurance, copayment or any other cost-sharing requirement on the coverage required by this section. A health care provider shall be reimbursed for providing the services described in this section without any deduction for coinsurance, copayments or any other cost-sharing amounts.

(4) Except as authorized under this section, a health benefit plan may not impose any restrictions or delays on the coverage required by this section.

(5) This section does not exclude coverage for contraceptive drugs, devices or products prescribed by a provider, acting within the provider's scope of practice, for:

(a) Reasons other than contraceptive purposes, such as decreasing the risk of ovarian cancer or eliminating symptoms of menopause; or

(b) Contraception that is necessary to preserve the life or health of an enrollee.

(6) This section does not limit the authority of the Department of Consumer and Business Services to ensure compliance with ORS 743A.063 and 743A.066.

(7) This section does not require a health benefit plan to cover:

(a) Experimental or investigational treatments;

(b) Clinical trials or demonstration projects, except as provided in ORS 743A.192;

(c) Treatments that do not conform to acceptable and customary standards of medical practice;

(d) Treatments for which there is insufficient data to determine efficacy; or

(e) Abortion if the insurer offering the health benefit plan excluded coverage for abortion in all of its individual, small employer and large employer group plans during the 2017 plan year.

(8) If services, drugs, devices, products or procedures required by this section are provided by an out-of-network provider, the health benefit plan must cover the services, drugs, devices, products or procedures without imposing any cost-sharing requirement on the enrollee if:

(a) There is no in-network provider to furnish the service, drug, device, product or procedure that is geographically accessible or accessible in a reasonable amount of time, as defined by the Department of Consumer and Business Services by rule consistent with the requirements for provider networks in ORS 743B.505; or

(b) An in-network provider is unable or unwilling to provide the service in a timely manner.

(9) An insurer may offer to a religious employer a health benefit plan that does not include coverage for contraceptives or abortion procedures that are contrary to the religious employer's religious tenets only if the insurer notifies in writing all employees who may be enrolled in the health benefit plan of the contraceptives and procedures the employer refuses to cover for religious reasons.

(10) If the Department of Consumer and Business Services concludes that enforcement of this section may adversely affect the allocation of federal funds to this state, the department may grant an exemption to the requirements but only to the minimum extent necessary to ensure the continued receipt of federal funds.

(11) An insurer that is subject to this section shall make readily accessible to enrollees and potential enrollees, in a consumer-friendly format, information about the coverage of contraceptives by each health benefit plan and the coverage of other services, drugs, devices, products and procedures described in this section. The insurer must provide the information:

(a) On the insurer's website; and

(b) In writing upon request by an enrollee or potential enrollee.

(12) This section does not prohibit an insurer from using reasonable medical management techniques to determine the frequency, method, treatment or setting for the coverage of services, drugs, devices, products and procedures described in subsection (2) of this section, other than coverage required by subsection (2)(g) and (j) of this section, if the techniques:

(a) Are consistent with the coverage requirements of subsection (2) of this section; and

(b) Do not result in the wholesale or indiscriminate denial of coverage for a service.

SECTION 3. No later than September 15, 2019, the Department of Consumer and Business Services shall report to the interim committees of the Legislative Assembly related to health on the degree of compliance by insurers with section 2 of this 2017 Act and of any actions taken by the department under ORS 731.988 to enforce compliance with section 2 of this 2017 Act.

SECTION 4. Section 5 of this 2017 Act is added to and made a part of ORS chapter 414.

SECTION 5. (1) The Oregon Health Authority shall administer a program to reimburse the cost of medically appropriate services, drugs, devices, products and procedures described in section 2 of this 2017 Act, for individuals who can become pregnant and who would be eligible for medical assistance if not for 8 U.S.C. 1611 or 1612.

(2) The authority shall provide the medical assistance for pregnant women that is authorized by Title XXI, section 2112, of the Social Security Act (42 U.S.C. 1397ll) for 60 days immediately postpartum.

(3) The authority shall collect data and analyze the cost-effectiveness of the services, drugs, devices, products and procedures paid for under this section.

(4) The authority, in collaboration with the Department of Consumer and Business Services if necessary, shall explore any and all opportunities to obtain federal financial participation in the costs of implementing this section, including but not limited to waivers or demonstration projects under Title X of the Public Health Service Act or Title XIX or XXI of the Social Security Act.  However, the implementation of this section is not contingent upon the authority's receipt of a waiver or authorization to operate a demonstration project.

SECTION 6. Not later than September 15, 2018, the Oregon Health Authority shall report to the interim committees of the Legislative Assembly related to health on the implementation of section 5 of this 2017 Act.

SECTION 7. (1) An individual may not, on the basis of actual or perceived race, color, national origin, sex, sexual orientation, gender identity, age or disability, be excluded from participation in, be denied the benefits of or otherwise be subjected to discrimination by any health benefit plan issued or delivered in this state, in the receipt of medical assistance as defined in ORS 414.025 or in the coverage of or payment for the services, drugs, devices, products and procedures described in section 2 of this 2017 Act.

(2) Violation of this section is an unlawful practice under ORS 659A.403.

(3) Nothing in this section shall be construed to invalidate or limit the rights, remedies, procedures or legal standards available to individuals under ORS 659A.820 or 659A.885 or to supersede state or local laws that provide additional protections against discrimination on any basis described in subsection (1) of this section.

SECTION 8. A public body as defined in ORS 174.109 or, except as provided in ORS 435.225, an officer, employee or agent of a public body may not:

(1) Deprive a consenting individual of the choice of terminating the individual's pregnancy;

(2) Interfere with or restrict, in the regulation or provision of benefits, facilities, services or information, the choice of a consenting individual to terminate the individual's pregnancy;

(3) Prohibit a health care provider, who is acting within the scope of the health care provider's license, from terminating or assisting in the termination of a patient's pregnancy; or

(4) Interfere with or restrict, in the regulation or provision of benefits, facilities, services or information, the choice of a health care provider, who is acting within the scope of the health care provider's license, to terminate or assist in the termination of a patient's pregnancy.

SECTION 9. The Health Evidence Review Commission shall review the coverage described in section 2 (2) of this 2017 Act and, no later than November 1 of each even-numbered year, report to the interim committees of the Legislative Assembly related to health any recommended changes to the coverage described in section 2 (2) of this 2017 Act based upon the latest clinical research.

SECTION 10. (1) As used in this section, "health benefit plan" has the meaning given that term in section 2 of this 2017 Act.

(2) In consultation with the Department of Consumer and Business Services, the Oregon Health Authority shall design a program to provide statewide access to abortion coverage for

Oregon residents enrolled in health benefit plans described in section 2 (7)(e) and (9) of this 2017 Act.

(3) In developing the design of the program described in subsection (2) of this section, the authority and the department shall consult with consumer advocates, insurers transacting insurance in this state that offer the health benefit plans described in section 2 (7)(e) and (9) of this 2017 Act and other stakeholders.

(4) The authority, in collaboration with the department, shall:

(a) If funding is available, take any actions authorized by state law to implement the program described in subsection (2) of this section; and

(b) Not later than November 1, 2017, report to the Speaker of the House of Representatives, the President of the Senate and the interim committees of the Legislative Assembly related to health:

(A) Any actions taken by the authority under paragraph (a) of this subsection; and

(B) Recommendations for legislative changes necessary to fully implement the program described in subsection (2) of this section.

<u>SECTION 11.</u> In addition to and not in lieu of any other appropriation, there is appropriated to the Oregon Health Authority, for the biennium beginning July 1, 2017, out of the General Fund, the amount of $10,195,935, which may be expended for carrying out the provisions of section 5 of this 2017 Act.

<u>SECTION 12.</u> Section 2 of this 2017 Act applies to health benefit plan policies or certificates issued, renewed, modified or extended on or after January 1, 2019.

<u>SECTION 13.</u> (1) Sections 5 and 9 of this 2017 Act become operative on January 1, 2018.

(2) The Oregon Health Authority shall take any action before January 1, 2018, that is necessary for the authority to implement the provisions of sections 5 and 9 of this 2017 Act on or after January 1, 2018.

<u>SECTION 14.</u> Section 10 of this 2017 Act is repealed on January 2, 2019.

<u>SECTION 15.</u> This 2017 Act being necessary for the immediate preservation of the public peace, health and safety, an emergency is declared to exist, and this 2017 Act takes effect on its passage.

————————

Passed by House July 1, 2017

.........................................................................
Timothy G. Sekerak, Chief Clerk of House

.........................................................................
Tina Kotek, Speaker of House

Passed by Senate July 5, 2017

.........................................................................
Peter Courtney, President of Senate

Received by Governor:

.......................M.,........................................., 2017

Approved:

.......................M.,........................................., 2017

.........................................................................
Kate Brown, Governor

Filed in Office of Secretary of State:

.......................M.,........................................., 2017

.........................................................................
Dennis Richardson, Secretary of State

Enrolled House Bill 3391 (HB 3391-B)                                      Page 5

**Exhibit B**
**Oregon Laws Chapter 721**

## CHAPTER 721

### AN ACT                    HB 3391

Relating to reproductive health care; and declaring an emergency.

Be It Enacted by the People of the State of Oregon:

**SECTION 1.** Section 2 of this 2017 Act is added to and made a part of the Insurance Code.

**SECTION 2.** (1) As used in this section:
(a) "Contraceptives" means health care services, drugs, devices, products or medical procedures to prevent a pregnancy.
(b) "Enrollee" means an insured individual and the individual's spouse, domestic partner and dependents who are beneficiaries under the insured individual's health benefit plan.
(c) "Health benefit plan" has the meaning given that term in ORS 743B.005, excluding Medicare Advantage Plans and including health benefit plans offering pharmacy benefits administered by a third party administrator or pharmacy benefit manager.
(d) "Religious employer" has the meaning given that term in ORS 743A.066.
(2) A health benefit plan offered in this state must provide coverage for all of the following services, drugs, devices, products and procedures:
(a) Well-woman care prescribed by the Department of Consumer and Business Services by rule consistent with guidelines published by the United States Health Resources and Services Administration.
(b) Counseling for sexually transmitted infections, including but not limited to human immunodeficiency virus and acquired immune deficiency syndrome.
(c) Screening for:
(A) Chlamydia;
(B) Gonorrhea;
(C) Hepatitis B;
(D) Hepatitis C;
(E) Human immunodeficiency virus and acquired immune deficiency syndrome;
(F) Human papillomavirus;
(G) Syphilis;
(H) Anemia;
(I) Urinary tract infection;
(J) Pregnancy;
(K) Rh incompatibility;
(L) Gestational diabetes;
(M) Osteoporosis;
(N) Breast cancer; and
(O) Cervical cancer.
(d) Screening to determine whether counseling related to the BRCA1 or BRCA2 genetic mutations is indicated and counseling related to the BRCA1 or BRCA2 genetic mutations if indicated.

(e) Screening and appropriate counseling or interventions for:
(A) Tobacco use; and
(B) Domestic and interpersonal violence.
(f) Folic acid supplements.
(g) Abortion.
(h) Breastfeeding comprehensive support, counseling and supplies.
(i) Breast cancer chemoprevention counseling.
(j) Any contraceptive drug, device or product approved by the United States Food and Drug Administration, subject to all of the following:
(A) If there is a therapeutic equivalent of a contraceptive drug, device or product approved by the United States Food and Drug Administration, a health benefit plan may provide coverage for either the requested contraceptive drug, device or product or for one or more therapeutic equivalents of the requested drug, device or product.
(B) If a contraceptive drug, device or product covered by the health benefit plan is deemed medically inadvisable by the enrollee's provider, the health benefit plan must cover an alternative contraceptive drug, device or product prescribed by the provider.
(C) A health benefit plan must pay pharmacy claims for reimbursement of all contraceptive drugs available for over-the-counter sale that are approved by the United States Food and Drug Administration.
(D) A health benefit plan may not infringe upon an enrollee's choice of contraceptive drug, device or product and may not require prior authorization, step therapy or other utilization control techniques for medically appropriate covered contraceptive drugs, devices or other products approved by the United States Food and Drug Administration.
(k) Voluntary sterilization.
(L) As a single claim or combined with other claims for covered services provided on the same day:
(A) Patient education and counseling on contraception and sterilization.
(B) Services related to sterilization or the administration and monitoring of contraceptive drugs, devices and products, including but not limited to:
(i) Management of side effects;
(ii) Counseling for continued adherence to a prescribed regimen;
(iii) Device insertion and removal; and
(iv) Provision of alternative contraceptive drugs, devices or products deemed medically appropriate in the judgment of the enrollee's provider.
(m) Any additional preventive services for women that must be covered without cost sharing under 42 U.S.C. 300gg-13, as identified by the United States Preventive Services Task Force or the Health Resources and Services Adminis-

1

tration of the United States Department of Health and Human Services as of January 1, 2017.

(3) A health benefit plan may not impose on an enrollee a deductible, coinsurance, copayment or any other cost-sharing requirement on the coverage required by this section. A health care provider shall be reimbursed for providing the services described in this section without any deduction for coinsurance, copayments or any other cost-sharing amounts.

(4) Except as authorized under this section, a health benefit plan may not impose any restrictions or delays on the coverage required by this section.

(5) This section does not exclude coverage for contraceptive drugs, devices or products prescribed by a provider, acting within the provider's scope of practice, for:

(a) Reasons other than contraceptive purposes, such as decreasing the risk of ovarian cancer or eliminating symptoms of menopause; or

(b) Contraception that is necessary to preserve the life or health of an enrollee.

(6) This section does not limit the authority of the Department of Consumer and Business Services to ensure compliance with ORS 743A.063 and 743A.066.

(7) This section does not require a health benefit plan to cover:

(a) Experimental or investigational treatments;

(b) Clinical trials or demonstration projects, except as provided in ORS 743A.192;

(c) Treatments that do not conform to acceptable and customary standards of medical practice;

(d) Treatments for which there is insufficient data to determine efficacy; or

(e) Abortion if the insurer offering the health benefit plan excluded coverage for abortion in all of its individual, small employer and large employer group plans during the 2017 plan year.

(8) If services, drugs, devices, products or procedures required by this section are provided by an out-of-network provider, the health benefit plan must cover the services, drugs, devices, products or procedures without imposing any cost-sharing requirement on the enrollee if:

(a) There is no in-network provider to furnish the service, drug, device, product or procedure that is geographically accessible or accessible in a reasonable amount of time, as defined by the Department of Consumer and Business Services by rule consistent with the requirements for provider networks in ORS 743B.505; or

(b) An in-network provider is unable or unwilling to provide the service in a timely manner.

(9) An insurer may offer to a religious employer a health benefit plan that does not include coverage for contraceptives or abortion procedures that are contrary to the religious employer's religious tenets only if the insurer notifies in writing all employees who may be enrolled in the health benefit plan of the contraceptives and procedures the employer refuses to cover for religious reasons.

(10) If the Department of Consumer and Business Services concludes that enforcement of this section may adversely affect the allocation of federal funds to this state, the department may grant an exemption to the requirements but only to the minimum extent necessary to ensure the continued receipt of federal funds.

(11) An insurer that is subject to this section shall make readily accessible to enrollees and potential enrollees, in a consumer-friendly format, information about the coverage of contraceptives by each health benefit plan and the coverage of other services, drugs, devices, products and procedures described in this section. The insurer must provide the information:

(a) On the insurer's website; and

(b) In writing upon request by an enrollee or potential enrollee.

(12) This section does not prohibit an insurer from using reasonable medical management techniques to determine the frequency, method, treatment or setting for the coverage of services, drugs, devices, products and procedures described in subsection (2) of this section, other than coverage required by subsection (2)(g) and (j) of this section, if the techniques:

(a) Are consistent with the coverage requirements of subsection (2) of this section; and

(b) Do not result in the wholesale or indiscriminate denial of coverage for a service.

SECTION 3. No later than September 15, 2019, the Department of Consumer and Business Services shall report to the interim committees of the Legislative Assembly related to health on the degree of compliance by insurers with section 2 of this 2017 Act and of any actions taken by the department under ORS 731.988 to enforce compliance with section 2 of this 2017 Act.

SECTION 4. Section 5 of this 2017 Act is added to and made a part of ORS chapter 414.

SECTION 5. (1) The Oregon Health Authority shall administer a program to reimburse the cost of medically appropriate services, drugs, devices, products and procedures described in section 2 of this 2017 Act, for individuals who can become pregnant and who would be eligible for medical assistance if not for 8 U.S.C. 1611 or 1612.

(2) The authority shall provide the medical assistance for pregnant women that is author-

ized by Title XXI, section 2112, of the Social Security Act (42 U.S.C. 1397ll) for 60 days immediately postpartum.

(3) The authority shall collect data and analyze the cost-effectiveness of the services, drugs, devices, products and procedures paid for under this section.

(4) The authority, in collaboration with the Department of Consumer and Business Services if necessary, shall explore any and all opportunities to obtain federal financial participation in the costs of implementing this section, including but not limited to waivers or demonstration projects under Title X of the Public Health Service Act or Title XIX or XXI of the Social Security Act. However, the implementation of this section is not contingent upon the authority's receipt of a waiver or authorization to operate a demonstration project.

SECTION 6. Not later than September 15, 2018, the Oregon Health Authority shall report to the interim committees of the Legislative Assembly related to health on the implementation of section 5 of this 2017 Act.

SECTION 7. (1) An individual may not, on the basis of actual or perceived race, color, national origin, sex, sexual orientation, gender identity, age or disability, be excluded from participation in, be denied the benefits of or otherwise be subjected to discrimination by any health benefit plan issued or delivered in this state, in the receipt of medical assistance as defined in ORS 414.025 or in the coverage of or payment for the services, drugs, devices, products and procedures described in section 2 of this 2017 Act.

(2) Violation of this section is an unlawful practice under ORS 659A.403.

(3) Nothing in this section shall be construed to invalidate or limit the rights, remedies, procedures or legal standards available to individuals under ORS 659A.820 or 659A.885 or to supersede state or local laws that provide additional protections against discrimination on any basis described in subsection (1) of this section.

SECTION 8. A public body as defined in ORS 174.109 or, except as provided in ORS 435.225, an officer, employee or agent of a public body may not:

(1) Deprive a consenting individual of the choice of terminating the individual's pregnancy;

(2) Interfere with or restrict, in the regulation or provision of benefits, facilities, services or information, the choice of a consenting individual to terminate the individual's pregnancy;

(3) Prohibit a health care provider, who is acting within the scope of the health care provider's license, from terminating or assisting in the termination of a patient's pregnancy; or

(4) Interfere with or restrict, in the regulation or provision of benefits, facilities, services or information, the choice of a health care provider, who is acting within the scope of the health care provider's license, to terminate or assist in the termination of a patient's pregnancy.

SECTION 9. The Health Evidence Review Commission shall review the coverage described in section 2 (2) of this 2017 Act and, no later than November 1 of each even-numbered year, report to the interim committees of the Legislative Assembly related to health any recommended changes to the coverage described in section 2 (2) of this 2017 Act based upon the latest clinical research.

SECTION 10. (1) As used in this section, "health benefit plan" has the meaning given that term in section 2 of this 2017 Act.

(2) In consultation with the Department of Consumer and Business Services, the Oregon Health Authority shall design a program to provide statewide access to abortion coverage for Oregon residents enrolled in health benefit plans described in section 2 (7)(e) and (9) of this 2017 Act.

(3) In developing the design of the program described in subsection (2) of this section, the authority and the department shall consult with consumer advocates, insurers transacting insurance in this state that offer the health benefit plans described in section 2 (7)(e) and (9) of this 2017 Act and other stakeholders.

(4) The authority, in collaboration with the department, shall:

(a) If funding is available, take any actions authorized by state law to implement the program described in subsection (2) of this section; and

(b) Not later than November 1, 2017, report to the Speaker of the House of Representatives, the President of the Senate and the interim committees of the Legislative Assembly related to health:

(A) Any actions taken by the authority under paragraph (a) of this subsection; and

(B) Recommendations for legislative changes necessary to fully implement the program described in subsection (2) of this section.

SECTION 11. In addition to and not in lieu of any other appropriation, there is appropriated to the Oregon Health Authority, for the biennium beginning July 1, 2017, out of the General Fund, the amount of $10,195,935, which may be expended for carrying out the provisions of section 5 of this 2017 Act.

SECTION 12. Section 2 of this 2017 Act applies to health benefit plan policies or certif-

icates issued, renewed, modified or extended on or after January 1, 2019.

SECTION 13. (1) Sections 5 and 9 of this 2017 Act become operative on January 1, 2018.

(2) The Oregon Health Authority shall take any action before January 1, 2018, that is necessary for the authority to implement the provisions of sections 5 and 9 of this 2017 Act on or after January 1, 2018.

SECTION 14. Section 10 of this 2017 Act is repealed on January 2, 2019.

SECTION 15. This 2017 Act being necessary for the immediate preservation of the public peace, health and safety, an emergency is declared to exist, and this 2017 Act takes effect on its passage.

Approved by the Governor August 15, 2017
Filed in the office of Secretary of State August 16, 2017
Effective date August 15, 2017

————————

# Exhibit C
## H.B. 2002 Enrolled

82nd OREGON LEGISLATIVE ASSEMBLY--2023 Regular Session

# Enrolled

# House Bill 2002

Sponsored by Representatives VALDERRAMA, NELSON, Senators LIEBER, STEINER; Representatives ANDERSEN, BOWMAN, BYNUM, DEXTER, FAHEY, GAMBA, GOMBERG, GRAYBER, HARTMAN, HELM, HOLVEY, HUDSON, KROPF, MARSH, MCLAIN, NGUYEN D, NGUYEN H, NOSSE, PHAM H, PHAM K, REYNOLDS, RUIZ, SOSA, TRAN, WALTERS, Senators CAMPOS, DEMBROW, FREDERICK, GELSER BLOUIN, GOLDEN, GORSEK, JAMA, MANNING JR, MEEK, PATTERSON, PROZANSKI, SOLLMAN, TAYLOR, WAGNER, WOODS

CHAPTER ..................................................

AN ACT

Relating to health; creating new provisions; amending ORS 15.430, 109.640, 161.005, 192.345, 192.820, 192.822, 192.826, 243.144, 243.877, 418.307, 435.215, 435.225, 436.225, 659.880, 659A.029, 675.070, 675.540, 675.745, 676.177, 677.190, 677.225, 677.320, 678.111, 685.110, 689.405 and 743A.067; repealing ORS 109.610, 109.660, 435.200 and 435.435; and declaring an emergency.

Whereas nothing in the insurance provisions of this 2023 Act affects the age at which a minor may consent to receive health care services; now, therefore,

**Be It Enacted by the People of the State of Oregon:**

## REPRODUCTIVE HEALTH RIGHTS

**SECTION 1.** ORS 435.205 to 435.235 and 659.880 are added to and made a part of sections 2 to 4 of this 2023 Act.

**SECTION 2. As used in sections 2 to 4 of this 2023 Act:**

(1) "Contraception" includes:

(a) Steroidal, chemical, physical or barrier, natural or permanent methods for preventing the union of an ovum with the spermatozoon, or for preventing the subsequent implantation of the fertilized ovum in the uterus;

(b) All postcoital methods, drugs or devices to prevent pregnancy; and

(c) Any other process, device or method to prevent pregnancy.

(2) "Public body" means a public body as defined in ORS 174.109 and the Oregon Health and Science University.

(3) "Reproductive health" means reproductive processes, functions and systems at all stages of life.

(4) "Reproductive health care" includes family planning and contraception, pregnancy termination services, prenatal, postnatal and delivery care, miscarriage management, fertility care, sterilization services, treatments for sexually transmitted infections and reproductive cancers and any other health care and medical services related to reproductive health.

**SECTION 3.** Every individual has a fundamental right to make decisions about the individual's reproductive health, including the right to make decisions about the individual's

reproductive health care, to use or refuse contraception, to continue the individual's pregnancy and give birth or to terminate the individual's pregnancy.

**SECTION 4. (1) Any person may bring an action against a public body, or an officer, employee or agent of a public body, for injunctive relief to enforce the requirements of sections 2 to 4 of this 2023 Act.**

**(2) The court may award reasonable attorney fees and costs to a prevailing plaintiff in an action under this section.**

**(3) ORS 30.260 to 30.300 apply to an action under this section.**

**SECTION 5.** ORS 659.880 is amended to read:

659.880. **(1)** A public body [*as defined in ORS 174.109*] or, except as provided in ORS 435.225, an officer, employee or agent of a public body may not:

[*(1)*] **(a)** Deprive a consenting individual of the choice of [*terminating the individual's pregnancy*] **exercising the individual's reproductive health rights under section 3 of this 2023 Act**;

[*(2)*] **(b)** Interfere with or restrict, in the regulation [*or provision*] of benefits, facilities, services or information, the choice of a consenting individual to [*terminate the individual's pregnancy*] **exercise the individual's reproductive health rights under section 3 of this 2023 Act;**

[*(3)*] **(c)** Prohibit a health care provider, who is acting within the scope of the health care provider's license, from [*terminating or assisting in the termination of a patient's pregnancy*] **providing reproductive health care information and services to a consenting individual;** [*or*]

[*(4)*] **(d)** Interfere with or restrict, in the regulation [*or provision*] of benefits, facilities, services or information, the choice of a health care provider, who is acting within the scope of the health care provider's license, [*to terminate or assist in the termination of a patient's pregnancy.*] **to provide reproductive health care information and services to a consenting individual;**

**(e) Subject an individual to criminal or civil liability or penalty, or otherwise deprive the individual of any rights, based on the individual's actions or omissions in exercising the individual's reproductive health rights under section 3 of this 2023 Act, including any action or omission affecting an actual, potential or alleged pregnancy outcome; or**

**(f) Subject any person to criminal or civil liability or penalty, or otherwise deprive any person of the person's rights, based solely on the person's actions in the provision of aid, assistance, resources or support to an individual in the exercise of the individual's reproductive health rights, provided that the person's actions do not otherwise violate the laws of this state.**

**(2)(a) Nothing in this section is intended to prevent the application of laws, rules, ordinances or taxes that affect the method or manner of sales or distribution of contraceptive devices or the provision of reproductive health care, provided that the laws, rules, ordinances or taxes are designed to promote public health and safety and do not unreasonably burden public access to contraception or other reproductive health care.**

**(b) Nothing in this section requires a public body to provide or pay for reproductive health care.**

**SECTION 6.** ORS 435.215 is amended to read:

435.215. [*The refusal of any person to accept family planning and birth control services shall in no way affect the right of such person to receive public assistance, medical assistance, as defined in ORS 414.025, or any other public benefit and every person to whom such services are offered shall be so advised initially both orally and in writing. Employees engaged in the administration of ORS 435.205 to 435.235 shall recognize that the right to make decisions concerning family planning and birth control is a fundamental personal right of the individual and nothing in ORS 435.205 to 435.235 shall in any way abridge such individual right, nor shall any individual be required to state the reason for refusing the offer of family planning and birth control services.*]

**(1) An individual's acceptance or refusal to accept reproductive health care information and services may not:**

(a) Be grounds for the loss of any privilege or immunity to which the individual is otherwise entitled; or

(b) Affect the individual's right to receive public assistance, medical assistance, as defined in ORS 414.025, or any other public benefit.

(2) An officer, employee or agent of a public body who is engaged in the provision of reproductive health care information and services:

(a) Shall advise every individual to whom the officer, employee or agent of a public body provides reproductive health care information and services, both orally and in writing, of the rights described under subsection (1) of this section;

(b) Shall recognize that the right to make decisions concerning reproductive health care is a fundamental personal right of the individual and that nothing in ORS 435.475 or 435.485 or sections 2 to 4 of this 2023 Act or ORS chapter 436 in any way abridges that right; and

(c) May not require any individual to state the reason for accepting or refusing the offer of reproductive health care information and services.

SECTION 7. ORS 435.225 is amended to read:

435.225. (1) [Any employee of the Oregon Health Authority] An officer, employee or agent of a public body may refuse to accept the duty of offering [family planning and birth control] reproductive health care information and services to the extent that such duty is contrary to the personal or religious beliefs of the [employee] officer, employee or agent. However, such [employee] officer, employee or agent shall notify the immediate supervisor in writing of such refusal in order that arrangements may be made for eligible [persons] individuals to obtain such information and services from another officer, employee or agent.

(2) If an officer, employee or agent of a public body refuses to provide reproductive health care information and services as provided in subsection (1) of this section, the public body shall immediately make arrangements for an individual to receive reproductive health care information and services from another officer, employee or agent of the public body.

(3) [Such refusal shall] The refusal of an officer, employee or agent of a public body to provide reproductive health care information and services under subsection (1) of this section may not be grounds for any disciplinary action, for dismissal, for any interdepartmental transfer, for any other discrimination in employment, or for suspension from employment, or for any loss in pay or other benefits.

SECTION 8. ORS 109.640, as amended by section 14, chapter 349, Oregon Laws 2021, is amended to read:

109.640. (1) As used in this section, "reproductive health care" has the meaning given that term in section 2 of this 2023 Act, except that "reproductive health care" does not include the elective sterilization of a minor under 15 years of age.

[(1)] (2)(a) As used in this subsection, "health care provider" means a physician, physician assistant licensed under ORS 677.505 to 677.525, nurse practitioner licensed under ORS 678.375 to 678.390 or a pharmacist licensed under ORS chapter 689.

(b) A minor under 15 years of age may give consent, without the consent of a parent or guardian of the minor, to an abortion only if the abortion is provided by a health care provider who is acting within the health care provider's scope of practice and who reasonably believes, in the health care provider's professional judgment, that:

(A) Involving the parent or guardian of the minor may result in the physical or emotional abuse of the minor or the neglect of the minor; or

(B) Requiring the consent of a parent or guardian of the minor would not be in the best interest of the minor, for the reasons documented by the health care provider after obtaining the concurrence of another health care provider who is associated with a separate medical practice or facility.

(3) Except as provided in subsection (2) of this section and notwithstanding subsection (4) of this section, a minor of any age may give consent, without the consent of a parent or guardian of the minor, to receive reproductive health care information and services from a

**health care provider who is** a physician, physician assistant licensed under ORS 677.505 to 677.525, nurse practitioner licensed under ORS 678.375 to 678.390, **pharmacist licensed under ORS chapter 689** or naturopathic physician licensed under ORS chapter 685 [*may provide birth control information and services to any person without regard to the age of the person*]**, and who is acting within the provider's scope of practice**.

[*(2)*] **(4)** A minor 15 years of age or older may give consent, without the consent of a parent or guardian of the minor, to:

(a) Hospital care, medical or surgical diagnosis or treatment by a physician licensed by the Oregon Medical Board or a naturopathic physician licensed under ORS chapter 685, and dental and surgical diagnosis or treatment by a dentist licensed by the Oregon Board of Dentistry[*, except as provided by ORS 109.660*].

(b) Diagnosis or treatment by a physician assistant who is licensed under ORS 677.505 to 677.525 and who is acting pursuant to a collaboration agreement as defined in ORS 677.495.

(c) Diagnosis and treatment by a nurse practitioner who is licensed by the Oregon State Board of Nursing under ORS 678.375 and who is acting within the scope of practice for a nurse practitioner.

(d) Except when the minor is obtaining contact lenses for the first time, diagnosis and treatment by an optometrist who is licensed by the Oregon Board of Optometry under ORS 683.010 to 683.340 and who is acting within the scope of practice for an optometrist.

**(5) If a person, including a health care provider, has reasonable cause to believe that a minor the person comes into contact with under this section has suffered abuse, as defined in ORS 419B.005, the person shall immediately comply with the person's mandatory child abuse reporting duties under ORS 419B.010.**

<u>NOTE:</u> Section 9 was deleted by amendment. Subsequent sections were not renumbered.

<u>**SECTION 10.**</u> ORS 418.307 is amended to read:

418.307. (1) A physician licensed by the Oregon Medical Board, a naturopathic physician licensed under ORS chapter 685, a dentist licensed by the Oregon Board of Dentistry or a hospital licensed by the Department of Human Services is authorized to treat a child who is ward of the court or is a dependent or delinquent child in accord with the best medical judgment of the physician, naturopathic physician, dentist or responsible official of the hospital and without consent if:

(a) Because of the general state of the child's health or any particular condition, the physician, naturopathic physician, dentist or responsible official of the hospital determines that in the medical judgment of the physician, naturopathic physician, dentist or responsible official prompt action is reasonably necessary to avoid unnecessary suffering or discomfort or to effect a more expedient or effective cure; and

(b) It is impossible or highly impractical to obtain consent for treating the child from the child-caring agency, the child's parent or the child's legal guardian.

(2) No charge of assault or battery shall be made against a physician, naturopathic physician, dentist or hospital official or employee who provides medical treatment pursuant to subsection (1) of this section.

(3) A minor child described in subsection (1) of this section [*who is 15 years of age or older*] may consent to medical treatment [*pursuant to*] **as provided in** ORS 109.640.

<u>**SECTION 11.**</u> ORS 436.225 is amended to read:

436.225. (1) In obtaining informed consent for sterilization a physician, physician assistant or nurse practitioner must offer to answer any questions the individual to be sterilized may have concerning the proposed procedure, and must provide orally all of the following information or advice to the individual to be sterilized:

(a) Advice that the individual is free to withhold or withdraw consent to the procedure at any time before the sterilization without affecting the right to future care or treatment;

(b) A description of available alternative methods of family planning and birth control;

(c) Advice that the sterilization procedure is considered to be irreversible;

(d) A thorough explanation of the specific sterilization procedure to be performed;

(e) A full description of the discomforts and risks that may accompany or follow the performing of the procedure, including an explanation of the type and possible effects of any anesthetic to be used; and

(f) A full description of the benefits or advantages that may be expected as a result of the sterilization.

(2) A natural parent, or a legal guardian or conservator of a minor child or protected person appointed under ORS chapter 125, may not give substitute consent for sterilization.

(3) Whenever any physician, physician assistant or nurse practitioner has reason to believe an individual 15 years of age or older is unable to give informed consent, no sterilization shall be performed until it is determined by a circuit court that the individual involved is able to and has given informed consent.  Whenever the court determines, under the provisions of this chapter, that a person lacks the ability to give informed consent, the court shall permit sterilization only if the person is 18 years of age or older and only upon showing that such operation, treatment or procedure is in the best interest of the individual.

(4) **Notwithstanding section 3 of this 2023 Act,** informed consent may not be obtained while the individual to be sterilized is:

(a) In labor or childbirth;

(b) Seeking to obtain or obtaining an abortion; or

(c) Under the influence of alcohol or other substances that affect the individual's state of awareness.

<u>SECTION 12.</u> ORS 743A.067, as amended by section 12, chapter 45, Oregon Laws 2022, is amended to read:

743A.067. (1) As used in this section:

(a) "Contraceptives" means health care services, drugs, devices, products or medical procedures to prevent a pregnancy.

(b) "Enrollee" means an insured individual and the individual's spouse, domestic partner and dependents who are beneficiaries under the insured individual's health benefit plan.

(c) "Health benefit plan" has the meaning given that term in ORS 743B.005, excluding Medicare Advantage Plans and including health benefit plans offering pharmacy benefits administered by a third party administrator or pharmacy benefit manager.

(d) "Prior authorization" has the meaning given that term in ORS 743B.001.

(e) "Religious employer" has the meaning given that term in ORS 743A.066.

(f) "Utilization review" has the meaning given that term in ORS 743B.001.

(2) A health benefit plan offered in this state must provide coverage for all of the following services, drugs, devices, products and procedures:

(a) Well-woman care prescribed by the Department of Consumer and Business Services by rule consistent with guidelines published by the United States Health Resources and Services Administration.

(b) Counseling for sexually transmitted infections, including but not limited to human immunodeficiency virus and acquired immune deficiency syndrome.

(c) Screening for:

(A) Chlamydia;

(B) Gonorrhea;

(C) Hepatitis B;

(D) Hepatitis C;

(E) Human immunodeficiency virus and acquired immune deficiency syndrome;

(F) Human papillomavirus;

(G) Syphilis;

(H) Anemia;

(I) Urinary tract infection;

(J) Pregnancy;

(K) Rh incompatibility;

(L) Gestational diabetes;

(M) Osteoporosis;

(N) Breast cancer; and

(O) Cervical cancer.

(d) Screening to determine whether counseling related to the BRCA1 or BRCA2 genetic mutations is indicated and counseling related to the BRCA1 or BRCA2 genetic mutations if indicated.

(e) Screening and appropriate counseling or interventions for:

(A) Tobacco use; and

(B) Domestic and interpersonal violence.

(f) Folic acid supplements.

(g) Abortion.

(h) Breastfeeding comprehensive support, counseling and supplies.

(i) Breast cancer chemoprevention counseling.

(j) Any contraceptive drug, device or product approved by the United States Food and Drug Administration, subject to all of the following:

(A) If there is a therapeutic equivalent of a contraceptive drug, device or product approved by the United States Food and Drug Administration, a health benefit plan may provide coverage for either the requested contraceptive drug, device or product or for one or more therapeutic equivalents of the requested drug, device or product.

(B) If a contraceptive drug, device or product covered by the health benefit plan is deemed medically inadvisable by the enrollee's provider, the health benefit plan must cover an alternative contraceptive drug, device or product prescribed by the provider.

(C) A health benefit plan must pay pharmacy claims for reimbursement of all contraceptive drugs available for over-the-counter sale that are approved by the United States Food and Drug Administration.

(D) A health benefit plan may not infringe upon an enrollee's choice of contraceptive drug, device or product and may not require prior authorization, step therapy or other utilization review techniques for medically appropriate covered contraceptive drugs, devices or other products approved by the United States Food and Drug Administration.

(k) Voluntary sterilization.

(L) As a single claim or combined with other claims for covered services provided on the same day:

(A) Patient education and counseling on contraception and sterilization.

(B) Services related to sterilization or the administration and monitoring of contraceptive drugs, devices and products, including but not limited to:

(i) Management of side effects;

(ii) Counseling for continued adherence to a prescribed regimen;

(iii) Device insertion and removal; and

(iv) Provision of alternative contraceptive drugs, devices or products deemed medically appropriate in the judgment of the enrollee's provider.

(m) Any additional preventive services for women that must be covered without cost sharing under 42 U.S.C. 300gg-13, as identified by the United States Preventive Services Task Force or the Health Resources and Services Administration of the United States Department of Health and Human Services as of January 1, 2017.

(3) A health benefit plan may not impose on an enrollee a deductible, coinsurance, copayment or any other cost-sharing requirement on the coverage required by this section. A health care provider shall be reimbursed for providing the services described in this section without any deduction for coinsurance, copayments or any other cost-sharing amounts.

(4) Except as authorized under this section, a health benefit plan may not impose any restrictions or delays on the coverage required by this section.

(5) This section does not exclude coverage for contraceptive drugs, devices or products prescribed by a provider, acting within the provider's scope of practice, for:

(a) Reasons other than contraceptive purposes, such as decreasing the risk of ovarian cancer or eliminating symptoms of menopause; or

(b) Contraception that is necessary to preserve the life or health of an enrollee.

(6) This section does not limit the authority of the Department of Consumer and Business Services to ensure compliance with ORS 743A.063 and 743A.066.

(7) This section does not require a health benefit plan to cover:

(a) Experimental or investigational treatments;

(b) Clinical trials or demonstration projects, except as provided in ORS 743A.192;

(c) Treatments that do not conform to acceptable and customary standards of medical practice;

(d) Treatments for which there is insufficient data to determine efficacy; or

(e) Abortion if the insurer offering the health benefit plan**:**

**(A) Has a certificate of authority to transact insurance in this state issued by the Department of Consumer and Business Services; and**

**(B)** Excluded coverage for abortion in all of its individual, small employer and large employer group plans during the 2017 plan year.

(8) If services, drugs, devices, products or procedures required by this section are provided by an out-of-network provider, the health benefit plan must cover the services, drugs, devices, products or procedures without imposing any cost-sharing requirement on the enrollee if:

(a) There is no in-network provider to furnish the service, drug, device, product or procedure that is geographically accessible or accessible in a reasonable amount of time, as defined by the Department of Consumer and Business Services by rule consistent with the requirements for provider networks in ORS 743B.505; or

(b) An in-network provider is unable or unwilling to provide the service in a timely manner.

(9) An insurer may offer to a religious employer a health benefit plan that does not include coverage for contraceptives or abortion procedures that are contrary to the religious employer's religious tenets only if the insurer notifies in writing all employees who may be enrolled in the health benefit plan of the contraceptives and procedures the employer refuses to cover for religious reasons.

(10) If the Department of Consumer and Business Services concludes that enforcement of this section may adversely affect the allocation of federal funds to this state, the department may grant an exemption to the requirements but only to the minimum extent necessary to ensure the continued receipt of federal funds.

(11) An insurer that is subject to this section shall make readily accessible to enrollees and potential enrollees, in a consumer-friendly format, information about the coverage of contraceptives by each health benefit plan and the coverage of other services, drugs, devices, products and procedures described in this section. The insurer must provide the information:

(a) On the insurer's website; and

(b) In writing upon request by an enrollee or potential enrollee.

(12) This section does not prohibit an insurer from using reasonable medical management techniques to determine the frequency, method, treatment or setting for the coverage of services, drugs, devices, products and procedures described in subsection (2) of this section, other than coverage required by subsection (2)(g) and (j) of this section, if the techniques:

(a) Are consistent with the coverage requirements of subsection (2) of this section; and

(b) Do not result in the wholesale or indiscriminate denial of coverage for a service.

(13) This section is exempt from ORS 743A.001.

### REPRODUCTIVE HEALTH SERVICES

**NOTE:** Sections 13 through 18 were deleted by amendment. Subsequent sections were not renumbered.

(Gender-Affirming Treatment)

SECTION 19. Section 20 of this 2023 Act is added to and made a part of the Insurance Code.

SECTION 20. (1) As used in this section:

(a) "Carrier" has the meaning given that term in ORS 743B.005.

(b) "Gender-affirming treatment" means a procedure, service, drug, device or product that a physical or behavioral health care provider prescribes to treat an individual for incongruence between the individual's gender identity and the individual's sex assignment at birth.

(c) "Health benefit plan" has the meaning given that term in ORS 743B.005.

(2) A carrier offering a health benefit plan in this state may not:

(a) Deny or limit coverage under the plan for gender-affirming treatment that is:

(A) Medically necessary as determined by the physical or behavioral health care provider who prescribes the treatment; and

(B) Prescribed in accordance with accepted standards of care.

(b) Apply categorical cosmetic or blanket exclusions to medically necessary gender-affirming treatment.

(c) Exclude as a cosmetic service a medically necessary procedure prescribed by a physical or behavioral health care provider as gender-affirming treatment, including but not limited to:

(A) Tracheal shave;

(B) Hair electrolysis;

(C) Facial feminization surgery or other facial gender-affirming treatment;

(D) Revisions to prior forms of gender-affirming treatment; and

(E) Any combination of gender-affirming treatment procedures.

(d) Issue an adverse benefit determination denying or limiting access to gender-affirming treatment unless a physical or behavioral health care provider with experience prescribing or delivering gender-affirming treatment has first reviewed and approved the denial of or the limitation on access to the treatment.

(3) A carrier described in subsection (2) of this section must:

(a) Satisfy any network adequacy standards under ORS 743B.505 related to gender-affirming treatment providers; and

(b)(A) Contract with a network of gender-affirming treatment providers that is sufficient in numbers and geographic locations to ensure that gender-affirming treatment services are accessible to all enrollees without unreasonable delay; or

(B) Ensure that all enrollees have geographical access without unreasonable delay to out-of-network gender-affirming treatment services with cost-sharing or other out-of-pocket costs for the services no greater than the cost-sharing or other out-of-pocket costs for the services when furnished by an in-network provider.

(4) The Department of Consumer and Business Services shall:

(a) Evaluate compliance with this section in each examination or analysis of the market conduct of a carrier under ORS 731.300; and

(b) Adopt rules to implement the provisions of this section.

(5) This section is exempt from ORS 743A.001.

SECTION 21. The Department of Consumer and Business Services shall conduct a targeted market conduct examination of all carriers that are subject to the requirements of section 20 of this 2023 Act to ensure compliance with section 20 of this 2023 Act. The examinations must be completed no later than January 2, 2027.

SECTION 22. No later than December 31, 2026, the Department of Consumer and Business Services shall report to the interim committees of the Legislative Assembly related to

health, in the manner provided in ORS 192.245, on the implementation of section 20 of this 2023 Act.

SECTION 23. Section 24 of this 2023 Act is added to and made a part of ORS chapter 414.

SECTION 24. (1) As used in this section, "gender-affirming treatment" means a procedure, service, drug, device or product that a physical or behavioral health care provider prescribes to treat an individual for incongruence between the individual's gender identity and the individual's sex assignment at birth.

(2) Notwithstanding ORS 414.065 and 414.690, medical assistance provided to a member of a coordinated care organization or a medical assistance recipient who is not enrolled in a coordinated care organization shall include gender-affirming treatment.

(3) The Oregon Health Authority or a coordinated care organization may not:

(a) Deny or limit gender-affirming treatment that is:

(A) Medically necessary as determined by the physical or behavioral health care provider who prescribes the treatment; and

(B) Prescribed in accordance with accepted standards of care.

(b) Deny as a cosmetic service a medically necessary procedure prescribed by a physical or behavioral health care provider as gender-affirming treatment, including but not limited to:

(A) Tracheal shave;

(B) Hair electrolysis;

(C) Facial feminization surgery or other facial gender-affirming treatment;

(D) Revisions to prior forms of gender-affirming treatment; and

(E) Any combination of gender-affirming treatment procedures.

(c) Deny or limit gender-affirming treatment unless a physical or behavioral health care provider with experience prescribing or delivering gender-affirming treatment has first reviewed and approved the denial of or the limitation on the treatment.

(4) A coordinated care organization must:

(a) Contract with a network of gender-affirming treatment providers that is sufficient in numbers and geographic locations to meet the network adequacy standards prescribed by ORS 414.609 (1); and

(b)(A) Ensure that gender-affirming treatment services are accessible to all of the coordinated care organization's members without unreasonable delay; or

(B) Ensure that all members have geographical access to non-contracting providers of gender-affirming treatment services without unreasonable delay.

(5) The authority shall monitor coordinated care organization compliance with the requirements of this section and may adopt rules necessary to carry out the provisions of this section.

SECTION 25. ORS 243.144, as amended by section 2, chapter 72, Oregon Laws 2022, is amended to read:

243.144. Benefit plans offered by the Public Employees' Benefit Board that reimburse the cost of medical and other health services and supplies must comply with the requirements for health benefit plan coverage described in:

(1) ORS 743A.058;

(2) ORS 743B.256;

(3) ORS 743B.420;

(4) ORS 743B.423;

(5) ORS 743B.601;

(6) ORS 743B.810; [*and*]

(7) ORS 743B.287 (4)**; and**

(8) Section 20 of this 2023 Act.

SECTION 26. ORS 243.877, as amended by section 3, chapter 72, Oregon Laws 2022, is amended to read:

243.877. Benefit plans offered by the Oregon Educators Benefit Board that reimburse the cost of medical and other health services and supplies must comply with the requirements for health benefit plan coverage described in:

(1) ORS 743A.058;

(2) ORS 743B.256;

(3) ORS 743B.420;

(4) ORS 743B.423;

(5) ORS 743B.601;

(6) ORS 743B.810; [*and*]

(7) ORS 743B.287 (4)**; and**

**(8) Section 20 of this 2023 Act**.

**(Contraceptives)**

**SECTION 27. Section 28 of this 2023 Act is added to and made a part of ORS chapter 414.**

**SECTION 28. (1) As used in this section, "prescription contraceptive" means a drug or device that requires a prescription and is approved by the United States Food and Drug Administration to prevent pregnancy.**

**(2) In determining the extent of prescription drugs to be provided in medical assistance, in accordance with ORS 414.065, the Oregon Health Authority shall ensure payment for a dispensing of prescription contraceptives, to an individual enrolled in the medical assistance program, that is sufficient to last for a period of 12 calendar months.**

**NOTE:** Sections 29 and 30 were deleted by amendment. Subsequent sections were not renumbered.

**PROTECTIONS FOR PROVIDERS AND INDIVIDUALS**
**(Malpractice insurance and licensing)**

**SECTION 31. An insurer that provides malpractice insurance for a health care provider for care provided in this state may not take any adverse action, including but not limited to sanctions, fines, penalties, rate increases or denial or revocation of coverage, against a health care provider authorized to provide care in this state if the adverse action is:**

**(1) Based solely on the health care provider's providing, authorizing, recommending, aiding, assisting, referring for or otherwise participating in a reproductive or gender-affirming health care service that is lawful in this state but unlawful in the jurisdiction in which the health care provider provided the service, so long as the service provided was performed in accordance with the standard of care applicable to the service; or**

**(2) A result of an adverse action taken against the health care provider's license issued by another state that resulted solely from the health care provider's providing, authorizing, recommending, aiding, assisting, referring for or otherwise participating in a reproductive or gender-affirming health care service that is lawful in this state but provided to a resident of a jurisdiction in which the service is unlawful or is unlawful in the jurisdiction in which the health care provider provided the service, so long as the service provided was performed in accordance with the standard of care applicable to the service.**

**SECTION 31a.** ORS 675.070 is amended to read:

675.070. (1) If any of the grounds enumerated in subsection (2) of this section exist, the Oregon Board of Psychology may impose any of the following sanctions:

(a) Deny a license to an applicant;

(b) Refuse to renew the license of a psychologist or psychologist associate;

(c) Suspend the license of a psychologist or psychologist associate for a period of not less than one year;

(d) Issue a letter of reprimand;

(e) Impose probation with authority to restrict the scope of practice of a psychologist or psychologist associate or require practice under supervision;

(f) Revoke the license of a psychologist or psychologist associate; or

(g) Impose a civil penalty as described in subsection (3) of this section.

(2) **Subject to subsection (7) of this section,** the board may impose a sanction listed in subsection (1) of this section against a psychologist or psychologist associate or applicant, or, if applicable, an unlicensed person found in violation of ORS 675.010 to 675.150, when, in the judgment of the board, the person:

(a) Has an impairment as defined in ORS 676.303;

(b) Has been convicted of violation of a law relating to controlled substances;

(c) Has been convicted of a felony or misdemeanor involving moral turpitude;

(d) Is guilty of immoral or unprofessional conduct or of gross negligence in the practice of psychology, including but not limited to:

(A) Conduct or practice contrary to recognized standard of ethics of the psychological profession or conduct or practice that constitutes a danger to the health or safety of a patient or the public, or conduct, practice or a condition that adversely affects a psychologist or psychologist associate's ability to practice psychology safely and skillfully.

(B) Willful ordering or performing of unnecessary tests or studies, administration of unnecessary treatment, failure to obtain consultations or perform referrals when failing to do so is not consistent with the standard of care, or otherwise ordering or performing a psychological service or treatment that is contrary to recognized standards of practice of the psychological profession;

(e) Has practiced or attempted to practice medicine without being licensed to do so;

(f) Has obtained or attempted to obtain a license under ORS 675.010 to 675.150 by fraud or material misrepresentation;

(g) Has impersonated a licensed psychologist or psychologist associate or has allowed another person to use the license of the psychologist;

(h) Has violated a provision of ORS 675.010 to 675.150 or 675.850 or a provision of the code of professional conduct formulated under ORS 675.110 (13);

(i) Has obtained a fee or payment from a patient or third party payer through fraud or intentional misrepresentation; or

(j) Notwithstanding ORS 670.280, has been convicted of a sex crime as defined in ORS 163A.005 or has been convicted in another state or jurisdiction of a crime that is substantially equivalent to a sex crime as defined in ORS 163A.005.

(3) The board may impose a civil penalty under subsection (1) of this section:

(a) In an amount not to exceed $5,000; or

(b) In an amount not to exceed $10,000, if any of the following conditions exist:

(A) The conduct giving rise to the penalty had a serious detrimental effect on the health or safety of another person;

(B) The person subject to the penalty has a history of discipline for the same or similar conduct;

(C) The conduct giving rise to the penalty involves a willful or reckless disregard of the law;

(D) The conduct giving rise to the penalty was perpetrated against a minor, an elderly person or a person with a disability; or

(E) The person subject to the penalty violated ORS 675.020 by practicing psychology or representing that the person is a psychologist without having a license.

(4) **Except as provided in subsection (7) of this section,** if a conviction described in subsection (2) of this section is used as grounds for denial, refusal, suspension, revocation, reprimand, probation or imposition of a civil penalty, a certified copy of the record of the conviction shall be conclusive evidence.

(5) The board may license an applicant or renew or restore a license suspended or revoked under subsection (2)(a) of this section due to a mental health condition if the board determines that the applicant or former licensed psychologist or former psychologist associate no longer has an impairment due to a mental health condition.

(6) **Except as provided in subsection (7) of this section,** license suspension or revocation in another state is grounds for license denial or disciplinary action by the board.

**(7) The board may not suspend or revoke a person's license to practice psychology, or refuse to grant a license to practice psychology to a person, because of a conviction or license suspension or revocation resulting solely from the person's provision of psychological services relating to reproductive or gender-affirming health care that are otherwise lawful in this state but unlawful in the jurisdiction in which the person provided the services, so long as the services provided were performed in accordance with the standard of care applicable to the services.**

SECTION 31b. ORS 675.540 is amended to read:

675.540. (1) **Subject to subsection (8) of this section,** the State Board of Licensed Social Workers may impose any or all of the sanctions specified in subsection (2) of this section, upon proof, after a hearing pursuant to the provisions of ORS chapter 183 relating to a contested case, that a regulated social worker:

(a) Has been convicted in this or any other state of a crime that is a felony in this state;

(b) Has been convicted of a felony in a federal court;

(c) Is unable to perform the practice of social work by reason of physical illness;

(d) Has an impairment as defined in ORS 676.303;

(e) Has been grossly negligent or has engaged in unprofessional conduct in the practice of social work;

(f) Has violated any provision of ORS 675.510 to 675.600 or 675.850 or any rule adopted under ORS 675.600; or

(g) Notwithstanding ORS 670.280, has been convicted of a sex crime as defined in ORS 163A.005 or has been convicted in another state or jurisdiction of a crime that is substantially equivalent to a sex crime as defined in ORS 163A.005.

(2) Pursuant to the provisions of subsection (1) of this section, the board may:

(a) Deny, suspend, revoke or refuse to renew any authorization to practice regulated social work issued under ORS 675.510 to 675.600.

(b) Place a regulated social worker on probation and impose conditions or limits on the scope of practice of a regulated social worker.

(c) Impose a civil penalty not to exceed $3,000 for each violation.

(3) The expiration, or voluntary surrender by a regulated social worker, of an authorization to practice regulated social work does not deprive the board of jurisdiction to proceed with any investigation of, or any action or disciplinary proceedings against, the regulated social worker.

(4) Information that the board obtains as part of an investigation into the conduct of a regulated social worker or an applicant for an authorization to practice regulated social work or as part of a contested case proceeding, consent order or stipulated agreement involving the conduct of a regulated social worker or applicant, is confidential as provided under ORS 676.175.

(5) Subject to the provisions of ORS chapter 183 relating to a contested case, the board may impose a civil penalty in an amount up to $5,000 upon proof that, after a person's authorization to practice regulated social work has been revoked by the board, the person has:

(a) Engaged in the practice of clinical social work; or

(b) Represented that the person is a regulated social worker.

(6) Subject to the provisions of ORS chapter 183 relating to a contested case, the board may impose a civil penalty of up to $3,000 upon proof that a person who is not a regulated social worker has:

(a) Represented that the person is a regulated social worker; or

(b) Used the title "social worker" or any title, words or abbreviations that indicate that the person has an authorization to practice regulated social work in violation of ORS 675.520.

(7) Subject to the provisions of ORS chapter 183 relating to a contested case, the board may impose a civil penalty of up to $5,000 upon proof that a person who is not a clinical social worker licensed under ORS 675.530 or a clinical social work associate certified under ORS 675.537 has:

(a) Engaged in the practice of clinical social work, unless the person is permitted to practice clinical social work under ORS 675.523; or

(b) Represented that the person is a clinical social worker or clinical social work associate.

**(8)(a) As used in this section, "social work services" means clinical social work, the practice of baccalaureate social work, the practice of master's social work or the practice of social work.**

**(b) The board may not suspend or revoke a person's authorization to practice regulated social work, or refuse to grant a person an authorization to practice regulated social work, because of a conviction or license suspension or revocation resulting solely from the person's provision of social work services relating to reproductive or gender-affirming health care that are otherwise lawful in this state but unlawful in the jurisdiction in which the person provided the services, so long as the services provided were performed in accordance with the standard of care applicable to the services.**

**SECTION 31c.** ORS 675.745 is amended to read:

675.745. (1) The Oregon Board of Licensed Professional Counselors and Therapists may deny, suspend, revoke or refuse to issue or to renew any license issued under ORS 675.715 to 675.835 upon proof that the applicant for licensure or the licensee:

(a) **Except as provided in subsection (8) of this section,** has been convicted of violating ORS 675.825 or of a crime in this or any other state or territory or against the federal government that brings into question the competence of the licensee in the role of a counselor or a therapist;

(b) Is unable to perform the practice of professional counseling or marriage and family therapy by reason of physical illness;

(c) Has an impairment as defined in ORS 676.303;

(d) Has been grossly negligent in the practice of professional counseling or marriage and family therapy;

(e) Has violated any provision of ORS 675.715 to 675.835 or 675.850;

(f) Has violated any rule of the board pertaining to the licensure of professional counselors or licensed marriage and family therapists;

(g) Has failed to file a professional disclosure statement or has filed a false, incomplete or misleading professional disclosure statement;

(h) Has practiced outside the scope of activities, including administering, constructing or interpreting tests or diagnosing or treating mental disorders, for which the licensee has individual training and qualification;

(i) **Except as provided in subsection (8) of this section,** has been disciplined by a state mental health licensing board or program in this or any other state for violation of competency or conduct standards; or

(j) Notwithstanding ORS 670.280, has been convicted of a sex crime as defined in ORS 163A.005 or has been convicted in another state or jurisdiction of a crime that is substantially equivalent to a sex crime as defined in ORS 163A.005.

(2)(a) The board may reprimand or impose probation on a licensee or a registered associate upon proof of any of the grounds for discipline provided in subsection (1) of this section.

(b) If the board elects to place a licensee or a registered associate on probation, the board may impose:

(A) Restrictions on the scope of practice of the licensee or associate;

(B) Requirements for specific training;

(C) Supervision of the practice of the licensee or associate; or

(D) Other conditions the board finds necessary for the protection of the public.

(3) The board may initiate injunctive proceedings in any circuit court against persons violating any provision of ORS 675.715 to 675.835 or any rules adopted by the board.

(4) Pursuant to ORS 183.745, the board may impose a civil penalty of not more than $2,500 for each ground for discipline listed in subsection (1) of this section found by the board.

(5) Pursuant to ORS 183.745, the board may impose a civil penalty of not more than $2,500 for each violation of or failure to observe any limitation or condition imposed by the board on the licensee's or registered associate's practice under subsection (2) of this section.

(6) Information that the board obtains as part of an investigation into licensee or applicant conduct or as part of a contested case proceeding, consent order or stipulated agreement involving licensee or applicant conduct is confidential as provided under ORS 676.175.

(7) In addition to the actions authorized by subsections (1) and (2) of this section, the board may take such disciplinary action as the board in its discretion finds proper, including but not limited to the assessment of the costs of the disciplinary process.

**(8) The board may not suspend or revoke a person's license or registration to practice professional counseling or marriage and family therapy, or refuse to grant a license or registration to practice professional counseling or marriage and family therapy to a person, because of a conviction or disciplinary action resulting solely from the person's provision of professional counseling services or marriage and family therapy services relating to reproductive or gender-affirming health care that are otherwise lawful in this state but unlawful in the jurisdiction in which the person provided the services, so long as the services provided were performed in accordance with the standard of care applicable to the services.**

SECTION 32. ORS 677.190 is amended to read:

677.190. The Oregon Medical Board may refuse to grant, or may suspend or revoke**,** a license to practice for any of the following reasons:

(1)(a) Unprofessional or dishonorable conduct.

(b) For purposes of this subsection, the use of an alternative medical treatment shall not by itself constitute unprofessional conduct. For purposes of this paragraph:

(A) "Alternative medical treatment" means:

(i) A treatment that the treating physician, based on the physician's professional experience, has an objective basis to believe has a reasonable probability for effectiveness in its intended use even if the treatment is outside recognized scientific guidelines, is unproven, is no longer used as a generally recognized or standard treatment or lacks the approval of the United States Food and Drug Administration;

(ii) A treatment that is supported for specific usages or outcomes by at least one other physician licensed by the Oregon Medical Board; and

(iii) A treatment that poses no greater risk to a patient than the generally recognized or standard treatment.

(B) "Alternative medical treatment" does not include use by a physician of controlled substances in the treatment of a person for chemical dependency resulting from the use of controlled substances.

(2) Employing any person to solicit patients for the licensee. However, a managed care organization, independent practice association, preferred provider organization or other medical service provider organization may contract for patients on behalf of physicians.

(3) Representing to a patient that a manifestly incurable condition of sickness, disease or injury can be cured.

(4) Obtaining any fee by fraud or misrepresentation.

(5) Willfully or negligently divulging a professional secret without the written consent of the patient.

(6)(a) **Except as provided in paragraph (b) of this subsection,** conviction of any offense punishable by incarceration in a Department of Corrections institution or in a federal prison, subject to ORS 670.280. A copy of the record of conviction, certified to by the clerk of the court entering the conviction, shall be conclusive evidence of the conviction.

**(b) The board may not suspend or revoke a person's license, or refuse to grant a license to a person, because of a conviction resulting solely from the person's provision of a reproductive or gender-affirming health care service that is otherwise lawful in this state but**

**unlawful in the jurisdiction in which the person provided the service, so long as the service provided was performed in accordance with the standard of care applicable to the service.**

(7) Impairment as defined in ORS 676.303.

(8) Fraud or misrepresentation in applying for or procuring a license to practice in this state, or in connection with applying for or procuring registration.

(9) Making statements that the licensee knows, or with the exercise of reasonable care should know, are false or misleading, regarding skill or the efficacy or value of the medicine, treatment or remedy prescribed or administered by the licensee or at the direction of the licensee in the treatment of any disease or other condition of the human body or mind.

(10) Impersonating another licensee licensed under this chapter or permitting or allowing any person to use the license.

(11) Aiding or abetting the practice of medicine or podiatry by a person not licensed by the board, when the licensee knows, or with the exercise of reasonable care should know, that the person is not licensed.

(12) Using the name of the licensee under the designation "doctor," "Dr.," "D.O." or "M.D.," "D.P.M.," "Acupuncturist," "P.A." or any similar designation in any form of advertising that is untruthful or is intended to deceive or mislead the public.

(13) Gross negligence or repeated negligence in the practice of medicine or podiatry.

(14) Incapacity to practice medicine or podiatry. If the board has evidence indicating incapacity, the board may order a licensee to submit to a standardized competency examination. The licensee shall have access to the result of the examination and to the criteria used for grading and evaluating the examination. If the examination is given orally, the licensee shall have the right to have the examination recorded.

(15)**(a) Except as provided in paragraph (b) of this subsection,** disciplinary action by another state of a license to practice, based upon acts by the licensee similar to acts described in this section. A certified copy of the record of the disciplinary action of the state is conclusive evidence thereof.

**(b) The board may not suspend or revoke a person's license, or refuse to grant a license to a person, because of a disciplinary action by another state resulting solely from the person's provision of a reproductive or gender-affirming health care service that is otherwise lawful in this state but unlawful in the jurisdiction in which the person provided the service, so long as the service provided was performed in accordance with the standard of care applicable to the service.**

(16) Failing to designate the degree appearing on the license under circumstances described in ORS 677.184 (3).

(17) Willfully violating any provision of this chapter or any rule adopted by the board, board order, or failing to comply with a board request pursuant to ORS 677.320.

(18) Failing to report the change of the location of practice of the licensee as required by ORS 677.172.

(19) Imprisonment as provided in ORS 677.225.

(20) Making a fraudulent claim.

(21)(a) Performing psychosurgery.

(b) For purposes of this subsection and ORS 426.385, "psychosurgery" means any operation designed to produce an irreversible lesion or destroy brain tissue for the primary purpose of altering the thoughts, emotions or behavior of a human being. "Psychosurgery" does not include procedures which may produce an irreversible lesion or destroy brain tissues when undertaken to cure well-defined disease states such as brain tumor, epileptic foci and certain chronic pain syndromes.

(22) Refusing an invitation for an informal interview with the board requested under ORS 677.415.

(23) Violation of the federal Controlled Substances Act.

(24) Prescribing controlled substances without a legitimate medical purpose, or prescribing controlled substances without following accepted procedures for examination of patients, or prescribing controlled substances without following accepted procedures for record keeping.

(25) Providing written documentation for purposes of ORS 475C.783 without having legitimately diagnosed a debilitating medical condition, as defined in ORS 475C.777, or without having followed accepted procedures for the examination of patients or for keeping records.

(26) Failure by the licensee to report to the board any adverse action taken against the licensee by another licensing jurisdiction or any peer review body, health care institution, professional or medical society or association, governmental agency, law enforcement agency or court for acts or conduct similar to acts or conduct that would constitute grounds for disciplinary action as described in this section.

(27) Failure by the licensee to notify the board of the licensee's voluntary resignation from the staff of a health care institution or voluntary limitation of a licensee's staff privileges at the institution if that action occurs while the licensee is under investigation by the institution or a committee thereof for any reason related to medical incompetence, unprofessional conduct, physical incapacity or impairment.

**SECTION 33.** ORS 677.225 is amended to read:

677.225. (1) A person's license issued under this chapter is suspended automatically if:

(a) The licensee is adjudged to be a person with mental illness under ORS 426.130 or is admitted on a voluntary basis to a treatment facility for mental illness that affects the ability of the licensee to safely practice medicine and if the licensee's residence in the hospital exceeds 25 consecutive days; or

(b) **Except as provided in subsection (4) of this section,** the licensee is an adult in custody in a penal institution.

(2)(a) The clerk of the court ordering commitment or incarceration under subsection (1)(a) or (b) of this section shall cause to be mailed to the Oregon Medical Board, as soon as possible, a certified copy of the court order. [*No fees are chargeable by*] The clerk **may not charge a fee** for performing the duties prescribed by this paragraph.

(b) The administrator of the hospital to which a person with a license issued under this chapter has voluntarily applied for admission shall cause to be mailed to the board as soon as possible, a certified copy of the record of the voluntary admission of [*such*] **the** person.

(c) Written evidence received from the supervisory authority of a penal or mental institution that the licensee is an adult in custody or patient therein is prima facie evidence for the purpose of subsection (1)(a) or (b) of this section.

(3) A suspension under this section may be terminated by the board when:

(a)(A) The board receives evidence satisfactory to the board that the licensee is not a person with mental illness as defined in ORS 426.005; or

(B) The board receives evidence satisfactory to the board that the licensee is no longer incarcerated; and

(b) The board is satisfied, with due regard for the public interest, that the licensee's privilege to practice may be restored.

**(4) This section does not apply to a licensee who is an adult in custody in a penal institution if the sole reason for incarceration is the licensee's performance of, or assistance in the performance of, a reproductive or gender-affirming health care service that is otherwise lawful in this state but unlawful in the jurisdiction in which the licensee provided, or assisted in the provision of, the service, so long as the service provided was performed in accordance with the standard of care applicable to the service.**

**SECTION 34. Section 35 of this 2023 Act is added to and made a part of ORS 678.010 to 678.410.**

**SECTION 35. The Oregon State Board of Nursing may not suspend or revoke a person's license or refuse to grant a license to a person, because of a conviction or disciplinary action by another state resulting solely from the person's provision of a reproductive or gender-**

affirming health care service that is otherwise lawful in this state but unlawful in the jurisdiction in which the person provided the service, so long as the service provided was performed in accordance with the standard of care applicable to the service.

**SECTION 36.** ORS 678.111, as amended by section 9, chapter 38, Oregon Laws 2022, is amended to read:

678.111. In the manner prescribed in ORS chapter 183 for a contested case, **and except as provided in section 35 of this 2023 Act**:

(1) The Oregon State Board of Nursing may refuse to issue a license to practice nursing by examination or indorsement or a nurse internship license or may revoke or suspend a license, issue a limited license, censure or reprimand or place on probation, subject to any conditions imposed by the board, a person issued a license, for any of the following causes:

(a) Conviction of the licensee of crime where the crime bears demonstrable relationship to the practice of nursing. A copy of the record of the conviction, certified to by the clerk of the court entering the conviction, shall be conclusive evidence of the conviction.

(b) Gross incompetence or gross negligence of the licensee in the practice of nursing at the level for which the licensee is licensed.

(c) Any willful fraud or misrepresentation in applying for or procuring a license or renewal of a license.

(d) Fraud or deceit of the licensee in the practice of nursing or in admission to the practice of nursing.

(e) Impairment as defined in ORS 676.303.

(f) Conduct derogatory to the standards of nursing.

(g) Violation of any provision of ORS 678.010 to 678.448 or rules adopted under ORS 678.010 to 678.448.

(h) Revocation or suspension of a license to practice nursing by any state or territory of the United States, or any foreign jurisdiction authorized to issue nursing credentials whether or not that license or credential was relied upon in issuing that license in this state. A certified copy of the order of revocation or suspension shall be conclusive evidence of the revocation or suspension.

(i) Physical condition that makes the licensee unable to conduct safely the practice for which the licensee is licensed.

(j) Violation of any condition imposed by the board when issuing a limited license.

(2) A license may be denied, suspended or revoked for the reasons stated in subsection (1) of this section.

(3) A license in inactive status may be denied, suspended or revoked for the reasons stated in subsection (1) of this section.

(4) A license in retired status may be denied, suspended or revoked for any cause stated in subsection (1) of this section.

**SECTION 37.** ORS 685.110 is amended to read:

685.110. The Oregon Board of Naturopathic Medicine may refuse to grant a license, may suspend or revoke a license, may limit a license, may impose probation, may issue a letter of reprimand and may impose a civil penalty not to exceed $5,000 for each offense for any of the following reasons:

(1) Using fraud or deception in securing a license.

(2) Impersonating another physician.

(3) Practicing naturopathic medicine under an assumed name.

(4) Performing an abortion.

(5) Being convicted of a crime involving moral turpitude.

(6) Any other reason that renders the applicant or licensee unfit to perform the duties of a naturopathic physician.

(7) Being convicted of a crime relating to practice of naturopathic medicine, **unless the conviction is solely the result of providing a reproductive or gender-affirming health care service that is otherwise lawful in this state but unlawful in the jurisdiction in which the person**

**provided the service, so long as the service provided was performed in accordance with the standard of care applicable to the service**.

(8) Committing negligence related to the practice of naturopathic medicine.

(9) Having an impairment as defined in ORS 676.303.

(10) Prescribing or dispensing drugs outside the scope of practice.

(11) Obtaining a fee through fraud or misrepresentation.

(12) Committing gross or repeated malpractice.

(13) Representing to a patient that a manifestly incurable condition of sickness, disease or injury can be permanently cured.

(14) Engaging in any conduct or practice contrary to a recognized standard of ethics of the profession or any conduct or practice that does or might constitute a danger to the health or safety of a patient or the public or any conduct, practice or condition that does or might adversely affect a physician's ability safely and skillfully to practice naturopathic medicine.

(15) Willfully and consistently utilizing any naturopathic service, X-ray equipment or treatment contrary to recognized standards of practice of the naturopathic profession.

(16) Failing to notify the board within 30 days of a change in the location of practice or of mailing address.

(17) Attempting to practice naturopathic medicine or practicing or claiming to practice naturopathic medicine or any of its components in this state without first complying with the provisions of this chapter.

(18) Having a license to practice naturopathic medicine in another jurisdiction suspended or revoked**, unless the suspension or revocation is solely the result of providing a reproductive or gender-affirming health care service that is otherwise lawful in this state but unlawful in the jurisdiction in which the person provided the service, so long as the service was performed in accordance with the standard of care applicable to the service**.

(19) Employing unlicensed persons to practice naturopathic medicine.

(20) Practicing natural childbirth without first obtaining a certificate of special competency.

(21) Failing to respond in a timely manner to a request for information regarding a complaint or the investigation of a complaint by the board.

(22) Failing to pay a civil penalty in the time specified by the order imposing the penalty.

(23) Violating any provision of this chapter or rules adopted by the board.

**SECTION 38.** ORS 689.405 is amended to read:

689.405. (1) The State Board of Pharmacy may refuse to issue or renew, or may suspend, revoke or restrict the license of any person or the certificate of registration of any drug outlet upon one or more of the following grounds:

(a) Unprofessional conduct as that term is defined by the rules of the board.

(b) Repeated or gross negligence.

(c) Incapacity of a nature that prevents a person from engaging in the activity for which the person is licensed with reasonable skill, competence and safety to the public.

(d) Impairment as defined in ORS 676.303.

(e) **Subject to subsection (4) of this section,** being found guilty by the board of a violation of subparagraph (B) of this paragraph, or by a court of competent jurisdiction of one or more of the following:

(A) A felony, as defined by the laws of this state; or

(B) Violations of the pharmacy or drug laws of this state or rules pertaining thereto, or of statutes, rules or regulations of any other state, or of the federal government.

(f) Fraud or intentional misrepresentation by a licensee or registrant in securing or attempting to secure the issuance or renewal of a license.

(g) Engaging or aiding and abetting an individual to engage in the practice of pharmacy without a license, or falsely using the title of pharmacist.

(h) Aiding and abetting an individual in performing the duties of a pharmacy technician without licensing.

(i) Being found by the board to be in violation of any of the provisions of ORS 435.010 to 435.130, 453.025, 453.045, 475.035 to 475.190, 475.744, 475.752 to 475.980 or this chapter or rules adopted pursuant to ORS 435.010 to 435.130, 453.025, 453.045, 475.035 to 475.190, 475.744, 475.752 to 475.980 and this chapter.

(j) Disciplinary action by another state regarding a license, based upon acts by the licensee similar to acts described in this subsection, **unless the disciplinary action resulted solely from the licensee's provision of a reproductive or gender-affirming health care service that is otherwise lawful in this state but unlawful in the jurisdiction in which the licensee provided the service, so long as the service provided was performed in accordance with the standard of care applicable to the service**. A certified copy of the record of disciplinary action of the state taking the disciplinary action is conclusive evidence thereof.

(2) Upon receipt of a complaint under this chapter, the board shall conduct an investigation as described under ORS 676.165.

(3) Actions taken under subsection (1) of this section shall be considered a contested case under ORS chapter 183.

**(4) The board may not suspend or revoke a person's license, or refuse to grant a license to a person, because of a conviction resulting solely from the person's provision of a reproductive or gender-affirming health care service that is otherwise lawful in this state but unlawful in the jurisdiction in which the person provided the service, so long as the service provided was performed in accordance with the standard of care applicable to the service.**

### (Confidentiality)

**SECTION 39.** ORS 192.345 is amended to read:

192.345. The following public records are exempt from disclosure under ORS 192.311 to 192.478 unless the public interest requires disclosure in the particular instance:

(1) Records of a public body pertaining to litigation to which the public body is a party if the complaint has been filed, or if the complaint has not been filed, if the public body shows that such litigation is reasonably likely to occur. This exemption does not apply to litigation which has been concluded, and nothing in this subsection shall limit any right or opportunity granted by discovery or deposition statutes to a party to litigation or potential litigation.

(2) Trade secrets. "Trade secrets," as used in this section, may include, but are not limited to, any formula, plan, pattern, process, tool, mechanism, compound, procedure, production data, or compilation of information which is not patented, which is known only to certain individuals within an organization and which is used in a business it conducts, having actual or potential commercial value, and which gives its user an opportunity to obtain a business advantage over competitors who do not know or use it.

(3) Investigatory information compiled for criminal law purposes. The record of an arrest or the report of a crime shall be disclosed unless and only for so long as there is a clear need to delay disclosure in the course of a specific investigation, including the need to protect the complaining party or the victim.  Nothing in this subsection shall limit any right constitutionally guaranteed, or granted by statute, to disclosure or discovery in criminal cases. For purposes of this subsection, the record of an arrest or the report of a crime includes, but is not limited to:

(a) The arrested person's name, age, residence, employment, marital status and similar biographical information;

(b) The offense with which the arrested person is charged;

(c) The conditions of release pursuant to ORS 135.230 to 135.290;

(d) The identity of and biographical information concerning both complaining party and victim;

(e) The identity of the investigating and arresting agency and the length of the investigation;

(f) The circumstances of arrest, including time, place, resistance, pursuit and weapons used; and

(g) Such information as may be necessary to enlist public assistance in apprehending fugitives from justice.

(4) Test questions, scoring keys, and other data used to administer a licensing examination, employment, academic or other examination or testing procedure before the examination is given and if the examination is to be used again. Records establishing procedures for and instructing persons administering, grading or evaluating an examination or testing procedure are included in this exemption, to the extent that disclosure would create a risk that the result might be affected.

(5) Information consisting of production records, sale or purchase records or catch records, or similar business records of a private concern or enterprise, required by law to be submitted to or inspected by a governmental body to allow it to determine fees or assessments payable or to establish production quotas, and the amounts of such fees or assessments payable or paid, to the extent that such information is in a form that would permit identification of the individual concern or enterprise. This exemption does not include records submitted by long term care facilities as defined in ORS 442.015 to the state for purposes of reimbursement of expenses or determining fees for patient care. Nothing in this subsection shall limit the use that can be made of such information for regulatory purposes or its admissibility in any enforcement proceeding.

(6) Information relating to the appraisal of real estate prior to its acquisition.

(7) The names and signatures of employees who sign authorization cards or petitions for the purpose of requesting representation or decertification elections.

(8) Investigatory information relating to any complaint filed under ORS 659A.820 or 659A.825, until such time as the complaint is resolved under ORS 659A.835, or a final order is issued under ORS 659A.850.

(9) Investigatory information relating to any complaint or charge filed under ORS 243.676 and 663.180.

(10) Records, reports and other information received or compiled by the Director of the Department of Consumer and Business Services under ORS 697.732.

(11) Information concerning the location of archaeological sites or objects as those terms are defined in ORS 358.905, except if the governing body of an Indian tribe requests the information and the need for the information is related to that Indian tribe's cultural or religious activities. This exemption does not include information relating to a site that is all or part of an existing, commonly known and publicized tourist facility or attraction.

(12) A personnel discipline action, or materials or documents supporting that action.

(13) Fish and wildlife information:

(a) Developed pursuant to ORS 496.004, 496.172 and 498.026 or ORS 496.192 and 564.100, regarding the habitat, location or population of any threatened species or endangered species; or

(b) Described in section 2, chapter 532, Oregon Laws 2019.

(14) Writings prepared by or under the direction of faculty of public educational institutions, in connection with research, until publicly released, copyrighted or patented.

(15) Computer programs developed or purchased by or for any public body for its own use. As used in this subsection, "computer program" means a series of instructions or statements which permit the functioning of a computer system in a manner designed to provide storage, retrieval and manipulation of data from such computer system, and any associated documentation and source material that explain how to operate the computer program. "Computer program" does not include:

(a) The original data, including but not limited to numbers, text, voice, graphics and images;

(b) Analyses, compilations and other manipulated forms of the original data produced by use of the program; or

(c) The mathematical and statistical formulas which would be used if the manipulated forms of the original data were to be produced manually.

(16) Data and information provided by participants to mediation under ORS 36.256.

(17) Investigatory information relating to any complaint or charge filed under ORS chapter 654, until a final administrative determination is made or, if a citation is issued, until an employer receives notice of any citation.

(18) Specific operational plans in connection with an anticipated threat to individual or public safety for deployment and use of personnel and equipment, prepared or used by a public body, if

public disclosure of the plans would endanger an individual's life or physical safety or jeopardize a law enforcement activity.

(19)(a) Audits or audit reports required of a telecommunications carrier. As used in this paragraph, "audit or audit report" means any external or internal audit or audit report pertaining to a telecommunications carrier, as defined in ORS 133.721, or pertaining to a corporation having an affiliated interest, as defined in ORS 759.390, with a telecommunications carrier that is intended to make the operations of the entity more efficient, accurate or compliant with applicable rules, procedures or standards, that may include self-criticism and that has been filed by the telecommunications carrier or affiliate under compulsion of state law. "Audit or audit report" does not mean an audit of a cost study that would be discoverable in a contested case proceeding and that is not subject to a protective order; and

(b) Financial statements. As used in this paragraph, "financial statement" means a financial statement of a nonregulated corporation having an affiliated interest, as defined in ORS 759.390, with a telecommunications carrier, as defined in ORS 133.721.

(20) The residence address of an elector if authorized under ORS 247.965 and subject to ORS 247.967.

(21) The following records, communications and information submitted to a housing authority as defined in ORS 456.005, or to an urban renewal agency as defined in ORS 457.010, by applicants for and recipients of loans, grants and tax credits:

(a) Personal and corporate financial statements and information, including tax returns;

(b) Credit reports;

(c) Project appraisals, excluding appraisals obtained in the course of transactions involving an interest in real estate that is acquired, leased, rented, exchanged, transferred or otherwise disposed of as part of the project, but only after the transactions have closed and are concluded;

(d) Market studies and analyses;

(e) Articles of incorporation, partnership agreements and operating agreements;

(f) Commitment letters;

(g) Project pro forma statements;

(h) Project cost certifications and cost data;

(i) Audits;

(j) Project tenant correspondence requested to be confidential;

(k) Tenant files relating to certification; and

(L) Housing assistance payment requests.

(22) Records or information that, if disclosed, would allow a person to:

(a) Gain unauthorized access to buildings or other property;

(b) Identify those areas of structural or operational vulnerability that would permit unlawful disruption to, or interference with, services; or

(c) Disrupt, interfere with or gain unauthorized access to public funds or to information processing, communication or telecommunication systems, including the information contained in the systems, that are used or operated by a public body.

(23) Records or information that would reveal or otherwise identify security measures, or weaknesses or potential weaknesses in security measures, taken or recommended to be taken to protect:

(a) An individual;

(b) Buildings or other property;

(c) Information processing, communication or telecommunication systems, including the information contained in the systems; or

(d) Those operations of the Oregon State Lottery the security of which are subject to study and evaluation under ORS 461.180 (6).

(24) Personal information held by or under the direction of officials of the Oregon Health and Science University or a public university listed in ORS 352.002 about a person who has or who is interested in donating money or property to the Oregon Health and Science University or a public

university, if the information is related to the family of the person, personal assets of the person or is incidental information not related to the donation.

(25) The home address, professional address and telephone number of a person who has or who is interested in donating money or property to a public university listed in ORS 352.002.

(26) Records of the name and address of a person who files a report with or pays an assessment to a commodity commission established under ORS 576.051 to 576.455, the Oregon Beef Council created under ORS 577.210 or the Oregon Wheat Commission created under ORS 578.030.

(27) Information provided to, obtained by or used by a public body to authorize, originate, receive or authenticate a transfer of funds, including but not limited to a credit card number, payment card expiration date, password, financial institution account number and financial institution routing number.

(28) Social Security numbers as provided in ORS 107.840.

(29) The electronic mail address of a student who attends a public university listed in ORS 352.002 or Oregon Health and Science University.

(30) The name, home address, professional address or location of a person that is engaged in, or that provides goods or services for, medical research at Oregon Health and Science University that is conducted using animals other than rodents. This subsection does not apply to Oregon Health and Science University press releases, websites or other publications circulated to the general public.

(31) If requested by a public safety officer, as defined in ORS 181A.355, or a county juvenile department employee who is charged with and primarily performs duties related to the custody, control or supervision of adjudicated youths confined in a detention facility, as defined in ORS 419A.004:

(a) The home address and home telephone number of the public safety officer or county juvenile department employee contained in the voter registration records for the officer or employee.

(b) The home address and home telephone number of the public safety officer or county juvenile department employee contained in records of the Department of Public Safety Standards and Training.

(c) The name of the public safety officer or county juvenile department employee contained in county real property assessment or taxation records. This exemption:

(A) Applies only to the name of the officer or employee and any other owner of the property in connection with a specific property identified by the officer or employee in a request for exemption from disclosure;

(B) Applies only to records that may be made immediately available to the public upon request in person, by telephone or using the Internet;

(C) Applies until the officer or employee requests termination of the exemption;

(D) Does not apply to disclosure of records among public bodies as defined in ORS 174.109 for governmental purposes; and

(E) May not result in liability for the county if the name of the officer or employee is disclosed after a request for exemption from disclosure is made under this subsection.

(32) Unless the public records request is made by a financial institution, as defined in ORS 706.008, consumer finance company licensed under ORS chapter 725, mortgage banker or mortgage broker licensed under ORS 86A.095 to 86A.198, or title company for business purposes, records described in paragraph (a) of this subsection, if the exemption from disclosure of the records is sought by an individual described in paragraph (b) of this subsection using the procedure described in paragraph (c) of this subsection:

(a) The home address, home or cellular telephone number or personal electronic mail address contained in the records of any public body that has received the request that is set forth in:

(A) A warranty deed, deed of trust, mortgage, lien, deed of reconveyance, release, satisfaction, substitution of trustee, easement, dog license, marriage license or military discharge record that is in the possession of the county clerk; or

(B) Any public record of a public body other than the county clerk.

(b) The individual claiming the exemption from disclosure must be a district attorney, a deputy district attorney, the Attorney General or an assistant attorney general, the United States Attorney for the District of Oregon or an assistant United States attorney for the District of Oregon, a city attorney who engages in the prosecution of criminal matters or a deputy city attorney who engages in the prosecution of criminal matters.

(c) The individual claiming the exemption from disclosure must do so by filing the claim in writing with the public body for which the exemption from disclosure is being claimed on a form prescribed by the public body. Unless the claim is filed with the county clerk, the claim form shall list the public records in the possession of the public body to which the exemption applies. The exemption applies until the individual claiming the exemption requests termination of the exemption or ceases to qualify for the exemption.

(33) The following voluntary conservation agreements and reports:

(a) Land management plans required for voluntary stewardship agreements entered into under ORS 541.973; and

(b) Written agreements relating to the conservation of greater sage grouse entered into voluntarily by owners or occupiers of land with a soil and water conservation district under ORS 568.550.

(34) Sensitive business records or financial or commercial information of the State Accident Insurance Fund Corporation that is not customarily provided to business competitors. This exemption does not:

(a) Apply to the formulas for determining dividends to be paid to employers insured by the State Accident Insurance Fund Corporation;

(b) Apply to contracts for advertising, public relations or lobbying services or to documents related to the formation of such contracts;

(c) Apply to group insurance contracts or to documents relating to the formation of such contracts, except that employer account records shall remain exempt from disclosure as provided in ORS 192.355 (35); or

(d) Provide the basis for opposing the discovery of documents in litigation pursuant to the applicable rules of civil procedure.

(35) Records of the Department of Public Safety Standards and Training relating to investigations conducted under ORS 181A.640 or 181A.870 (6), until the department issues the report described in ORS 181A.640 or 181A.870.

(36) A medical examiner's report, autopsy report or laboratory test report ordered by a medical examiner under ORS 146.117.

(37) Any document or other information related to an audit of a public body, as defined in ORS 174.109, that is in the custody of an auditor or audit organization operating under nationally recognized government auditing standards, until the auditor or audit organization issues a final audit report in accordance with those standards or the audit is abandoned. This exemption does not prohibit disclosure of a draft audit report that is provided to the audited entity for the entity's response to the audit findings.

(38)(a) Personally identifiable information collected as part of an electronic fare collection system of a mass transit system.

(b) The exemption from disclosure in paragraph (a) of this subsection does not apply to public records that have attributes of anonymity that are sufficient, or that are aggregated into groupings that are broad enough, to ensure that persons cannot be identified by disclosure of the public records.

(c) As used in this subsection:

(A) "Electronic fare collection system" means the software and hardware used for, associated with or relating to the collection of transit fares for a mass transit system, including but not limited to computers, radio communication systems, personal mobile devices, wearable technology, fare instruments, information technology, data storage or collection equipment, or other equipment or improvements.

(B) "Mass transit system" has the meaning given that term in ORS 267.010.

(C) "Personally identifiable information" means all information relating to a person that acquires or uses a transit pass or other fare payment medium in connection with an electronic fare collection system, including but not limited to:

(i) Customer account information, date of birth, telephone number, physical address, electronic mail address, credit or debit card information, bank account information, Social Security or taxpayer identification number or other identification number, transit pass or fare payment medium balances or history, or similar personal information; or

(ii) Travel dates, travel times, frequency of use, travel locations, service types or vehicle use, or similar travel information.

(39)(a) If requested by a civil code enforcement officer:

(A) The home address and home telephone number of the civil code enforcement officer contained in the voter registration records for the officer.

(B) The name of the civil code enforcement officer contained in county real property assessment or taxation records. This exemption:

(i) Applies only to the name of the civil code enforcement officer and any other owner of the property in connection with a specific property identified by the officer in a request for exemption from disclosure;

(ii) Applies only to records that may be made immediately available to the public upon request in person, by telephone or using the Internet;

(iii) Applies until the civil code enforcement officer requests termination of the exemption;

(iv) Does not apply to disclosure of records among public bodies as defined in ORS 174.109 for governmental purposes; and

(v) May not result in liability for the county if the name of the civil code enforcement officer is disclosed after a request for exemption from disclosure is made under this subsection.

(b) As used in this subsection, "civil code enforcement officer" means an employee of a public body, as defined in ORS 174.109, who is charged with enforcing laws or ordinances relating to land use, zoning, use of rights-of-way, solid waste, hazardous waste, sewage treatment and disposal or the state building code.

(40) Audio or video recordings, whether digital or analog, resulting from a law enforcement officer's operation of a video camera worn upon the officer's person that records the officer's interactions with members of the public while the officer is on duty. When a recording described in this subsection is subject to disclosure, the following apply:

(a) Recordings that have been sealed in a court's record of a court proceeding or otherwise ordered by a court not to be disclosed may not be disclosed.

(b) A request for disclosure under this subsection must identify the approximate date and time of an incident for which the recordings are requested and be reasonably tailored to include only that material for which a public interest requires disclosure.

(c) A video recording disclosed under this subsection must, prior to disclosure, be edited in a manner as to render the faces of all persons within the recording unidentifiable.

(41) The contents of tips reported to a tip line, as defined in ORS 339.329. However, personally identifiable information, as defined in ORS 339.329, is not subject to public interest balancing under this section and remains exempt from disclosure except as provided in ORS 339.329.

(42) Residential addresses of individuals with intellectual or developmental disabilities residing in adult foster homes as defined in ORS 443.705 or residential training facilities or residential training homes as those terms are defined in ORS 443.400.

**(43) The name, home address, professional address or location of an individual who is authorized to provide physical and behavioral health care services in this state and who provides reproductive and gender-affirming health care services.**

**SECTION 40.** ORS 192.345, as amended by section 4, chapter 532, Oregon Laws 2019, section 2, chapter 318, Oregon Laws 2021, and section 23, chapter 489, Oregon Laws 2021, is amended to read:

192.345. The following public records are exempt from disclosure under ORS 192.311 to 192.478 unless the public interest requires disclosure in the particular instance:

(1) Records of a public body pertaining to litigation to which the public body is a party if the complaint has been filed, or if the complaint has not been filed, if the public body shows that such litigation is reasonably likely to occur. This exemption does not apply to litigation which has been concluded, and nothing in this subsection shall limit any right or opportunity granted by discovery or deposition statutes to a party to litigation or potential litigation.

(2) Trade secrets. "Trade secrets," as used in this section, may include, but are not limited to, any formula, plan, pattern, process, tool, mechanism, compound, procedure, production data, or compilation of information which is not patented, which is known only to certain individuals within an organization and which is used in a business it conducts, having actual or potential commercial value, and which gives its user an opportunity to obtain a business advantage over competitors who do not know or use it.

(3) Investigatory information compiled for criminal law purposes. The record of an arrest or the report of a crime shall be disclosed unless and only for so long as there is a clear need to delay disclosure in the course of a specific investigation, including the need to protect the complaining party or the victim.  Nothing in this subsection shall limit any right constitutionally guaranteed, or granted by statute, to disclosure or discovery in criminal cases. For purposes of this subsection, the record of an arrest or the report of a crime includes, but is not limited to:

(a) The arrested person's name, age, residence, employment, marital status and similar bi-ographical information;

(b) The offense with which the arrested person is charged;

(c) The conditions of release pursuant to ORS 135.230 to 135.290;

(d) The identity of and biographical information concerning both complaining party and victim;

(e) The identity of the investigating and arresting agency and the length of the investigation;

(f) The circumstances of arrest, including time, place, resistance, pursuit and weapons used; and

(g) Such information as may be necessary to enlist public assistance in apprehending fugitives from justice.

(4) Test questions, scoring keys, and other data used to administer a licensing examination, employment, academic or other examination or testing procedure before the examination is given and if the examination is to be used again. Records establishing procedures for and instructing persons administering, grading or evaluating an examination or testing procedure are included in this exemption, to the extent that disclosure would create a risk that the result might be affected.

(5) Information consisting of production records, sale or purchase records or catch records, or similar business records of a private concern or enterprise, required by law to be submitted to or inspected by a governmental body to allow it to determine fees or assessments payable or to estab-lish production quotas, and the amounts of such fees or assessments payable or paid, to the extent that such information is in a form that would permit identification of the individual concern or en-terprise. This exemption does not include records submitted by long term care facilities as defined in ORS 442.015 to the state for purposes of reimbursement of expenses or determining fees for pa-tient care.  Nothing in this subsection shall limit the use that can be made of such information for regulatory purposes or its admissibility in any enforcement proceeding.

(6) Information relating to the appraisal of real estate prior to its acquisition.

(7) The names and signatures of employees who sign authorization cards or petitions for the purpose of requesting representation or decertification elections.

(8) Investigatory information relating to any complaint filed under ORS 659A.820 or 659A.825, until such time as the complaint is resolved under ORS 659A.835, or a final order is issued under ORS 659A.850.

(9) Investigatory information relating to any complaint or charge filed under ORS 243.676 and 663.180.

(10) Records, reports and other information received or compiled by the Director of the De-partment of Consumer and Business Services under ORS 697.732.

(11) Information concerning the location of archaeological sites or objects as those terms are defined in ORS 358.905, except if the governing body of an Indian tribe requests the information and the need for the information is related to that Indian tribe's cultural or religious activities. This exemption does not include information relating to a site that is all or part of an existing, commonly known and publicized tourist facility or attraction.

(12) A personnel discipline action, or materials or documents supporting that action.

(13) Fish and wildlife information developed pursuant to ORS 496.004, 496.172 and 498.026 or ORS 496.192 and 564.100, regarding the habitat, location or population of any threatened species or endangered species.

(14) Writings prepared by or under the direction of faculty of public educational institutions, in connection with research, until publicly released, copyrighted or patented.

(15) Computer programs developed or purchased by or for any public body for its own use. As used in this subsection, "computer program" means a series of instructions or statements which permit the functioning of a computer system in a manner designed to provide storage, retrieval and manipulation of data from such computer system, and any associated documentation and source material that explain how to operate the computer program. "Computer program" does not include:

(a) The original data, including but not limited to numbers, text, voice, graphics and images;

(b) Analyses, compilations and other manipulated forms of the original data produced by use of the program; or

(c) The mathematical and statistical formulas which would be used if the manipulated forms of the original data were to be produced manually.

(16) Data and information provided by participants to mediation under ORS 36.256.

(17) Investigatory information relating to any complaint or charge filed under ORS chapter 654, until a final administrative determination is made or, if a citation is issued, until an employer receives notice of any citation.

(18) Specific operational plans in connection with an anticipated threat to individual or public safety for deployment and use of personnel and equipment, prepared or used by a public body, if public disclosure of the plans would endanger an individual's life or physical safety or jeopardize a law enforcement activity.

(19)(a) Audits or audit reports required of a telecommunications carrier. As used in this paragraph, "audit or audit report" means any external or internal audit or audit report pertaining to a telecommunications carrier, as defined in ORS 133.721, or pertaining to a corporation having an affiliated interest, as defined in ORS 759.390, with a telecommunications carrier that is intended to make the operations of the entity more efficient, accurate or compliant with applicable rules, procedures or standards, that may include self-criticism and that has been filed by the telecommunications carrier or affiliate under compulsion of state law. "Audit or audit report" does not mean an audit of a cost study that would be discoverable in a contested case proceeding and that is not subject to a protective order; and

(b) Financial statements. As used in this paragraph, "financial statement" means a financial statement of a nonregulated corporation having an affiliated interest, as defined in ORS 759.390, with a telecommunications carrier, as defined in ORS 133.721.

(20) The residence address of an elector if authorized under ORS 247.965 and subject to ORS 247.967.

(21) The following records, communications and information submitted to a housing authority as defined in ORS 456.005, or to an urban renewal agency as defined in ORS 457.010, by applicants for and recipients of loans, grants and tax credits:

(a) Personal and corporate financial statements and information, including tax returns;

(b) Credit reports;

(c) Project appraisals, excluding appraisals obtained in the course of transactions involving an interest in real estate that is acquired, leased, rented, exchanged, transferred or otherwise disposed of as part of the project, but only after the transactions have closed and are concluded;

(d) Market studies and analyses;

(e) Articles of incorporation, partnership agreements and operating agreements;

(f) Commitment letters;

(g) Project pro forma statements;

(h) Project cost certifications and cost data;

(i) Audits;

(j) Project tenant correspondence requested to be confidential;

(k) Tenant files relating to certification; and

(L) Housing assistance payment requests.

(22) Records or information that, if disclosed, would allow a person to:

(a) Gain unauthorized access to buildings or other property;

(b) Identify those areas of structural or operational vulnerability that would permit unlawful disruption to, or interference with, services; or

(c) Disrupt, interfere with or gain unauthorized access to public funds or to information processing, communication or telecommunication systems, including the information contained in the systems, that are used or operated by a public body.

(23) Records or information that would reveal or otherwise identify security measures, or weaknesses or potential weaknesses in security measures, taken or recommended to be taken to protect:

(a) An individual;

(b) Buildings or other property;

(c) Information processing, communication or telecommunication systems, including the information contained in the systems; or

(d) Those operations of the Oregon State Lottery the security of which are subject to study and evaluation under ORS 461.180 (6).

(24) Personal information held by or under the direction of officials of the Oregon Health and Science University or a public university listed in ORS 352.002 about a person who has or who is interested in donating money or property to the Oregon Health and Science University or a public university, if the information is related to the family of the person, personal assets of the person or is incidental information not related to the donation.

(25) The home address, professional address and telephone number of a person who has or who is interested in donating money or property to a public university listed in ORS 352.002.

(26) Records of the name and address of a person who files a report with or pays an assessment to a commodity commission established under ORS 576.051 to 576.455, the Oregon Beef Council created under ORS 577.210 or the Oregon Wheat Commission created under ORS 578.030.

(27) Information provided to, obtained by or used by a public body to authorize, originate, receive or authenticate a transfer of funds, including but not limited to a credit card number, payment card expiration date, password, financial institution account number and financial institution routing number.

(28) Social Security numbers as provided in ORS 107.840.

(29) The electronic mail address of a student who attends a public university listed in ORS 352.002 or Oregon Health and Science University.

(30) The name, home address, professional address or location of a person that is engaged in, or that provides goods or services for, medical research at Oregon Health and Science University that is conducted using animals other than rodents. This subsection does not apply to Oregon Health and Science University press releases, websites or other publications circulated to the general public.

(31) If requested by a public safety officer, as defined in ORS 181A.355, or a county juvenile department employee who is charged with and primarily performs duties related to the custody, control or supervision of adjudicated youths confined in a detention facility, as defined in ORS 419A.004:

(a) The home address and home telephone number of the public safety officer or county juvenile department employee contained in the voter registration records for the officer or employee.

(b) The home address and home telephone number of the public safety officer or county juvenile department employee contained in records of the Department of Public Safety Standards and Training.

(c) The name of the public safety officer or county juvenile department employee contained in county real property assessment or taxation records. This exemption:

(A) Applies only to the name of the officer or employee and any other owner of the property in connection with a specific property identified by the officer or employee in a request for exemption from disclosure;

(B) Applies only to records that may be made immediately available to the public upon request in person, by telephone or using the Internet;

(C) Applies until the officer or employee requests termination of the exemption;

(D) Does not apply to disclosure of records among public bodies as defined in ORS 174.109 for governmental purposes; and

(E) May not result in liability for the county if the name of the officer or employee is disclosed after a request for exemption from disclosure is made under this subsection.

(32) Unless the public records request is made by a financial institution, as defined in ORS 706.008, consumer finance company licensed under ORS chapter 725, mortgage banker or mortgage broker licensed under ORS 86A.095 to 86A.198, or title company for business purposes, records described in paragraph (a) of this subsection, if the exemption from disclosure of the records is sought by an individual described in paragraph (b) of this subsection using the procedure described in paragraph (c) of this subsection:

(a) The home address, home or cellular telephone number or personal electronic mail address contained in the records of any public body that has received the request that is set forth in:

(A) A warranty deed, deed of trust, mortgage, lien, deed of reconveyance, release, satisfaction, substitution of trustee, easement, dog license, marriage license or military discharge record that is in the possession of the county clerk; or

(B) Any public record of a public body other than the county clerk.

(b) The individual claiming the exemption from disclosure must be a district attorney, a deputy district attorney, the Attorney General or an assistant attorney general, the United States Attorney for the District of Oregon or an assistant United States attorney for the District of Oregon, a city attorney who engages in the prosecution of criminal matters or a deputy city attorney who engages in the prosecution of criminal matters.

(c) The individual claiming the exemption from disclosure must do so by filing the claim in writing with the public body for which the exemption from disclosure is being claimed on a form prescribed by the public body. Unless the claim is filed with the county clerk, the claim form shall list the public records in the possession of the public body to which the exemption applies. The exemption applies until the individual claiming the exemption requests termination of the exemption or ceases to qualify for the exemption.

(33) The following voluntary conservation agreements and reports:

(a) Land management plans required for voluntary stewardship agreements entered into under ORS 541.973; and

(b) Written agreements relating to the conservation of greater sage grouse entered into voluntarily by owners or occupiers of land with a soil and water conservation district under ORS 568.550.

(34) Sensitive business records or financial or commercial information of the State Accident Insurance Fund Corporation that is not customarily provided to business competitors. This exemption does not:

(a) Apply to the formulas for determining dividends to be paid to employers insured by the State Accident Insurance Fund Corporation;

(b) Apply to contracts for advertising, public relations or lobbying services or to documents related to the formation of such contracts;

(c) Apply to group insurance contracts or to documents relating to the formation of such contracts, except that employer account records shall remain exempt from disclosure as provided in ORS 192.355 (35); or

(d) Provide the basis for opposing the discovery of documents in litigation pursuant to the applicable rules of civil procedure.

(35) Records of the Department of Public Safety Standards and Training relating to investigations conducted under ORS 181A.640 or 181A.870 (6), until the department issues the report described in ORS 181A.640 or 181A.870.

(36) A medical examiner's report, autopsy report or laboratory test report ordered by a medical examiner under ORS 146.117.

(37) Any document or other information related to an audit of a public body, as defined in ORS 174.109, that is in the custody of an auditor or audit organization operating under nationally recognized government auditing standards, until the auditor or audit organization issues a final audit report in accordance with those standards or the audit is abandoned. This exemption does not prohibit disclosure of a draft audit report that is provided to the audited entity for the entity's response to the audit findings.

(38)(a) Personally identifiable information collected as part of an electronic fare collection system of a mass transit system.

(b) The exemption from disclosure in paragraph (a) of this subsection does not apply to public records that have attributes of anonymity that are sufficient, or that are aggregated into groupings that are broad enough, to ensure that persons cannot be identified by disclosure of the public records.

(c) As used in this subsection:

(A) "Electronic fare collection system" means the software and hardware used for, associated with or relating to the collection of transit fares for a mass transit system, including but not limited to computers, radio communication systems, personal mobile devices, wearable technology, fare instruments, information technology, data storage or collection equipment, or other equipment or improvements.

(B) "Mass transit system" has the meaning given that term in ORS 267.010.

(C) "Personally identifiable information" means all information relating to a person that acquires or uses a transit pass or other fare payment medium in connection with an electronic fare collection system, including but not limited to:

(i) Customer account information, date of birth, telephone number, physical address, electronic mail address, credit or debit card information, bank account information, Social Security or taxpayer identification number or other identification number, transit pass or fare payment medium balances or history, or similar personal information; or

(ii) Travel dates, travel times, frequency of use, travel locations, service types or vehicle use, or similar travel information.

(39)(a) If requested by a civil code enforcement officer:

(A) The home address and home telephone number of the civil code enforcement officer contained in the voter registration records for the officer.

(B) The name of the civil code enforcement officer contained in county real property assessment or taxation records. This exemption:

(i) Applies only to the name of the civil code enforcement officer and any other owner of the property in connection with a specific property identified by the officer in a request for exemption from disclosure;

(ii) Applies only to records that may be made immediately available to the public upon request in person, by telephone or using the Internet;

(iii) Applies until the civil code enforcement officer requests termination of the exemption;

(iv) Does not apply to disclosure of records among public bodies as defined in ORS 174.109 for governmental purposes; and

(v) May not result in liability for the county if the name of the civil code enforcement officer is disclosed after a request for exemption from disclosure is made under this subsection.

(b) As used in this subsection, "civil code enforcement officer" means an employee of a public body, as defined in ORS 174.109, who is charged with enforcing laws or ordinances relating to land use, zoning, use of rights-of-way, solid waste, hazardous waste, sewage treatment and disposal or the state building code.

(40) Audio or video recordings, whether digital or analog, resulting from a law enforcement officer's operation of a video camera worn upon the officer's person that records the officer's interactions with members of the public while the officer is on duty. When a recording described in this subsection is subject to disclosure, the following apply:

(a) Recordings that have been sealed in a court's record of a court proceeding or otherwise ordered by a court not to be disclosed may not be disclosed.

(b) A request for disclosure under this subsection must identify the approximate date and time of an incident for which the recordings are requested and be reasonably tailored to include only that material for which a public interest requires disclosure.

(c) A video recording disclosed under this subsection must, prior to disclosure, be edited in a manner as to render the faces of all persons within the recording unidentifiable.

(41) The contents of tips reported to a tip line, as defined in ORS 339.329. However, personally identifiable information, as defined in ORS 339.329, is not subject to public interest balancing under this section and remains exempt from disclosure except as provided in ORS 339.329.

(42) Residential addresses of individuals with intellectual or developmental disabilities residing in adult foster homes as defined in ORS 443.705 or residential training facilities or residential training homes as those terms are defined in ORS 443.400.

**(43) The name, home address, professional address or location of an individual who is authorized to provide physical and behavioral health care services in this state and who provides reproductive and gender-affirming health care services.**

SECTION 41. ORS 192.820 is amended to read:

192.820. As used in ORS 192.820 to 192.868:

(1) "Actual address" means:

(a) A residential, work or school street address of an individual specified on the application of the individual to be a program participant; or

(b) The name of the county in which the program participant resides or the name or number of the election precinct in which the program participant is registered to vote.

(2) "Address Confidentiality Program" means the program established under ORS 192.822.

(3) "Application assistant" means an employee of or a volunteer serving a public or private entity designated by the Attorney General under ORS 192.854 to assist individuals with applications to participate in the Address Confidentiality Program.

**(4) "Health care provider" means an individual who is authorized in this state to provide physical and behavioral health care services and who provides reproductive and gender-affirming health care services.**

[(4)] **(5)** "Program participant" means an individual accepted into the Address Confidentiality Program under ORS 192.820 to 192.868.

[(5)] **(6)** "Public body" has the meaning given that term in ORS 174.109.

[(6)] **(7)** "Public record" has the meaning given that term in ORS 192.311.

[(7)] **(8)** "Substitute address" means an address designated by the Attorney General under the Address Confidentiality Program.

[(8)] **(9)** "Victim of a sexual offense" means:

(a) An individual against whom a sexual offense has been committed, as described in ORS 163.305 to 163.467, 163.427, 163.466 or 163.525; or

(b) Any other individual designated by the Attorney General by rule.

[(9)] **(10)** "Victim of domestic violence" means:

(a) An individual against whom domestic violence has been committed, as defined in ORS 135.230, 181A.355 or 411.117;

(b) An individual who has been a victim of abuse, as defined in ORS 107.705; or

(c) Any other individual designated a victim of domestic violence by the Attorney General by rule.

[(10)] **(11)** "Victim of human trafficking" means:

(a) An individual against whom an offense described in ORS 163.263, 163.264 or 163.266 has been committed; or

(b) Any other individual designated by the Attorney General by rule. In adopting rules under this subsection, the Attorney General shall consider individuals against whom an act recognized as a severe form of trafficking in persons under 22 U.S.C. 7102 has been committed.

[(11)] **(12)** "Victim of stalking" means:

(a) An individual against whom stalking has been committed, as described in ORS 163.732; or

(b) Any other individual designated by the Attorney General by rule.

**SECTION 42.** ORS 192.822 is amended to read:

192.822. (1) The Address Confidentiality Program is established in the Department of Justice to:

(a) Protect the confidentiality of the actual address of a **health care provider or a** victim of domestic violence, a sexual offense, stalking or human trafficking; **and**

(b) Prevent assailants or potential assailants of the **health care provider or** victim from finding the **health care provider or** victim through public records.

(2) The Attorney General shall designate a substitute address for a program participant and act as the agent of the program participant for purposes of service of all legal process in this state and receiving and forwarding first-class, certified or registered mail.

(3) The Attorney General is not required to forward any packages or mail other than first-class, certified or registered mail to the program participant.

(4) The Attorney General is not required to track or otherwise maintain records of any mail received on behalf of a program participant unless the mail is certified or registered.

**SECTION 43.** ORS 192.826 is amended to read:

192.826. (1) Any of the following individuals with the assistance of an application assistant may file an application with the Attorney General to participate in the Address Confidentiality Program:

(a) An adult individual.

(b) A parent or guardian acting on behalf of a minor when the minor resides with the parent or guardian.

(c) A guardian acting on behalf of an incapacitated individual.

(2) The application must be dated, signed and verified by the applicant and the application assistant who assisted in the preparation of the application.

(3) **Except as provided in subsection (8) of this section,** the application must contain all of the following:

(a) A statement by the applicant that the applicant or the applicant's child or ward is a victim of domestic violence, a sexual offense, stalking or human trafficking and that the applicant fears for the applicant's safety or the safety of the applicant's child or ward.

(b) Evidence that the applicant or the applicant's child or ward is a victim of domestic violence, a sexual offense, stalking or human trafficking. This evidence may include any of the following:

(A) Law enforcement, court or other federal, state or local government records or files;

(B) Documentation from a public or private entity that provides assistance to victims of domestic violence, a sexual offense, stalking or human trafficking if the applicant or the applicant's child or ward is an alleged victim of domestic violence, a sexual offense, stalking or human trafficking;

(C) Documentation from a religious, medical or other professional from whom the applicant has sought assistance in dealing with the alleged domestic violence, sexual offense, stalking or human trafficking; or

(D) Other forms of evidence as determined by the Attorney General by rule.

Exhibit Page 43

(c) A statement by the applicant that disclosure of the actual address of the applicant would endanger the safety of the applicant or the safety of the applicant's child or ward.

(d) A statement by the applicant that the applicant:

(A) Resides at a location in this state that is not known by assailants or potential assailants of the applicant or the applicant's child or ward; and

(B) Will not disclose the location to assailants or potential assailants of the applicant or the applicant's child or ward while the applicant is a program participant.

(e) Written consent permitting the Attorney General to act as an agent for the applicant for the service of all legal process in this state and the receipt of first-class, certified or registered mail.

(f) The mailing address and telephone number at which the Attorney General can contact the applicant.

(g) The actual address that the applicant requests not be disclosed by the Attorney General that directly relates to the increased risk of the applicant or the applicant's child or ward as a victim of domestic violence, a sexual offense, stalking or human trafficking.

(h) A sworn statement by the applicant that to the best of the applicant's knowledge the information contained in the application is true.

(i) A recommendation by an application assistant that the applicant be a participant in the Address Confidentiality Program.

(4) Upon the filing of a properly completed application and upon approval by the Attorney General, the Attorney General shall certify the applicant as a program participant.

(5) Upon certification, the Attorney General shall issue an Address Confidentiality Program authorization card to the program participant. The Address Confidentiality Program authorization card is valid as long as the program participant remains certified under the program.

(6) The term of certification shall be for a period of time determined by the Attorney General by rule, unless prior to the end of the period one of the following occurs:

(a) The program participant withdraws the certification by filing with the Attorney General a request for withdrawal signed by the program participant and acknowledged in writing by a notary public or an application assistant; or

(b) The Attorney General cancels the certification under ORS 192.834.

(7) A program participant may renew the certification by filing an application for renewal with the Attorney General at least 30 days prior to expiration of the current certification.

**(8) The Attorney General shall establish by rule the requirements for an application filed by a health care provider.**

<u>SECTION 44.</u> ORS 676.177 is amended to read:

676.177. (1) Notwithstanding any other provision of ORS 676.165 to 676.180 **and except as provided in subsection (5) of this section**, a health professional regulatory board, upon a determination by the board that it possesses otherwise confidential information that reasonably relates to the regulatory or enforcement function of another public entity, may disclose that information to the other public entity.

(2) Any public entity that receives information pursuant to subsection (1) of this section shall agree to take all reasonable steps to maintain the confidentiality of the information, except that the public entity may use or disclose the information to the extent necessary to carry out the regulatory or enforcement functions of the public entity.

(3) For purposes of this section, "public entity" means:

(a) A board or agency of this state, or a board or agency of another state with regulatory or enforcement functions similar to the functions of a health professional regulatory board of this state;

(b) A district attorney;

(c) The Department of Justice;

(d) A state or local public body of this state that licenses, franchises or provides emergency medical services; or

(e) A law enforcement agency of this state, another state or the federal government.

(4) Notwithstanding subsections (1) to (3) of this section, the Oregon Board of Physical Therapy may disclose information described in subsection (1) of this section to the Physical Therapy Compact Commission established in ORS 688.240.

**(5) A health professional regulatory board may not disclose the information described in subsection (1) of this section to another public entity if the information relates to the provision of or referral for reproductive or gender-affirming health care services.**

(Health Care Facilities)

SECTION 45. **(1) A person commits the crime of interfering with a health care facility if the person intentionally, knowingly or recklessly interferes with access to or from a health care facility, or disrupts the normal functioning of a health care facility, by:**

**(a) Physically obstructing or impeding the free passage of a person seeking to enter or depart from the facility or from the common areas of the real property upon which the facility is located;**

**(b) Making noise that unreasonably disturbs the peace within the facility;**

**(c) Trespassing on the facility or the common areas of the real property upon which the facility is located;**

**(d) Causing the telephone of the facility to ring, vibrate or otherwise alert by visual or auditory means if:**

**(A) The person has no communicative purpose; or**

**(B) The person knows that the person has been forbidden from causing the telephone to ring, vibrate or alert by an individual exercising lawful authority over the receiving telephone; or**

**(e) Subjecting an owner, agent, patient or employee of the facility to alarm by conveying a telephonic, electronic or written threat to inflict serious physical injury on that individual or to commit a felony involving the individual, the property of the individual or a member of the individual's family, when the threat would reasonably be expected to cause alarm.**

**(2) Interfering with a health care facility is a Class A misdemeanor.**

**(3)(a) No law shall be passed restraining the free expression of opinion, or restricting the right to speak, write, or print freely on any subject whatever; but every person shall be responsible for the abuse of this right.**

**(b) Nothing in this section prohibits lawful picketing, lawful protesting or peaceful assembly, or other publicity for the purpose of providing the public with information.**

**(4) In a criminal proceeding based on a charge described in this section, the court shall take all steps reasonably necessary to safeguard the individual's privacy and prevent harassment of a health care patient or health care provider who is a victim or witness in the proceeding, including granting protective orders and motions in limine when appropriate.**

**(5) As used in this section:**

**(a) "Health care facility" means a facility that provides health care services directly to patients, including but not limited to a hospital, clinic, health care provider's office, health maintenance organization, diagnostic or treatment center, mental health facility, hospice or nursing home.**

**(b) "Health care provider" means an individual licensed, certified, registered or otherwise authorized to practice by a board, as defined in ORS 413.164, or an officer, director, employee or agent of a health care facility.**

SECTION 46. **(1) Irrespective of any criminal prosecution or the result thereof, a person or health care facility aggrieved by conduct prohibited by section 45 of this 2023 Act may bring a civil action against the person or group of persons engaging in the prohibited conduct, individually or jointly with other aggrieved persons, in the appropriate court for relief.**

**(2) A plaintiff who prevails in a claim described in this section may recover:**

**(a) Economic or noneconomic damages, as those terms are defined in ORS 31.705;**

(b) Statutory damages of $500 per day for each day that the prohibited conduct occurred for a plaintiff who is an individual, or $5,000 per day for each day that the prohibited conduct occurred for a plaintiff that is a health care facility;

(c) Injunctive relief;

(d) Reasonable attorney fees; and

(e) Any other appropriate equitable relief.

(3) In a proceeding on an action described in this section, the court shall take all steps reasonably necessary to safeguard the individual's privacy and prevent harassment of a health care patient or health care provider who is a party to or witness in the proceeding, including granting protective orders and motions in limine when appropriate.

(4) The following persons and entities qualify as aggrieved for the purposes of subsection (1) of this section:

(a) A person, physically present at the health care facility when the prohibited conduct occurs, whose access is or is about to be obstructed or impeded;

(b) A person, physically present at the health care facility when the prohibited conduct occurs, whose care is or is about to be disrupted;

(c) The health care facility or an employee or agent of the health care facility; or

(d) The owner of the health care facility or the building or property upon which the health care facility is located.

(5) As used in this section:

(a) "Health care facility" has the meaning given that term in section 45 of this 2023 Act.

(b) "Health care provider" has the meaning given that term in section 45 of this 2023 Act.

(Employees)

**SECTION 47.** ORS 659A.029 is amended to read:

659A.029. For purposes of ORS 659A.030, the phrase "because of sex" includes, but is not limited to, because of pregnancy, childbirth and related medical conditions or occurrences. [*Women*] **An individual** affected by **the individual's** pregnancy, childbirth or related medical conditions or occurrences shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as [*other persons*] **any other person** not so affected but similar in [*their*] ability or inability to work by reason of physical condition, and nothing in this section shall be interpreted to permit otherwise.

(Interstate Actions)

**SECTION 48.** (1) As used in this section:

(a) "Gender-affirming treatment" means a procedure, service, drug, device or product that a physical or behavioral health care provider prescribes to treat an individual for incongruence between the individual's gender identity and the individual's sex assignment at birth.

(b) "Reproductive health" means reproductive processes, functions and systems at all stages of life.

(c) "Reproductive health care" includes family planning and contraception, pregnancy termination services, prenatal, postnatal and delivery care, miscarriage management, fertility care, sterilization services, treatments for sexually transmitted infections and reproductive cancers and any other health care and medical services related to reproductive health.

(2) A law of another state that authorizes a person to bring a civil or criminal action against a person that does any of the following is contrary to the public policy of this state:

(a) Receive reproductive health care or gender-affirming treatment;

**(b) Provide or attempt to provide reproductive health care or gender-affirming treatment; or**

**(c) Knowingly engage in conduct that aids or abets the provision of reproductive health care or gender-affirming treatment.**

**(3) Notwithstanding ORCP 38 C, a person may not request that a clerk of court issue a subpoena for service upon a person to whom a foreign subpoena is directed if the foreign subpoena relates to gender-affirming treatment or reproductive health care services that are permitted under the laws of this state, unless the person requesting the subpoena provides a written declaration that the foreign subpoena relates to:**

**(a) An out-of-state action founded in tort, contract or statute, for which a similar claim would exist under the laws of this state, brought by a patient or the patient's authorized legal representative, for damages suffered by the patient; or**

**(b) An out-of-state action founded in contract, and for which a similar claim would exist under the laws of this state, brought or sought to be enforced by a party with a contractual relationship with the person that is the subject of the subpoena.**

<u>SECTION 49.</u> ORS 15.430 is amended to read:

15.430. Notwithstanding ORS 15.440, 15.445 and 15.455, Oregon law governs noncontractual claims in the following actions:

(1) Actions in which, after the events giving rise to the dispute, the parties agree to the application of Oregon law.

(2) Actions in which none of the parties raises the issue of applicability of foreign law.

(3) Actions in which the party or parties who rely on foreign law fail to assist the court in establishing the relevant provisions of foreign law after being requested by the court to do so.

(4) Actions filed against a public body of the State of Oregon, unless the application of Oregon law is waived by a person authorized by Oregon law to make the waiver on behalf of the public body.

(5) Actions against an owner, lessor or possessor of land, buildings or other real property situated in Oregon that seek to recover for, or to prevent, injury on that property and arising out of conduct that occurs in Oregon.

(6) Actions between an employer and an employee who is primarily employed in Oregon that arise out of an injury that occurs in Oregon.

(7) Actions for professional malpractice arising from services rendered entirely in Oregon by personnel licensed to perform those services under Oregon law.

**(8)(a) Actions against a provider of reproductive health care or gender-affirming treatment, as those terms are defined in section 48 of this 2023 Act, if the reproductive health care or gender-affirming treatment at issue was provided in this state.**

**(b) Actions against a patient receiving reproductive health care or gender-affirming treatment if the reproductive health care or gender-affirming treatment at issue was received in this state.**

**(c) Actions against any person who provides aid, assistance, resources or support to a person in providing or receiving reproductive health care or gender-affirming treatment in this state.**

## CONFORMING AMENDMENTS

<u>SECTION 50.</u> ORS 161.005 is amended to read:

161.005. ORS 161.005 to 161.055, 161.085 to 161.125, 161.150 to 161.175, 161.190 to 161.275, 161.290 to 161.373, 161.405 to 161.485, 161.505 to 161.585, 161.605, 161.615 to 161.685, 161.705 to 161.737, 162.005, 162.015 to 162.035, 162.055 to 162.115, 162.135 to 162.205, 162.225 to 162.375, 162.405 to 162.425, 162.465, 163.005, 163.095, 163.107, 163.115, 163.125 to 163.145, 163.149, 163.160 to 163.208, 163.191, 163.196, 163.215 to 163.257, 163.261, 163.263, 163.264, 163.266, 163.275, 163.285, 163.305 to 163.467, 163.432, 163.433, 163.472, 163.505 to 163.575, 163.665 to 163.693, 163.700, 163.701, 163.715,

164.005, 164.015 to 164.135, 164.138, 164.140, 164.205 to 164.270, 164.305 to 164.377, 164.395 to 164.415, 164.805, 164.857, 164.886, 165.002 to 165.102, 165.109, 165.118, 165.805, 165.815, 166.005 to 166.095, 166.350, 166.382, 166.384, 166.660, 167.002 to 167.027, 167.057, 167.060 to 167.100, 167.117, 167.122 to 167.162, 167.203 to 167.252, 167.310 to 167.340, 167.350, 167.810 and 167.820 **and section 45 of this 2023 Act** shall be known and may be cited as Oregon Criminal Code of 1971.

**SECTION 51.** ORS 677.320 is amended to read:

677.320. (1) Upon the complaint of any [*citizen*] **resident** of this state, or upon its own initiative, the Oregon Medical Board may investigate any alleged violation of this chapter. If, after the investigation, the board has reason to believe that any person is subject to **criminal** prosecution [*criminally*] **in this state** for the violation of this chapter, [*it*] **the board** shall lay the facts before the proper district attorney.

(2) In the conduct of investigations, the board or its designated representative may:

(a) Take evidence;

(b) Take the depositions of witnesses, including the person charged;

(c) Compel the appearance of witnesses, including the person charged;

(d) Require answers to interrogatories; and

(e) Compel the production of books, papers, accounts, documents and testimony pertaining to the matter under investigation.

(3) In exercising its authority under subsection (2) of this section, the board may issue subpoenas over the signature of the executive director and the seal of the board in the name of the State of Oregon.

(4) In any proceeding under this section where the subpoena is addressed to a licensee of this board, it shall not be a defense that the material that is subject to the subpoena is protected under a patient and physician privilege.

(5) If a licensee who is the subject of an investigation or complaint is to appear before members of the board investigating the complaint, the board shall provide the licensee with a current summary of the complaint or the matter being investigated not less than five days prior to the date that the licensee is to appear.  At the time the summary of the complaint or the matter being investigated is provided, the board shall provide to the licensee a current summary of documents or alleged facts that the board has acquired as a result of the investigation. The name of the complainant or other information that reasonably may be used to identify the complainant may be withheld from the licensee.

(6) A licensee who is the subject of an investigation and any person authorized to act on behalf of the licensee shall not knowingly contact the complainant until the licensee has requested a contested case hearing and the board has authorized the taking of the complainant's deposition pursuant to ORS 183.425.

(7) Except in an investigation or proceeding conducted by the board or another public entity, or in an action, suit or proceeding where a public entity is a party, a licensee shall not be questioned or examined regarding any communication with the board made in an appearance before the board as part of an investigation. This section shall not prohibit examination or questioning of a licensee regarding records dealing with a patient's care and treatment or affect the admissibility of those records. As used in this section, "public entity" has the meaning given that term in ORS 676.177.

## REPEALS

**SECTION 52.** ORS 109.610, 109.660, 435.200 and 435.435 are repealed.

**NOTE:** Sections 53 through 58 were deleted by amendment.  Subsequent sections were not renumbered.

## MISCELLANEOUS

**SECTION 59.** (1) Section 20 of this 2023 Act applies to health benefit plans issued, renewed or extended on or after January 1, 2024.

(2) Section 24 of this 2023 Act applies to medical assistance provided and to contracts with coordinated care organizations for periods beginning on or after January 1, 2024.

(3) The amendments to ORS 243.144 and 243.877 by sections 25 and 26 of this 2023 Act apply to health benefit plans offered by the Public Employees' Benefit Board or the Oregon Educators Benefit Board that are issued, renewed or extended on or after January 1, 2024, and for self-insured health benefit plans in effect for periods beginning on or after January 1, 2024.

(4) Sections 31 and 35 of this 2023 Act and the amendments to ORS 675.070, 675.540, 675.745, 677.190, 677.225, 677.320, 678.111, 685.110 and 689.405 by sections 31a to 33, 36 to 38 and 51 of this 2023 Act apply to reproductive and gender-affirming health care services provided on or after the effective date of this 2023 Act.

(5) The amendments to ORS 659A.029 by section 47 of this 2023 Act apply to unlawful employment discrimination occurring before, on or after the effective date of this 2023 Act.

**SECTION 60.** The unit captions used in this 2023 Act are provided only for the convenience of the reader and do not become part of the statutory law of this state or express any legislative intent in the enactment of this 2023 Act.

**SECTION 61.** This 2023 Act being necessary for the immediate preservation of the public peace, health and safety, an emergency is declared to exist, and this 2023 Act takes effect on its passage.

_____

Passed by House May 1, 2023

Repassed by House June 21, 2023

......................................................................
Timothy G. Sekerak, Chief Clerk of House


......................................................................
Dan Rayfield, Speaker of House

Passed by Senate June 15, 2023


......................................................................
Rob Wagner, President of Senate

Received by Governor:

........................M.,........................................................., 2023

Approved:

........................M.,........................................................., 2023


......................................................................
Tina Kotek, Governor

Filed in Office of Secretary of State:

........................M.,........................................................., 2023


......................................................................
Secretary of State

**Exhibit D**
**Public Hearing on H.B. 2002**



# Oregon State Legislature

 MENU



36:38 / 4:26:15

## House Committee On Behavioral Health and Health Care 03/20/2023 3:00 PM



**Documents**     ◄ Share     ⚒ Agenda

Agenda

HBHHC-3-20-2023-recording-log.pdf

**Exhibit E**
**DCBS About Us**

  

An official website of the State of Oregon »

(http://www.oregon.gov)

## News and information

(/dcbs/news-info)

(/dcbs/)

🏠 (/dcbs/Pages/index.aspx)  ›  News and information (/dcbs/news-info/Pages/index.aspx)  ›  About us

# About us

☰ Site Navigation

## Mission

> "To protect and serve Oregon's consumers and workers while supporting a positive business climate."

DCBS is Oregon's largest consumer protection and business regulatory agency. We are a resource to consumers and businesses in areas involving:

- Finance (insurance, investments, Oregon-chartered banks and credit unions, consumer finance companies, mortgage lenders, pawnbrokers, payday lenders)
- Workplace health and safety
- Building safety

The department is made up of 934 employees from various backgrounds and fields. From economists to consumer advocates, DCBS employees strive to provide the highest quality service to Oregon consumers, workers, and businesses. How we can serve you:

- Licensing, chartering, and examining: Financial and insurance companies and professionals, building trades workers and inspectors, worker leasing
- Educating and advocating: Workplace safety workshops, insurance hotline, investor outreach, workers' compensation helplines
- Setting and enforcing standards: Workplace safety and health, financial and insurance laws, building codes, workers' compensation benefits

# Andrew R. Stolfi

Oregon.gov (http://www.oregon.gov) ↓ Statewide Links ↓ Explore the official State website of the State of Oregon »

Andrew R. Stolfi was appointed Department of Consumer and Business Services director in April 2020. He is also the state's insurance commissioner. He began with the department in February 2018 as Division of Financial Regulation (http://dfr.oregon.gov/) administrator and insurance commissioner.

Previously, Andrew spent six years in Switzerland at the International Association of Insurance Supervisors in a variety of roles, including chief operating officer and chief counsel. He held various senior management roles at the Illinois Department of Insurance, including acting director, chief of staff, and special counsel for policy and legislative affairs.

His legal background includes serving as attorney and policy analyst in the Office of the Governor of the State of Illinois; judicial law clerk for the Honorable Thomas E. Hoffman in the Illinois Appellate Court, First District; and a special assistant corporation counsel for the City of Chicago Law Department.

He has a bachelor's degree from the University of Vermont and a law degree with honors from Chicago-Kent College of Law.

## DCBS budget

2021-2023 Budget (/dcbs/news-info/Pages/budget.aspx)



**Andrew R. Stolfi**
*Director*

**Exhibit F**
*Hobby Lobby* **Brief**

No. 13-354

### In the
# Supreme Court of the United States

KATHLEEN SEBELIUS, SECRETARY OF HEALTH
AND HUMAN SERVICES, *et al.*,
*Petitioners*,

v.

HOBBY LOBBY STORES, INC., MARDEL, INC.,
DAVID GREEN, BARBARA GREEN, STEVE GREEN,
MART GREEN, and DARSEE LETT,
*Respondents.*

### On Writ of Certiorari to the United States
### Court of Appeals for the Tenth Circuit

### BRIEF FOR RESPONDENTS

PAUL D. CLEMENT
MICHAEL H. MCGINLEY
BANCROFT PLLC
1919 M Street NW
Suite 470
Washington, DC 20036

PETER M. DOBELBOWER
*General Counsel and
Chief Legal Officer*
HOBBY LOBBY STORES, INC.
7701 SW 44th Street
Oklahoma City, OK 73179

S. KYLE DUNCAN
*Counsel of Record*
ERIC C. RASSBACH
LUKE W. GOODRICH
HANNAH C. SMITH
MARK L. RIENZI
LORI H. WINDHAM
ADÈLE AUXIER KEIM
THE BECKET FUND FOR
 RELIGIOUS LIBERTY
3000 K Street NW, Ste. 220
Washington, DC 20007
(202) 349-7209
kduncan@becketfund.org

JOSHUA D. HAWLEY
UNIVERSITY OF MISSOURI
323 Hulston Hall
Columbia, MO 65211

*Counsel for Respondents*

4

screenings," which must be covered without cost-sharing.  42 U.S.C. § 300gg-13(a)(4).  Rather than defining this category, Congress delegated that authority to the Health Resources and Services Administration ("HRSA"), a sub-agency within HHS. HRSA, in turn, asked the Institute of Medicine ("IOM"), part of the "semi-private" National Academy of Sciences, "to develop recommendations to help implement these requirements."  Pet.Br.5; Pet.App.9a-10a;  see generally IOM,  *Clinical Preventive Services for Women: Closing the Gaps* (2011) ("IOM Report").  In August 2011, HRSA adopted the IOM's recommendations without change. HRSA*, Women's Preventive Services Guidelines*, http://www.hrsa.gov/womensguidelines.

The end result of this regulatory process is that "non-grandfathered [health] plans * * * generally are required to provide coverage without cost sharing" of "[a]ll Food and Drug Administration approved contraceptive methods, sterilization procedures, and patient education and counseling for all women with reproductive capacity."[1]  *Ibid*.  "Four of the twenty approved methods—two types of intrauterine devices (IUDs) and the emergency contraceptives commonly known as Plan B and Ella—can function by preventing

---

[1] FDA-approved methods include male and female condoms, diaphragms, sponges, cervical caps, spermicides, the pill, the mini-pill, the continuous-use pill, patches, vaginal rings, progestin shots, implantable rods, sterilization surgery for men and women, and sterilization implants for women.  FDA, *Birth Control Guide* (May 2013), http://www.fda.gov/For Consumers/ByAudience/ForWomen/FreePublications/ucm313215.htm.  The contraceptive-coverage mandate does not include contraceptive methods for men.  78 Fed. Reg. 39870, 39870 n.1 (July 2, 2013).

5

the implantation of a fertilized egg."[2]   Pet.App.10a. This requirement to cover FDA-approved drugs and devices is the contraceptive-coverage mandate at issue here.

The government has exempted a vast array of employers from this mandate for both religious and secular reasons.   First, HHS recognized that the mandate would significantly impact religious believers.  See 45 C.F.R. § 147.131(a) (authorizing "an exemption * * * with respect to a group health plan established or maintained by a religious employer * * * with respect to any requirement to cover contraceptive services").  Accordingly, it established exemptions for "religious employers," defined as non-profit organizations "described in a provision of the Internal Revenue Code that refers to churches, their integrated auxiliaries, conventions or associations of churches, and to the exclusively religious activities of any religious order."  Pet.App.11a-12a; see 45 C.F.R. § 147.131(a); 26 U.S.C. § 6033(a)(3)(A)(i), (iii).

Second, HHS has provided an "accommodation" for other religious non-profit organizations whose religious beliefs prevent them from complying with all or part of the mandate, allowing them to route

---

[2] As it has throughout this litigation, the government concedes that the drugs and devices at issue can prevent uterine implantation of an embryo.  See Pet.Br.9 n.4 (conceding that Plan B (levonorgestrel), Ella (ulipristal acetate) and copper IUDs like ParaGard may act by "preventing implantation (of a fertilized egg in the uterus)"; *ibid.* (admitting that IUDs with progestin "alter[ ] the endometrium"); see also FDA, *Birth Control Guide, supra*. The en banc Tenth Circuit found "no material dispute" on this issue.  Pet.App.10a n.3.

# Exhibit G
## H.B. 3391 Measure History

Case 6:23-cv-01282-MK   Document 12   Filed 09/12/23   Page 64 of 101

Help (https://www.oregonlegislature.gov/OLIS_help/Pages/Measures.aspx#Overview) | Staff Login (/liz/2017R1/Account/Login)

# 2017 Regular Session

HB 3391 Enrolled
(/liz/2017R1/Downloads/MeasureDocument/HB3391)

### Overview ❯

**At the request of:**

| | |
|---|---|
| **Chief Sponsors:** | Representative Barker, Williamson, Fahey, (https://www.oregonlegislature.gov/fahey) Senator Monnes Anderson |
| **Regular Sponsors:** | Representative Alonso Leon, Boone, Gomberg, (https://www.oregonlegislature.gov/gomberg (https://www.oregonlegislature.gov/helm) Hernandez, Holvey, (https://www.oregonlegislature Keny-Guyer, Lininger, Malstrom, Marsh, (https://www.oregonlegislature.gov/marsh) McLain, (https://www.oregonlegislature.gov/mclain) Meek, (https://www.oregonlegislature.gov/meek) (https://www.oregonlegislature.gov/nosse) Piluso, Power, Rayfield, (https://www.oregonlegislature.gov/rayfield) Reardon, Sanchez, (https://www.oregonlegislatu Smith Warner, Sollman, (https://www.oregonlegislature.gov/sollman) Witt, Senator Beyer, De (https://www.oregonlegislature.gov/dembrow) Frederick, (https://www.oregonlegislature.gov/ Gelser, (https://www.oregonlegislature.gov/gelser) Manning Jr, (https://www.oregonlegislatur Prozanski, (https://www.oregonlegislature.gov/prozanski) Riley, Steiner Hayward, (https://www.oregonlegislature.gov/steiner) Taylor (https://www.oregonlegislature.gov/taylor) |
| **Bill Title:** | Relating to reproductive health care; and declaring an emergency. |
| **Catchline/Summary:** | Requires health benefit plan coverage of specified health care services, drugs, devices, proc procedures related to reproductive health. ➕ |
| **Chapter Number:** | Chapter 721 |
| **Fiscal Impact:** | Budget Report Issued |
| **Revenue Impact:** | No Revenue Impact |
| **Measure Analysis:** | Staff Measure Summary / Impact Statements (/liz/2017R1/Measures/Analysis/HB3391) |
| **Current Location:** | Chapter Number Assigned |
| **Current Committee:** | () |
| **Current Subcommittee:** | |
| **Subsequent Referral(s):** | |
| **Potential Conflicts of Interest/Vote Explanations:** | Potential Conflicts of Interest/Vote Explanation Documents (https://www.oregonlegislature.gov/pcive/Forms/Display.aspx?View={F16B1F7B-33C4-4EA7 9D3022EE155C}&FilterField1=Session&FilterValue1=2017R1&FilterField2=Measure&Filter\ |

**Measure History**  ❯

| | |
|---|---|
| **3-9** (H) | First reading. Referred to Speaker's desk. |
| **3-9** (H) | Referred to Health Care with subsequent referral to Ways and Means. |
| **3-15** (H) | Public Hearing held. (/liz/2017R1/Committees/HHC/2017-03-15-15-00/HB3391/PUB/Details)↗ (/liz/2017R1/Committees/HHC/2017-03-15-15-00) |
| **4-14** (H) | Work Session held. (/liz/2017R1/Committees/HHC/2017-04-14-08-00/HB3391/WRK/Details)↗ (/liz/2017R1/Committees/HHC/2017-04-14-08-00) ⊕ |
| **4-19** (H) | Recommendation: Do pass with amendments, be printed A-Engrossed, and be referred to Ways and Means by prior reference. |
| **4-19** (H) | Referred to Ways and Means by prior reference. |
| **6-26** (H) | Assigned to Subcommittee On Human Services. |
| **6-28** (H) | Public Hearing and Work Session held. (/liz/2017R1/Committees/JWMHS/2017-06-28-08-30/HB3391/PAW/Details)↗ (/liz/2017R1/Committees/JWMHS/2017-06-28-08-30) |
| **6-28** (H) | Returned to Full Committee. |
| **6-29** (H) | Work Session held. (/liz/2017R1/Committees/JWM/2017-06-29-12-00/HB3391/WRK/Details)↗ (/liz/2017R1/Committees/JWM/2017-06-29-12-00) ⊕ |
| **6-30** (H) | Recommendation: Do pass with amendments and be printed B-Engrossed. |
| **6-30** (H) | Second reading. |

| | |
|---|---|
| 7-1 (H) | Third Reading. Carried by Fahey. Motion to refer to Ways and Means failed. Ayes, 22; Nays, 34--Alonso Leon, Barker, Barnhart, Bynum, Clem, Doherty, Evans, Fahey, Gomberg, Gorsek, Greenlick, Helm, Hernandez, Holvey, Keny-Guyer, Lininger, Lively, Malstrom, Marsh, McKeown, McLain, Meek, Nathanson, Nosse, Piluso, Power, Rayfield, Reardon, Sanchez, Smith Warner, Sollman, Williamson, Witt, Speaker Kotek; Excused, 4--Barreto, Boone, Hayden, Noble. ✪ |
| 7-1 (H) | Bill passed. Ayes, 33; Nays, 23--Bentz, Buehler, Esquivel, Hack, Heard, Huffman, Johnson, Kennemer, Lewis, Lively, McLane, Nearman, Olson, Parrish, Post, Reschke, Smith DB, Smith G, Sprenger, Stark, Vial, Whisnant, Wilson; Excused, 4--Barreto, Boone, Hayden, Noble. ✪ |
| 7-3 (S) | First reading. Referred to President's desk. |
| 7-3 (S) | Referred to Ways and Means. |
| 7-4 (S) | Recommendation: Do pass the B-Eng. bill. |
| 7-4 (S) | Second reading. |
| 7-5 (S) | Motion to refer to Rules to adopt the -B11 amendment failed. Ayes, 13; nays, 17--Beyer, Burdick, Dembrow, Devlin, Frederick, Gelser, Hass, Johnson, Manning Jr, Monnes Anderson, Monroe, Prozanski, Riley, Roblan, Steiner Hayward, Taylor, President Courtney. ✪ |
| 7-5 (S) | Third reading. Carried by Devlin, Steiner Hayward. Passed. Ayes, 17; nays, 13--Baertschiger Jr, Boquist, DeBoer, Ferrioli, Girod, Hansell, Knopp, Kruse, Linthicum, Olsen, Thatcher, Thomsen, Winters. ✪ |
| 7-5 (S) | Dembrow declared potential conflict of interest by unanimous consent. |
| 7-10 (H) | Speaker signed. |
| 7-18 (S) | President signed. |
| 8-15 (H) | Governor signed. |
| 8-18 (H) | Chapter 721, (2017 Laws): Effective date August 15, 2017. |

**Scheduled Events** ⌄

Exhibit Page 62

**Committee Meetings**

No Meetings Currently Scheduled

**Floor Sessions**

No Floor Sessions to Display

**Oregon State Legislature**
**Building Hours:** Monday - Friday, 8:00am - 5:00pm
1-800-332-2313 **|** 900 Court St. NE, Salem Oregon 97301



(https://www.facebook.com/OregonCapitol#!/OregonCapitol)

 (https://twitter.com/OregonCapitol)

(https://www.oregonlegislature.gov/Pages/pressrelease.aspx)

eSubscribe

(https://www.oregonlegislature.gov/citizen_engagement/Pages/e-
Subscribe.aspx)
Disclaimer
(https://www.oregonlegislature.gov/Pages/disclaimer.aspx) **|**
Universal Access
(https://www.oregonlegislature.gov/Pages/universalAccess.aspx)
**|** Employment
(https://www.oregonlegislature.gov/la/Pages/employment.aspx)
**|** Oregon.Gov (http://www.oregon.gov/Pages/index.aspx)

# Exhibit H
## H.B. 3391 Witness Registration

①

**PUBLIC RECORD: This form, your verbal testimony, and materials you distribute will be posted on the Internet and accessible to the public.**

## WITNESS REGISTRATION

Committee Name: House Health Care

Public Hearing on: HB 3391 - Opponents    Date: 3/15/17

Please register if you wish to testify on the above-named measure/issue. **_Please print legibly_**.

| Name PRINT LEGIBLY | Organization or County of Residence | Check if you live more than 100 miles from this meeting. | For | Against | Neutral |
|---|---|---|---|---|---|
| Jessica Adamson | Providence Health - Service | | | | |
| Mike Cotton | Providence Health Plan | | | | |
| Colm Willis | Oregon Right to Life | | | | |
| Teresa Harke | Oregon Family Council | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

CS001 (rev. 6/2014)

Exhibit Page 65

②

**PUBLIC RECORD: This form, your verbal testimony, and materials you distribute will be posted on the Internet and accessible to the public.**

## WITNESS REGISTRATION

Committee Name: _House  Health Care_

Public Hearing on: _HB  3391  -  Proponents_          Date: _3/15/17_

Please register if you wish to testify on the above-named measure/issue. ***Please print legibly***.

| Name PRINT LEGIBLY | Organization or County of Residence | Check if you live more than 100 miles from this meeting. | Position on Measure | | |
|---|---|---|---|---|---|
| | | | For | Against | Neutral |
| Dr. Zeenia Junkeer | NARAL Pro-Choice Oregon | | | | |
| Maria Isabel Rodriguez | M.D., Oregon Health and Science University | | | | |
| Dr. James Newhall | | | | | |
| Christy Splitt | | | | | |
| Gloria Pinzon | | | | | |
| Kaden ~~Merritt~~ ~~Butler~~ Merrill | | | | | |
| Mike Morrison | | | | | |
| Daniel Morris | | | | | |
| Michael Cahana | | | | | |
| Kimberly McCullough | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

# Exhibit I
## H.B. 3391 Witness Registration (2d)

**PUBLIC RECORD: This form, your verbal testimony, and materials you distribute will be posted on the Internet and accessible to the public.**

## WITNESS REGISTRATION

Committee Name: Joint Ways & Means Subcommittee on Human Services

Public Hearing on: HB 3391                    Date: 6-28-2017

Please register if you wish to testify on the above-named measure/issue. **_Please print legibly_**.

| Name PRINT LEGIBLY | Organization or County of Residence | Check if you live more than 100 miles from this meeting. | Position on Measure | | |
|---|---|---|---|---|---|
| | | | For | Against | Neutral |
| Roger Martin | ORE Catholic Conf | | | ✓ | |
| Laurel Swerdlow | Planned Parenthood Advocates | | ✓ | | |
| Colm Willis | ~~Oregon~~ Oregon Right to Life | | | ✓ | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

CS001 (rev. 6/2014)

**Exhibit J**
**Harke Written Testimony on H.B. 3391**

3/15/17

Teresa Harke
Oregon Family Council
P.O. Box 13367
Portland, OR 97213

House Committee on Health Care

# Testimony on HB 3391

Chair Greenlick, members of the committee,

My name is Teresa Harke and I am with the Oregon Family Council. I'm here today to testify in **opposition** to **HB 3391**.

House Bill 3391 is a sweeping assault on religious freedom by requiring all Oregon health insurance policies to provide free abortion coverage. Many Oregonians have a moral and religious opposition to abortion and this bill would require them to violate their conscience and participate in abortion coverage.

Our legal analysis (attached) by attorney Shawn Lindsay, shows that this bill ultimately fails in its attempt to protect our first amendment rights of religious freedom. The religious exemption only applies to non-profit religious employers leaving "individuals of faith, unincorporated associations, and religious owners of for-profit entities" in conflict. Individuals and organizations not included in the exemption find themselves in a cruel predicament; they must either violate their conscience or violate the law.

Furthermore, House Bill 3391 does not provide religious employers any specified access to plans that do not cover abortion or contraceptives, leaving even those exempted, to the whims of state insurers as to whether they can even find such a plan. It also requires a religious employer to notify all employees of the abortion and contraceptives that they will not cover. This makes the current exemption antagonistic to religious organizations and persons.

A bill requiring all insurers to cover abortion leaves it vulnerable to court challenges on basis of constitutionality. Recent Supreme Court cases cited in our legal analysis upheld that government should accommodate religious beliefs and "that individuals do not lose their religious freedom when they open a family business." Attorney Shawn Lindsay also noted, "HB 3391 does not comply with...U.S. Supreme Court rulings and, consequently, it is at high risk of being struck down as unconstitutional."

We strongly urge you to vote "no" on HB 3391 to protect religious freedom rights of conscience.



HARRIS BERNE
CHRISTENSEN LLP

ATTORNEYS & COUNSELORS

LARGE FIRM EXPERTISE. SMALL FIRM EFFICIENCY.

**Shawn M. Lindsay**
shawn@hbclawyers.com

March 14, 2017

**VIA ELECTRONIC MAIL (*teresa@oregonfamilycouncil.org*)**
Teresa Harke
Oregon Family Council, Inc.
11935 NE Sumner St.
Portland, OR 97220

Re:    **Legal Analysis of HB 3391**

Dear Mrs. Harke,

HB 3391, if made law, would require all Oregon health insurance policies to provide coverage for abortions and contraceptive drugs. See Section 2(2)(g) and (j). HB 3391 would also require all Oregon health insurance policies to provide this coverage at no cost to the enrollee. See Section 2(3). Pursuing such "free" coverage suggests zealousness because it is not currently part of federal or state law and never has been.

HB 3391 Section 2(9) attempts to comply with religious freedoms by stating an insurer may offer to a "religious employer" a health benefit plan that does not include coverage for abortions and contraceptives that are contrary to the religious employer's religious tenets SO LONG AS the insurer notifies in writing all employees of the abortions and contraceptives that the employer refuses to cover for religious reasons. But Section2(9) woefully fails to comply with religious freedoms guaranteed by the U.S. and Oregon Constitutions.

Section 2(9) limits protection from violations of conscious to "religious employers," which must be formally structured nonprofit corporations (See ORS. 743A.066). It provides no protection to individuals of faith, unincorporated associations, or religious owners of for-profit entities. These individuals' only options would be to either violate their consciences or violate the law . . . an unconscionable and cruel position to put them in. Further, Section 2(9) gives religious employers no specific access to plans that do not contain abortion and contraceptive coverage (nor to religious individuals, unincorporated associations, or owners of for-profit entities). It only states insurers have the *discretion* to offer or not offer such a plan. With no express provision giving religious individuals access to health plans that do not violate their consciences, HB 3391 is hostile and merciless to millions of Oregonians of faith.

Main Office            Salem Office
5000 Meadows Road       625 Hawthorne Avenue SE    T  503.968.1475
Suite 400               Suite 100                  F  503.968.2003
Lake Oswego, OR 97035   Salem, OR 97301            W  hbclawyers.com

March 14, 2017
Page 2

Because of the limited religious freedom protections of HB 3391, it is vulnerable to court challenges for being unconstitutional. In *Zubik/Little Sisters of the Poor*, the U.S. Supreme Court unanimously overturned lower court rulings against the Little Sisters and directed that the government should "arrive at an approach going forward that accommodates the petitioners' religious beliefs." In *Burwell v. Hobby Lobby*, the U.S. Supreme Court ruled that individuals do not lose their religious freedom when they open a family business. The court ruled in favor of the David and Barbara Green and their family business, Hobby Lobby, that they would not be required to violate their faith by having abortifacient drugs included in their company's health insurance plan. HB 3391 does not comply with either of the above U.S. Supreme Court rulings and, consequently, it is at high risk of being struck down as unconstitutional.

Very truly yours,

**HARRIS BERNE CHRISTENSEN LLP**

Shawn M. Lindsay

SML:sls

**Exhibit K**
**Letter from Cotton to Greenlick**

**Providence Health Plans**
P.O. Box 4327
Portland, OR 97208-4327
www.providence.org/healthplans



March 15, 2017

The Honorable Mitch Greenlick
Chair, House Committee on Health Care
State Capitol
Salem, Oregon 97301

RE:     HB 3391 – Insurer abortion mandate

Dear Chair Greenlick and members of the committee,

On behalf of Providence Health Plans and Providence Health & Services, thank you for the opportunity to outline our serious concerns regarding specific provisions of House Bill 3391.

Providence is a faith-based, not-for-profit health system that proudly serves as Oregon's largest health care provider, largest health plan and the largest private employer. As a health care provider that includes eight hospitals, 49 primary care clinics, 22 immediate and express care clinics, comprehensive behavioral health services, specialty programs and research, a range of elderly services, along with palliative and hospice care – we are committed to clinical excellence.

Fundamental to any success in improving health outcomes, is Providence's commitment to increasing access to health insurance coverage. For more than 30 years, Providence Health Plans has served Oregonians by offering coverage options in a wide range of markets. Since the implementation of the Affordable Care Act and Medicaid expansion – which Providence strongly supports – we have been committed to serving all Oregonians. With a reputation for trusted, compassionate service, our membership has grown by 61 percent since 2013. In the individual market, we are one of only two carriers dedicated to ensuring access statewide. Today, almost 50 percent of Oregonians who purchase individual coverage on the exchange do so through Providence Health Plans. In total, Providence provides managed care services for more than one million individuals, including approximately 642,000 insured and self-funded plan members.

Providence Health Plans' commitment to compassionate service for all, particularly the poor and vulnerable, is strongly rooted in our Mission and tradition – established 160 years ago when the Sisters of Providence arrived in the Northwest from Montreal. As a Catholic-sponsored organization, Providence Health Plans operates under the Ethical and Religious Directives for Catholic Health Care Services, which emphasize respect for the sanctity of life and provide important direction related to Catholic thought and tradition. The Directives also provide clear instruction that Catholic institutions are not permitted to provide, or cooperate with the provision of, abortion services. This would be considered material cooperation – and is a red line for Providence Health Plans that cannot be crossed.

Providence Health Plan
Page 2

We are strongly opposed to House Bill 3391 in its current form. Requiring Providence Health Plans to include abortion as a covered benefit directly violates the ERDs and puts at risk those who receive coverage through Providence on the individual and group markets – that's as many as 260,000 Oregonians. This is an unfortunate position to find ourselves in, especially when there are portions of the bill, like CAWEM expansion, that Providence would support as a stand-alone bill. Regrettably, our good-faith efforts with advocates and legislative leadership to identify a path forward have failed to produce a result that provides a narrowly tailored conscience clause for insurers sponsored by a religious organization; that would provide the certainty we require.

Proponents have argued that Section 2(10) (page 3, lines 39-42) would provide Providence a sufficient exemption.  The provision states:

(10) If the Department of Consumer and Business Services concludes that the enforcement of this section may adversely impact the allocation of federal funds to this state, the department may grant an exemption to the requirements, but only to the minimum extent necessary to ensure the continued receipt of federal funds.

Any exemption granted under this subsection seems to rely on the Weldon Amendment, a federal provision started in 2005 that is required to be adopted each year as part of the Labor, Health and Human Services and Education appropriation bill. It prohibits the federal government, or any state or local government, from discriminating against a health care entity (including insurers) for refusal to provide, pay for, provide coverage of or refer for abortion services. If the amendment is violated, the federal government could penalize states by withholding all federal funds from HHS, the Department of Education and the Department of Labor. The Weldon Amendment has never been enforced. In part because the penalty is so severe, and it offers no ability for individuals or entities to seek enforcement or other relief.

The provisions of Section 2(10) are insufficient to provide certainty for Providence Health Plans for several reasons, including:

- The subsection provides DCBS the ability to subjectively decide whether federal funds **may** be adversely affected by the enforcement of the bill.  Posing questions such as: Are federal funds at risk merely by the existence of the Weldon Amendment?  Would DCBS conclude federal funds are at risk only if the state was notified of the imminent withdrawal of federal funds?  Without specific criteria, people can disagree as to whether federal funds may be affected and allow DCBS to make a very consequential decision without clear guidance as to what constitutes "adversely affected" with respect to federal funds.

- The Weldon Amendment is a federal requirement, subject to the Congressional budget process.  Any changes to the amendment – in enforcement provisions or otherwise – may result in a different conclusion, thereby triggering the requirement for Providence Health Plans to comply with the provisions of Section 2.

- The subsection does not require DCBS to issue an exemption even if the agency concludes that federal funds may be adversely affected.  Instead, it says that DCBS **may** issue an exemption.

- The lack of specific criteria for DCBS to reach a conclusion of "adversely affected" federal funds means that the definition/interpretation of the meaning of the section will be open to review when there are changes in the leadership of the agency and/or in the governor's office.

Providence Health Plan
Page 3

For an issue that determines whether we can provide health insurance coverage in Oregon, Providence Health Plans cannot rely on the language in the subsection that lacks specific criteria for determining whether federal funds are adversely affected and a federal amendment, which must be approved each year.

We appreciate that proponents share our goal in ensuring that thousands of Oregonians do not lose their insurance carrier as a result of the passage of this bill. However, we see the solution to this goal quite differently – proponents believe Section 2(10) addresses our shared objective, and Providence believes that in order to provide certainty, we need a narrowly crafted statutory conscience clause. It is our position that if the proponents believe that the language in Section 2(10) would provide Providence a guaranteed exemption, then it is unclear to us why there's an objection to language that ensures the mandatory coverage of abortion services does not place Oregon's largest health insurer and the health care coverage for as many as 260,000 Oregonians at risk.

We appreciate the opportunity to express our serious concerns with this HB 3391 as proposed. As this bill continues to be debated, we welcome the opportunity to work with proponents to explore statutory options that provide certainty that Providence Health Plans will not be required to cover abortion services in direct violation of the ERDs. We urge this policy committee to address the issue at hand and not pass the bill to Ways and Means without having resolved this critical issue. Absent a consensus solution, Providence requests that this committee exercise its wise judgment and experience with the health care environment to provide a conscience clause for religious-sponsored insurers.

Sincerely,

Michael L. Cotton
Chief Executive
Providence Health Plans

**Exhibit L**
**Public Hearing on H.B. 3391**



# Exhibit M
## H.B. 3391 Analyses and Reports

Help (https://www.oregonlegislature.gov/OLIS_help/Pages/Measures.aspx#Analysis) | Staff Login
(/liz/2017R1/Account/Login)

# 2017 Regular Session

HB 3391 Enrolled
(/liz/2017R1/Downloads/MeasureDocument/HB3391)

## Staff Measure Summary  ⌄

---

📄
(/liz/2017R1/Downloads/MeasureAnalysisDocument/37025)

Staff Measure Summary for HB3391 A (House)
(/liz/2017R1/Downloads/MeasureAnalysisDocumen
for the House Committee On Health Care
(/liz/2017R1/Committees/HHC/Overview)

## Revenue Impact Statement  ⌄

---

📄
(/liz/2017R1/Downloads/MeasureAnalysisDocument/36879)

Revenue Impact Statement for HB3391 A
(/liz/2017R1/Downloads/MeasureAnalysisDocumen

---

📄
(/liz/2017R1/Downloads/MeasureAnalysisDocument/39635)

Revenue Impact Statement for HB3391 B
(/liz/2017R1/Downloads/MeasureAnalysisDocumen

## Fiscal Impact Statement  ⌄

---

📄
(/liz/2017R1/Downloads/MeasureAnalysisDocument/39461)

Fiscal Impact Statement for HB3391 A
(/liz/2017R1/Downloads/MeasureAnalysisDocumen

## Budget Report  ⌄

---

📄
(/liz/2017R1/Downloads/MeasureAnalysisDocument/39660)

Budget Report for HB3391 B (House)
(/liz/2017R1/Downloads/MeasureAnalysisDocumen

---

📄
(/liz/2017R1/Downloads/MeasureAnalysisDocument/39863)

Budget Report for HB3391 B (Senate)
(/liz/2017R1/Downloads/MeasureAnalysisDocumen

## Open Government Impact Statement  ⌄

No items to display.

## Staff Analyses and Reports  ⌄

| Title | Document Type | Exhibit | Submitter |
|---|---|---|---|
| 📄 HB 3391 Subcommittee Recommendation (/liz/2017R1/Downloads/CommitteeMeetingDocument/136997) | Meeting Material | 25 | |

Exhibit Page 80

| Title | Document Type | Exhibit | Submitter |
|---|---|---|---|
| HB 3391 A Preliminary Budget Report (/liz/2017R1/Downloads/CommitteeMeetingDocument/136971) | Budget Report | 27 | |
| HB 3391 LFO Recommendation (/liz/2017R1/Downloads/CommitteeMeetingDocument/136260) | Meeting Material | 2 | |
| HB 3391 -A9 Fiscal Impact Statement (/liz/2017R1/Downloads/CommitteeMeetingDocument/136259) | Fiscal Impact Statement | 3 | |
| HB 3391 Witness Registration Sheet (/liz/2017R1/Downloads/CommitteeMeetingDocument/136756) | Witness Registration | 43 | |
| HB 3391 -3 fiscal impact (/liz/2017R1/Downloads/CommitteeMeetingDocument/120003) | Fiscal Impact Statement | | Staff |
| Courtney Graham and Andrea Salinas fact sheet (/liz/2017R1/Downloads/CommitteeMeetingDocument/107499) | Meeting Material | 12 | NARAL Pro-Choice Oregon, American Civil Liberties Union of Oregon, Family Forward Oregon, et al. |
| HB 3391 witness registration (/liz/2017R1/Downloads/CommitteeMeetingDocument/108284) | Witness Registration | 5 | Staff |

**Oregon State Legislature**
**Building Hours:** Monday - Friday, 8:00am - 5:00pm
1-800-332-2313 | 900 Court St. NE, Salem Oregon 97301



(https://www.facebook.com/OregonCapitol#!/OregonCapitol)

# Exhibit N
## H.B. 3391 Advocacy Fact Sheet

  

   

# HB 3391: Reproductive Health Equity Act Of 2017

Access to reproductive health care is critical for the health and economic security of all Oregonians. The Reproductive Health Equity Act of 2017 establishes comprehensive coverage for the full spectrum of reproductive health services, including family planning, abortion, and postpartum care, for all Oregonians, regardless of income, citizenship status, gender identity, or type of insurance.

**Thousands of Oregonians still lack coverage for the full range of reproductive health services:**

- The Affordable Care Act requires insurance plans to pay for the full range of FDA-approved contraceptives at 100%, but it also "grandfathered" some plans, enabling them to apply contraception cost-sharing policies that were in place prior to passage of the ACA. In Oregon, approximately 18,600 women of reproductive age receive healthcare coverage from grandfathered plans, which means they are forced to pay out-of-pocket costs for preventive health services, including contraception. Furthermore, under the new federal administration this coverage is in jeopardy for all women.
- An estimated 43,000 women of reproductive age in Oregon who purchase insurance on the Exchange, as well as an unknown number of women with employer-sponsored coverage, have policies with deductibles of $2,500 or more. While most plans cover abortion, the cost of the procedure must first come out of this deductible, leaving the procedure unaffordable and inaccessible for many.
- Barriers to access persist even for those who have coverage. Some plans limit the range of contraceptives they cover and restrict timely access to care in cases of network inadequacy.
- 48,000 women of reproductive age in Oregon are categorically excluded from Medicaid and prohibited from purchasing insurance on the Exchange due to their citizenship status, leaving them without coverage for essential health services like reproductive health care.
- Transgender and gender-nonconforming Oregonians need access to services often categorized as "women's" health care, including gender-specific cancer screenings and the full range of reproductive health services. Unfortunately, when coverage is dependent on one's gender marker, procedural barriers can hinder access to this necessary and life-saving care.

**The Reproductive Health Equity Act fills these gaps in reproductive health coverage.**

The Reproductive Health Equity Act ensures that Oregonians receive the full range of preventive reproductive health services at zero out-of-pocket cost, fills gaps in reproductive health coverage for those categorically excluded from health programs due to citizenship status, and prohibits discrimination in reproductive health care. Specifically, the Act would:

- Require all commercial plans to abide by the ACA provision that prohibits insurers from imposing co-pays, deductibles or co-insurance on preventive reproductive health services.
- Add abortion and vasectomy to the list of reproductive health services that commercial plans must cover at zero out-of-pocket cost.
- Codify the right to safe and legal abortion in Oregon, which is particularly important given the uncertain future of Roe v. Wade.
- Establish coverage for the full range of reproductive health care, including family planning, abortion and postpartum care, for Oregonians who are categorically excluded from health programs due to citizenship status.
- Codify a nondiscrimination clause that prohibits discrimination, including discrimination on the basis of gender identity, in reproductive health coverage.

**Support the Reproductive Health Equity Act so all Oregonians have access to the care they need!**

Contact Courtney Graham (courtney@grahamadvocacy.com) and Andrea Salinas (andreas@strategies360.com) to learn more.

**Exhibit O**
**Equity v. Equality, Milken Institute**

7/31/23, 5:33 PM                Equity vs. Equality: What's the Difference? | Online Public Health

Case 6:23-cv-01282-MK    Document 12    Filed 09/12/23    Page 89 of 101



Online Public Health / Resources

# Equity vs. Equality: What's the Difference?

November 5, 2020



While the terms equity and equality may sound similar, the implementation of one versus the other can lead to dramatically different outcomes for marginalized people.

Equality means each individual or group of people is given the same resources or opportunities. Equity recognizes that each person has different circumstances and allocates the exact resources and opportunities needed to reach an equal outcome.

In the illustration below, two individuals have unequal access to a system — in this case, the tree that provides fruit. With equal support from evenly distributed tools, their access to the fruit still remains unequal. The equitable solution, however, allocates the exact resources that each person needs to access the fruit, leading to positive outcomes for both individuals.

Exhibit Page 85

While the tree appears to be a naturally occurring system, it's critical to remember that social systems aren't naturally inequitable — they've been intentionally designed to reward specific demographics for so long that the system's outcomes may appear unintentional but are actually rooted discriminatory practices and beliefs.



2019 Design in Tech Report | Addressing Imbalance

**INEQUALITY**





2019 Design in Tech Report | Addressing Imbalance

**EQUITY**



Source: "Addressing Imbalance," by Tony Ruth for the 2019 Design in Tech Report. ↗

*Equity is a solution for addressing imbalanced social systems. Justice can take equity one step further by fixing the systems in a way that leads to long-term, sustainable, equitable access for generations to come.*

According to the World Health Organization (WHO), equity is defined ↗ as "the absence of avoidable or remediable differences among groups of people, whether those groups are defined socially, economically, demographically or geographically." Therefore, as the WHO notes, health inequities involve more than lack of equal access to needed resources to maintain or improve health outcomes. They also refer to difficulty when it comes to "inequalities that infringe on fairness and human rights norms."

The U.S. Centers for Disease Control and Prevention (CDC) refers to health equity ↗ as "when everyone has the opportunity to be as healthy as possible." As such, equity is a process and equality is an outcome of that process. Or, as the Race Matters Institute ↗ describes, "The route to achieving equity will not be accomplished through treating everyone equally. It will be achieved by treating everyone equitably, or justly according to their circumstances."

Understanding the difference between health equality and health equity ↗ is important to public health to ensure that resources are directed appropriately — as well as supporting the ongoing process of meeting people where they are. Inherent to this process is the promotion of diversity in teams and personnel, public health practice, research methods and other related factors. For these reasons, providing the same type and number of resources to all is not enough. In order to reduce the health disparities gap, the underlying issues and individual needs of underserved and vulnerable populations must be effectively addressed.

# The Difference Between Equity and Equality

"The route to achieving equity will not be accomplished through treating everyone equally. It will be achieved by treating everyone justly according to their circumstances."

—*Paula Dressel, Race Matters Institute* [1]

## EXAMPLES OF EQUALITY[2]

A city cuts the budget for 25 community centers by reducing the operational hours for all centers by the same amount at the same times.

A community meeting, where all members of the community are invited, about a local environmental health concern is held in English though English is not the primary language for 25% of the residents.

Examples of EqualityAll public schools in a community have computer labs with the same number of computers and hours of operation during school hours.

## EXAMPLES OF EQUITY[2]

The city determines which times and how many hours communities actually need to use their community centers and reduces hours for centers that aren't used as frequently.

Examples of EquityThe community leaders hire translators to attend the meeting or offer an additional meeting held in another language.

Examples of EquityComputer labs in lower income neighborhoods have more computers and printers, as well as longer hours of operation, as some students don't have access to computers or internet at home.

There are many successful initiatives in communities around the United States where specific steps have been taken to make approaches to health more equitable (PDF, 4.9MB), according to the CDC. Attempts to achieve equity have involved identifying the individualized needs of specific populations and implementing steps to help meet those needs. Below are three examples of public health initiatives.

# Project Brotherhood

Project Brotherhood 🔗 — a clinic for Black men at Woodlawn Health Center in Chicago — was created through the CDC's Healthy Communities Program. The clinic was formed by a Black physician and a nurse-epidemiologist who were interested in better addressing the health needs of Black men. Partnering with a Black social science researcher, they conducted focus groups with Black men to learn about their experiences with the health care system and met with other Black staff at the clinic. As a result of this research, Project Brotherhood employed a number of specific strategies, including:

- Offering free health care, with optional appointments and evening clinic hours, to make health care more accessible to Black men.

- Providing health seminars and courses specifically for Black men.

- Employing a barber to perform free haircuts after receiving health education training to be a health advocate for Black men whom the clinic staff could not reach.

- Providing fatherhood classes to help Black men become more effectively involved in the lives of their children.

- Building "a culturally competent workforce able to create a safe, respectful, male-friendly environment and to overcome mistrust in Black communities toward the traditional health care system."

- Organizing physician participation in support group discussions to enhance understanding between providers and patients.

According to the organization, positive outcomes were achieved: "In January 1999, Project Brotherhood averaged four medical visits and eight group participants per week. By September 2005, the average grew to 27 medical visits and 35 group participants per week...." By 2007, Project Brotherhood had provided service to more than 13,000 people since the initiative started and created a health services environment designed specifically for Black men where they would be respected, heard and empowered, thus helping to reduce the health disparities experienced by this population.

# Poder es Salud

Poder es Salud (Power for Health) 🔗 is a partnership involving nonprofits, government organizations, local health care providers and several community- and faith-based groups. This partnership was formed to address social determinants of health and reduce health disparities in Black and Latino communities in Multnomah County, Oregon,

by employing an approach to "increase social capital through durable social networks for the purpose of facilitating the achievement of community goals and health outcomes." This was achieved through three specific strategies:

- Conducting community-based participatory research to support cross-cultural partnerships.

- Implementing popular education, which involves mutual learning and analysis.

- Providing community health workers with specialized training "in leadership, local politics, governance structure, advocacy, community organizing, popular education, and health."

Program effectiveness was reflected in follow-up surveys that showed "significant improvements in social support, self-rated health and mental health among community members that participated in the interventions with community health workers who use popular education."

## Project BRAVE: Building and Revitalizing an Anti-Violence Environment

Project BRAVE ⧉ is a school-based intervention that builds on existing relationships among schools, community members, community-based organizations and local researchers. In doing so, Project BRAVE supports preexisting opportunities for students to share their experiences with violence and to take part in community change to reduce it. The program's effectiveness was evidenced by an increase in school attendance, which is an important social determinant of community health.

# Using Equity and Equality in Public Health Practice

Understanding the difference between equity and equality is a key component in the effort to reduce health disparities among vulnerable populations. The good news is that public health officials can take specific steps to help address this confusion in their own communities — including using educational resources such as the CDC's Defining and Measuring Disparities, Inequities, and Inequalities in the Healthy People Initiative (PDF, 391KB) ⧉ and group exercises such as those suggested by JustHealthAction (PDF, 637KB), ⧉ in which teams can work together to differentiate between equity and equality.

# Additional Resources about Equity and Equality

- Office of Health Equity, ⧉ U.S. Department of Health and Human Services

- Health Equity, ⧉ American Public Health Association

- Equity of Opportunity, ⧉ U.S. Department of Education

- Health Equity: Why It Matters, and How To Take Action, ⧉ Robert Wood Johnson Foundation

- Racial Equity Impact Assessment Toolkit, ⧉ Race Forward

- Equity vs. Equality: 6 Steps Toward Equity, ⧉ Edutopia

---

Sources:

1 "Racial Equality or Racial Equity? The Difference it Makes," Race Matters Institute. 2014. Accessed Oct. 15, 2020. http://viablefuturescenter.org/racemattersinstitute/2014/04/02/racial-equality-or-racial-equity-the-difference-it-makes/

2 "How are Equity and Equality Different?" Just Health Action, 2010. Accessed Oct. 15, 2010. http://justhealthaction.org/wp-content/uploads/2010/05/JHA-Lesson-Plan-3-How-are-equity-and-equality-different-final.pdf

Citation for this content: MPH@GW, the George Washington University *online Master of Public Health program*

MPH

MHA

Careers

About GW

Resources

Covid-19 Update

Legal

Terms of Use

REQUEST INFO

# Exhibit P
## H.B. 3391 Report to Legislature

**September 2018**

# ›› House Bill 3391 Reproductive Health Equity Act: Report to the Legislature

*Legislation requires a report from the Oregon Health Authority.*
*This report describes the progress made in carrying out House Bill 3391.*



PUBLIC HEALTH DIVISION
Reproductive Health Program

# Executive summary

## Overview of House Bill 3391

The Reproductive Health Equity Act (House Bill 3391) was passed in the summer of 2017. The basis for this landmark legislation is the idea that everyone deserves access to:

- Client-centered reproductive health education and counseling;
- High-quality clinical care;
- A broad range of contraceptive methods; and
- The right to become pregnant (or become a parent) without stigma or shame.

House Bill (HB) 3391 ensures that Oregonians have access to comprehensive reproductive health care regardless of their income, citizenship or immigration status, gender identity, or insurance coverage.

HB 3391:

- Expands coverage for reproductive health services for some uninsured individuals;
- Provides insured individuals with protections for reproductive health services with no cost sharing, such as co-pays or payments toward deductibles;
- Codifies the legal right to abortion; and
- Bans discrimination in the delivery of reproductive health services.

Oregon has long been a leader in enacting policies and programs that support access to high-quality reproductive health services. However, disparities persist in:

- Unintended pregnancy rates;
- Maternal and birth outcomes;
- Sexually transmitted infections (STIs); and
- Cervical cancer.

These disparities highlight structural and societal inequities that may inhibit

Upon signing, Governor Kate Brown said "To lead productive and thriving lives, Oregonians must have the ability to control their bodies and make informed decisions about their health. I am proud to sign legislation that expands access to basic reproductive health services for all Oregonians — regardless of where they live, where they come from, or how they identify as a person."

## Attorney Certificate of Service

I hereby certify that on September 12, 2023, I have made service of the foregoing **Declaration of Joseph D. Maughon in Support of Preliminary Injunction Motion** on the parties listed below in the manner indicated:

| | |
|---|---|
| BRIAN SIMMONDS MARSHALL #196129<br>Senior Assistant Attorney General<br>Department of Justice<br>100 SW Market Street<br>Portland, OR 97201<br>Tel (971) 673-1880<br>Fax (971) 673-5000<br>Brian.S.Marshall@doj.state.or.us<br>*Attorney for Defendants Oregon Department of Consumer and Business Services and Andrew W. Stolfi* | ☐ U.S. Mail<br>☐ Facsimile<br>☐ Hand Delivery<br>☐ Overnight Courier<br>☐ Email:<br>☒ Electronically via USDC CM/ECF system |
| ALEX C. JONES #213898<br>Department of Justice<br>100 SW Market Street<br>Portland, OR 97201<br>Tel (971) 673-1880<br>Fax (971) 673-5000<br>Alex.C.Jones@doj.state.or.us<br>*Attorney for Defendants Oregon Department of Consumer and Business Services and Andrew W. Stolfi* | ☐ U.S. Mail<br>☐ Facsimile<br>☐ Hand Delivery<br>☐ Overnight Courier<br>☐ Email:<br>☒ Electronically via USDC CM/ECF system |

DATED: September 12, 2023

JURISLAW LLP

/s/ Shawn Lindsay
Shawn Lindsay, OSB #020695
JURISLAW, LLP
Three Centerpointe Drive, Suite 160
Lake Oswego, OR 97035
Telephone: 503.968.1475
shawn@jurislawyer.com
*Attorney for Plaintiff*